UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

**CAPITAL CASE**

CIVIL ACTION NO. 06-CV-181-JBC

VICTOR DEWAYNE TAYLOR                                              PETITIONER

V.                              **MEMORANDUM OPINION AND ORDER**

THOMAS SIMPSON, Warden                                         RESPONDENT

* * * * *

Victor Dewayne Taylor is the petitioner in this Death Penalty habeas corpus proceeding filed under 28 U.S.C. § 2254.  In 1986, he was convicted of murdering Richard Stephenson and Scott Nelson on September 29, 1984 in Louisville, Kentucky.

Taylor's counsel has filed a motion [Record No. 8] seeking funds from this court for deoxyribonucleic acid ("DNA") retesting of physical evidence.  Taylor wants to conduct DNA testing on human spermatozoa collected from the body of Scott Nelson.  Warden Thomas Simpson, the respondent, has filed a response and objection to Taylor's motion for independent DNA testing [Record No. 9].

Taylor states that in April of 1986, when he was tried and convicted of two counts of murder and sentenced to death, DNA testing was not readily available. Taylor claims that he has made a preliminary showing of constitutional error and that a DNA test is reasonably necessary to support his claim for relief.

Taylor's request is based upon 18 U.S.C. §3599(2)(f).[1]  Under this statute, if a district court determines that "investigative, expert or other services are reasonably necessary for the representation of a defendant" charged with a crime punishable by death, it may authorize limited funding for such services.

### ISSUE PRESENTED

The issue is whether a DNA test is reasonably necessary to support Taylor's claims for relief by determining the origin of the seminal fluid found in the body of one of the victims. For the reasons set forth below, the court determines that this request must first be presented to the trial court.  Accordingly, the court will deny Taylor's motion.

### Factual History
### 1.  Taylor's Convictions and Appeals

Richard Stephenson and Scott Nelson, Louisville high school students, were on their way to a high school football game.  When they got lost and stopped at a fast food restaurant to ask directions, Wade and Taylor confronted them.  At Taylor's trial, the prosecution presented evidence in the form of a statement by Wade which indicated that he and Taylor kidnapped and robbed the two students.    Other witnesses testified that Taylor had a gun and forced the victims to get into their car

---

[1]Although the petitioner actually cited 21 U.S.C. §848(q)(4)(B) as authority for his request, §848 (q) is not now the operative statute, as it no longer contains the provision for funding requests for indigent habeas petitioners (provision repealed by Public Law 109-77, 120 Stat. 231, Title II, Sec. 221 (March 9, 2006)).   Such funding is now governed by 18 U.S.C. §3599 (f)and (g)(2).  Fees and expenses for investigative and other expert services authorized under subsection (f) may not exceed $7,500.00 unless the court certifies that excess payment is warranted.  §3599(g)(2).

and drive away. Witnesses Cecil Pepper and Dino Pace testified that they witnessed the abduction and followed the car a few blocks until it turned down a side street. Both Pepper and Pace identified Taylor as the gunman.

After reaching a secluded area, Taylor and Wade forced the victims to get out of the car. In his statement, Wade said that he and Taylor robbed the boys and that he removed the boys' trousers, bound their ankles, and gagged them in the alley. Taylor and Wade forced both of the victims to take off their clothes and hand over their personal property. The victims' tattered and partially clothed bodies were found early the next morning. An investigation ensued, and a few days later the police arrested Taylor and Wade. They were both charged with the murder, kidnapping, and robbery of Stephenson and Nelson.

Wade's statement was that Taylor decided to kill the two victims because he was afraid they would identify them. Wade said he waited on a nearby street while Taylor shot both boys in the head. Their bodies were found with a gunshot wound to the temple of each from point-blank range. An autopsy performed on both victims revealed human spermatozoa in the anus of one of the victims.

After a change of venue, Taylor and Wade were tried separately in Lexington in early 1986. Wade was found guilty of two counts of murder, kidnapping, and first-degree robbery, but was acquitted of sodomy. The jury recommended sentences of fifteen years on the robbery, twenty-two years on the kidnapping, and life imprisonment on the murders. All sentences were to run concurrently, and Wade was sentenced to life imprisonment.

Approximately one month after Wade was tried and convicted, Taylor was tried in the Fayette Circuit Court.   Taylor was convicted of two counts of murder, kidnapping, and first-degree robbery and one count of first-degree sodomy.   He received two death sentences for the murder convictions, two death sentences for the kidnapping convictions, and a total of sixty years' imprisonment for the two robbery counts and one sodomy count.

Taylor's conviction was affirmed on direct appeal.  *Taylor v. Commonwealth*, Ky., 821 S.W.2d 72 (1990) (as modified July 3, 1991) ("Taylor I"), *cert. denied*, 502 U.S. 1100,  and *cert. denied*, 502 U.S. 1121 (1992).   In *Taylor I*, the Kentucky Supreme Court vacated the two death sentences on the kidnapping charges on grounds that those sentences violated the U.S. and Kentucky constitutional provisions against double jeopardy.  *Id.* at 77.

Subsequently, Taylor filed a R. Cr. 11.42 motion to set aside the remaining judgments against him.  After an evidentiary hearing, the trial court denied the motion.  Taylor appealed that ruling to the Kentucky Supreme Court as a matter of right.  The Kentucky Supreme Court affirmed.  *See Taylor v. Commonwealth*, 63 S.W.2d 151 (Ky. 2001), *cert. denied*, 536 U.S. 945 (U.S., Ky., June 24, 2002) ("Taylor II").

In *Taylor II*, the Supreme Court affirmed numerous evidentiary rulings of the trial court.  In particular, it upheld a ruling admitting an out-of-court confession which George Wade gave to the police investigating the murders.   Wade's out-of-court

statement was part of the Commonwealth's case against Taylor.[2]  Wade's statement was not subject to cross-examination.  When the United States Supreme Court rendered *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), it abrogated that aspect of *Taylor II*.  *Crawford* held that admitting testimony like Wade's out-of-court statement violated the Sixth Amendment's Confrontation Clause, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Id*. at 1365.

Taylor then filed a motion in the trial court seeking a new trial, under C.R. 60.02, in which he asserted two grounds of relief.  First, Taylor argued that in light of *Crawford*, Wade's recanted testimony exculpated him from guilt.  Second, he argued that a juror's false responses to questions about her views on capital punishment during voir dire entitled him to a new trial.

In his C.R. 60.02 motion, Taylor also challenged as unconstitutional KRS 422.285, the Kentucky statute which governs the request for post-conviction DNA testing.  He alleged that the statute  infringed upon the state constitutional right of the judiciary to set court procedures.  The trial court rejected these arguments and denied the C.R. 60.02 motion.  The Kentucky Supreme Court affirmed the denial of

---

[2]In addition to Wade's out-of-court statement to police, various witnesses testified as to Taylor's commission of the murders.  The Kentucky Supreme Court rendered a detailed accounting of the witnesses' testimony in *Taylor I* and *II*.  This accounting included but was not limited to witness Eugene Taylor's testimony that he overheard Taylor admit to the murders the following day.  Witness Beverly Shackleford testified that on several occasions Taylor directly admitted to her that he had murdered the boys.  On one of these occasions, he tried to sell her one of the boys' class ring and school jacket.  Numerous personal effects of the victims were found in Taylor's two Louisville residences.  Additionally, forensic evidence linked Taylor to the murders.

the C.R. 60.02 motion.  *See Taylor v. Commonwealth*, 175 S.W. 3d 68 (Ky. 2005)
(as modified November 23, 2005) (" *Taylor III*" ).

In *Taylor III*, the Kentucky Supreme Court held that admission of Wade's out-of-
court statement was harmless error, given the abundance of other evidence against
Taylor.  It also held that the juror's failure to disclose, during voir dire, her reliance on
a biblical passage did not entitle Taylor to a new trial.  The Kentucky Supreme Court
agreed that KRS 422.285 is an unconstitutional encroachment of the Court's
rule-making prerogatives, *Taylor III*, 175 S.W. 3d at 77-78.  It nevertheless upheld the
statute under the doctrine of comity.  The Kentucky Supreme Court affirmed Taylor's
death sentences.  The Kentucky Supreme Court denied rehearing on November 23,
2005.  *Id.* [3]

## 2.  Petitioner's Argument

Taylor filed his § 2254 petition for writ of habeas corpus under § 2254 in this
court on June 2, 2006.  He filed his motion seeking funds for DNA testing on
September 11, 2006.  He states in his motion that William Morris Durbin, a forensic
serologist working for the Kentucky State Police at the Jefferson Regional Crime Lab,
testified at his trial that he (Durbin) performed serological testing on various items
submitted to him, including anal swabs from both of the victims.  Durbin testified as
follows:

Human spermatozoa were found on Exhibit 38, the anal swabs from

---

[3]There is no indication that Taylor filed a petition for writ of *certiorari* with the
United States Supreme Court after *Taylor III* was rendered.

Nelson, however, the quantity was too limited for conclusive A,B,O grouping tests

TE Trial 4/10/86, p. 123.

Taylor states that Durbin's exhibit 38 was never introduced into evidence and that Durbin's report indicated that swabs were consumed in the analysis. DNA testing has not been performed on the swab. Taylor argues that "some sort of a slide must have been made in order for the contents of the swab to have been examined under a microscope so that the determination could be made that human spermatozoa were present. This slide was never introduced into evidence, either." [Motion, p. 3]

Taylor extrapolates that the remainder of the anal swabs, and the slide containing the human spermatozoa, are still in the possession of the Kentucky State Police at the Jefferson Regional Crime Lab. He states that DNA testing was not employed in criminal investigations until after he was tried in March and April, 1986. He argues that conducting DNA testing on both the slide in question [Durbin's Exhibit 38] and the anal swabs from the victims is necessary, because DNA test results excluding him as the donor of human spermatozoa in Durbin's Exhibit 38 would have a profound effect, not only on the jury's finding that he was guilty of the murders, but also on the penalty that was ultimately assessed.

Taylor argues that a DNA test result which excludes him as the donor of the human spermatozoa would call into question his guilt on the first degree sodomy charge. He argues that the jury was swayed toward imposing the death sentence against him, and not co-defendant Wade, because it found that he (Taylor) had

-7-

sodomized Scott Nelson.

Taylor argues that his co-defendant, George Wade, was *acquitted* of sodomy in the first degree in his trial (which preceded Taylor's) and that Wade received a life sentence, even though the jury convicted him on all of the other charged offenses. Taylor contends that a DNA test result which exonerates him from the crime of sodomy "would undoubtedly undermine the reliability of the death sentences that were imposed in this case." [Motion, p. 4].

### 3. Commonwealth's Response [Record No. 9]

In its objection to the motion, the Commonwealth first contends that Taylor failed to fully exhaust his state court remedies. It argues that Taylor's motion under § 3599 amounts to nothing more than an effort to obtain DNA testing without complying with the specific disclosure requirements of KRS. 422. 285. The Commonwealth asserts, "By enacting KRS 422.285, Kentucky has demonstrated a compelling interest in satisfying itself of the guilt or innocence of its citizens through its own, appropriate DNA testing. Federal courts should accommodate that state interest by disallowing prisoners to avoid Kentucky's statutory scheme for DNA verification of guilt or innocence." [Record No. 9, p. 2].

Second, the Commonwealth argues that DNA testing is not reasonably necessary. The Commonwealth points to the fact that the jury found numerous other aggravating circumstances (such as robbery and multiple deaths) on which to base the death sentence for Taylor. The Commonwealth asserts that the sodomy conviction was only one of the aggravating circumstances which the jury found and used as a

basis for imposing the death penalty.  The Commonwealth argues that even if DNA testing revealed a result in Taylor's favor, the testing would not negate the death sentences in light of the existence of the other aggravating circumstances.

The Commonwealth further argues that there was overwhelming and substantial evidence which supported imposition of the death sentences.  The Commonwealth appended to its response the eighteen-page "Trial Evidence" section of one of its briefs filed in the Supreme Court of Kentucky (Taylor's appeal of the denial of his new trial and CR 60.02 motions, Case No. 2004-SC-018).  *See* Record No. 9, Appendix No. 1. That appendix discussed at length the testimony of numerous witnesses at Taylor's trial who testified as to Taylor's commission of the murders.  The Commonwealth summarized the most pertinent testimony [Record No. 9, page 5].

The Commonwealth contends that DNA testing would not exonerate Taylor.[4] The Commonwealth argues that any results of a DNA test will not conclusively establish that Taylor did not sodomize the victims.  It argues that instead of completely *excluding* Taylor, the test, if conclusive, would merely provide a basis for an expert to form an opinion *to include* others.

### 4.  Kentucky's Innocence Protection Statute

---

[4]The Commonwealth argues that "While the anal swab of Christopher Scott Nelson did have human spermatozoa, even if a DNA test did not conclusively match the spermatozoa to Petitioner, same would not conclusively show actual innocence of all the crimes herein as the petitioner acknowledged to Jeffrey Brown that George Wade also sodomized Nelson (and each also sodomized Stephenson although no spermatozoa was found).  That evidence is in addition to other evidence implicating Petitioner, including his own admissions to third parties." [Record No. 9, p. 4]

Over the last several years, "innocence protection" statutes have been enacted in thirty-eight states and the District of Columbia.  These newly enacted laws allow prisoners to pursue post-conviction DNA testing on biological evidence to establish their actual innocence.  These statutes were implemented to prevent destruction of lawful evidence and to combat the absence of any specific constitutional duty to preserve such evidence.  Such statutes emerged from a national reform effort.  In late 2004, the Federal Innocence Protection statute was enacted.  *See* 18 U.S.C.A. §3600 (2004).

While the statutes differ substantially from state to state, all of the statutes have some common provisions.

> "Generally, innocence protection statutes permit a convicted prisoner to petition the court for DNA testing of biological evidence in the possession of the government, notwithstanding the expiration of the normal time period for post-conviction litigation under applicable court rules and local statutes. Innocence protection statutes also authorize the court to order the government to make the still-existing biological evidence available for DNA testing if the prisoner meets the statutory qualifications.  To qualify for DNA testing under most innocence protection statutes, the prisoner's petition for testing must aver that the identity of the perpetrator was a disputed issue at trial, and the petition must include a declaration that there still exists biological evidence that was collected by the government in the original investigation which has been maintained by the government with a proper chain of custody.  Finally, the petition for testing must state that DNA analysis of the evidence would demonstrate that the prisoner is actually innocent or would not have been convicted. The recently-enacted Federal Innocence Protection statute has similar provisions."

42 *American Criminal Law Review*, 1239, 1251 [Citations omitted].

In 2002, Kentucky enacted  its innocence protection statute, KRS 422.285. This statute allows a person convicted of, and sentenced to death for, a capital

offense to request DNA testing of any evidence in the possession of the Commonwealth, provided that certain preliminary issues are resolved, *e.g.*, condition of the evidence.  There are also notice provisions contained in the statute that require a petitioner to inform the Commonwealth of the testing and grant it access to the laboratory reports.[5]

---

[5]KRS. 422.285 provides as follows:

(1) At any time, a person who was convicted of and sentenced to death for a capital offense and who meets the requirements of this section may request the forensic deoxyribonucleic acid (DNA) testing and analysis of any evidence that is in the possession or control of the court or Commonwealth, that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

(2) After notice to the prosecutor and an opportunity to respond, the court shall order DNA testing and analysis if the court finds that all of the following apply:

(a) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing and analysis;

(b) The evidence is still in existence and is in a condition that allows DNA testing and analysis to be conducted; and

(c) The evidence was not previously subjected to DNA testing and analysis or was not subjected to the testing and analysis that is now requested and may resolve an issue not previously resolved by the previous testing and analysis.

(3) After notice to the prosecutor and an opportunity to respond, the court may order DNA testing and analysis if the court finds that all of the following apply:

(a) A reasonable probability exists that either:

1. The petitioner's verdict or sentence would have been more favorable if the results of DNA testing and analysis had been available at the trial leading to the judgment of conviction; or

2. DNA testing and analysis will produce exculpatory evidence;

(b) The evidence is still in existence and is in a condition that allows DNA testing and analysis to be conducted; and

(c) The evidence was not previously subject to DNA testing and analysis or was not subjected to the testing and analysis that is now requested and that may resolve an issue not previously resolved by the previous testing and analysis.

(4) If the court orders testing and analysis pursuant to subsection (2) of this section, the court shall order the responsibility for payment, if necessary.  If the court orders testing and analysis of this section pursuant to subsection (3) of this section, the court shall require the petitioner to pay the costs of testing and analysis, if required by KRS 17.176. If the court orders testing and analysis under subsection (2) or (3) of this section the court shall appoint counsel to those petitioners who qualify for appointment under KRS Chapter

-11-

### 5. State Court DNA Litigation in Instant Proceeding

Taylor states that he sought independent DNA testing while his case was pending in the state courts. Specifically, Taylor states that he filed an *ex parte* motion for funds for DNA testing prior to the effective date of KRS 422.285. He alleges that when that motion had not been ruled upon after approximately nine months, he filed

---

31.

    (5) If the prosecutor or defense counsel has previously subjected evidence to DNA testing and analysis, the court shall order the prosecutor or defense counsel to provide all the parties and the court with access to the laboratory reports that were prepared in connection with the testing and analysis, including underlying data and laboratory notes. If the court orders DNA testing and analysis pursuant to this section, the court shall order the production of any laboratory reports that are prepared in connection with the testing and analysis and may order the production of any underlying data and laboratory notes.

    (6) If a petition is filed pursuant to this section, the court shall order the state to preserve during the pendency of the proceeding all evidence in the state's possession or control that could be subjected to DNA testing and analysis. The state shall prepare an inventory of the evidence and shall submit a copy of the inventory to the defense and the court. If the evidence is intentionally destroyed after the court orders its preservation, the court may impose appropriate sanctions, including criminal contempt.

    (7) The court may make any other orders that the court deems appropriate, including designating any of the following:

        (a) The preservation of some of the sample for replicating the testing and analysis; and

        (b) Elimination samples from third parties.

    (8) If the results of the DNA testing and analysis are not favorable to the petitioner, the court shall dismiss the petition. The court may make further orders as it deems appropriate, including any of the following:

        (a) Notifying the Department of Corrections and the Parole Board;

        (b) Requesting that the petitioner's sample be added to the Kentucky State Police database; and

        (c) Providing notification to the victim or family of the victim.

    (9) In a capital case in which the death penalty has been imposed, notwithstanding any other provision of law that would bar a hearing as untimely, if the results of the DNA testing and analysis are favorable to the petitioner, the court shall order a hearing and make any further orders that are required pursuant to this section or the Kentucky Rules of Criminal Procedure.

a motion to declare KRS 422.285 unconstitutional. The trial court never explicitly ruled on Petitioner's *ex parte* motion for funds for independent DNA testing.

The motion was implicitly overruled when the trial court denied Taylor's motion for a new trial and his motion to declare KRS 422.285 unconstitutional.  On appeal, Taylor argued that KRS 422.285 is unconstitutional because it encroached upon the rule-making powers assigned to the judiciary in violation of the separation-of-powers provisions in Sections 27 and 28 of the Kentucky Constitution.   As noted, the Kentucky Supreme Court held that KRS 422.285 violated the Kentucky Constitution but chose to follow the statute as a matter of comity.  *Taylor III,* 175 S.W. 3d at 77.

<u>DISCUSSION</u>
1.  <u>Claim Has Not Been Exhausted</u>

One may not seek federal habeas corpus relief until he has exhausted his state judicial remedies.  *Morris v. Wing*, 421 F.2d 651 (6th Cir. 1970).  A federal court will ordinarily not review an issue in a habeas corpus petition unless the petitioner has first exhausted the claim before the state court, as the state court should normally have an opportunity to pass on the constitutional claim prior to federal habeas review.   28 U.S.C. § 2254(b); *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18 (1981).

 The state court is the most appropriate forum to resolve factual issues in the first instance.  *Eaton v. Angelone*, 139 F.3d 990, 995 (4th Cir.1998) (state fact-finding processes should not be supplanted by repetitive federal proceedings); *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425-26 (6th Cir.2003).  As a matter of comity, a federal court should not consider a constitutional claim as long as a

petitioner has an available state forum.  *Bowen v. Tennessee*, 698 F.2d 241 (6th Cir. 1983); *Rose v. Lundy*, 455 U.S. 509 (1982).

The court must first determine whether Taylor has exhausted his claim in state court.  *Prather v. Rees*, 822 F.2d 1418, 1420 (6th Cir.1987).  In the Sixth Circuit, a habeas petitioner is usually required to present his habeas claims to the state's highest court (here, the Kentucky Supreme Court) in order to exhaust his available state judicial remedies.  *Silverburg v. Evitts*, 993 F.2d 124 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 485 (6th Cir. 1990).  A petitioner has exhausted when he has presented the substance of the claim to the highest court in the state.  *Prather*, 822 F.2d at 1420.

In this case, the highest appellate court in Kentucky has determined that Kentucky's statutory procedure for obtaining post-conviction DNA testing, enumerated in KRS 422. 285,  is constitutional.  Although the Kentucky Supreme Court determined that KRS 422.285 infringed on that court's constitutional rule-making power, it upheld the statute and its disclosure requirements.  The Kentucky Supreme Court concluded that the testing process outlined in the statute could be "'tolerated in a spirit of comity' because it does not unreasonably interfere with the 'orderly functioning of the courts.'"  *Taylor*, 175 S.W.3d at 77 (citing *Commonwealth v. Render*, 734 S.W.2d 794, 797 (Ky. 1987).[6]

---

[6]The Kentucky Supreme Court explained its decision to extend comity to KRS 422.285, and therefore uphold the statute as constitutional:  "Principles of comity enjoy a strong history in our Commonwealth and in this nation, and remain a sound rule of law . . . In *O'Bryan v. Hedgespeth* we expressed it thusly:  'Comity, by definition, means the

Here, while Taylor filed an *ex parte* motion in the trial court *prior* to the enactment of KRS 422.285, he has clearly not filed a motion in the trial court requesting  DNA testing under the specific statutory framework of KRS. 422.285. Instead, he challenged the constitutionality of the statute in the Kentucky state courts.

A year has now passed since the Kentucky Supreme Court rendered its opinion in *Taylor III*, yet the record does not reflect that Taylor has applied to the trial court for post-conviction DNA testing under KRS 422.285.  He has instead asked this court to award him funds under §3599 to conduct his own independent post-conviction DNA testing, and thus dispense with the process laid out in KRS 422. 285.  Essentially, he asks this court to authorize him funds to enable him to proceed with post-conviction DNA testing under a different, or more  preferable, framework.

Taylor must first seek post-conviction DNA testing in the trial court under the process prescribed in Kentucky's innocence statute, KRS 422.285.  Only after that process runs its course in state court can Taylor avail himself of a habeas corpus remedy in this court.  In order for a claim to be considered exhausted, it must be "fairly presented to the state courts," which means "that both the operative facts and the controlling legal principles must be presented to the state court." *Matthews v. Evatt*, 105 F.3d 907, 910-11 (4th Cir.1997) (internal quotations omitted).

As the Kentucky Supreme Court observed in *Taylor III*, "It is  important to note

---

judicial adoption of a rule unconstitutionally enacted by the legislature not as a matter of obligation but out of deference and respect.'" *Taylor*, 175 S.W.3d at 77.

that Taylor did not move the trial court to grant deoxyribonucleic acid (DNA) testing as provided for in the statute.  Instead, he sought a declaratory judgment that the statute was unconstitutional." *Taylor v. Commonwealth*, 175 S.W.3d at 75.

Requiring Taylor to proceed in the trial court promotes an important goal: judicial economy.  In light of the Kentucky Supreme Court's having determined that KRS 422.285 was a constitutional process for post-conviction DNA testing, the trial court must first evaluate Taylor's request for DNA testing.  Specifically, the trial court can order post-DNA testing if it first determines that "reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing and analysis."  KRS 422.285(2)(a).

Once that hurdle is met, the trial court may next need to conduct an evidentiary hearing on the  critical  issue of whether the anal swabs and/or slides which Durbin examined  before the 1986 trial are even susceptible to the type of DNA testing which Taylor now seeks.  If the trial court allows the testing to proceed, reports from the tests must be filed.  Expert testimony may be necessary, and a factual record must be developed before this court can address any issues relating to post-conviction DNA testing.

*Bryant v. Greiner*, 2006 WL 1675938 (S.D.N.Y., June 15, 2006), which involved a similar fact pattern, guides this court's disposition of Taylor's motion for funding under §3599.  In 1998, Bryant was convicted of murder in the second degree and sentenced to twenty-five years to life in prison.  He filed a habeas petition in

-16-

federal court under § 2254.  In November of 2005, Bryant asked the federal court to hold his petition in abeyance in order to allow him to exhaust additional claims in the state courts or grant him permission to withdraw the petition and re-file once he exhausted all state remedies.

Bryant argued in his § 2254 petition that he had been denied access to DNA evidence that would prove his innocence.  During the police investigation of the murder at issue, investigators took swab samples of semen from the body of the victim, but the DNA in the semen "was never tested in a way that could specifically determine the source of the sperm or match the sperm to a particular person." *Bryant*, at * 1.  None of the forensic evidence, as tested at the time, inculpated Bryant. *Id*.  The tests undertaken showed that "someone else was involved," but no DNA matching tests were performed.  All other evidence against Bryant was circumstantial.  None of the three witnesses for the prosecution saw the murder but testified they had seen Bryant either before or after the incident. *Id*.

The court noted that under 28 U.S.C. § 2254(b)(1)(A), federal courts could not consider a petition for habeas corpus unless the petitioner had exhausted all state judicial remedies. Finding that Bryant had presented the three claims listed in his original § 2254 petition to the state courts at all levels, the court concluded that the three claims had been fully exhausted in state court. *Id*. at * 3.  Because Bryant had not submitted his request for DNA testing to the state court, that issue had not been exhausted in the state court.

-17-

The court cited the Antiterrorism and Effective Death Penalty Act ("AEDPA"), under which Congress significantly altered the proceedings for habeas corpus petitions, imposing a one-year statute of limitations and minimizing the grounds for second and successive petitions. 28 U .S.C. § 2244.  The court further noted that although the one-year statute of limitations is tolled while state court post-conviction relief is pursued, 28 U.S.C. § 2244(d)(2), it is not tolled while a habeas petition is pending in federal court.  *Duncan v. Walker,* 533 U.S. 167 (2001).  Faced with the exhaustion requirement, the court concluded that If Bryant's petition were withdrawn to allow him to exhaust his DNA-related claim, any new petition he filed would be barred.

The *Bryant* court thus implemented a "stay and abeyance" procedure which the Second Circuit employed in *Zarvela v. Artuz*, 254 F.3d 374, 380 (2d Cir.) *cert. denied sub nom Fischer v. Zarvela*, 534 U.S. 1015 (2001),[7] and which the Supreme Court substantially endorsed in *Rhines v. Weber*, 125 S. Ct. 1528, 1535-36 (2005).[8]  Under this procedure, the federal court conditionally stays the § 2254 proceeding to allow the

_____

[7] In *Zarvela*, the Second Circuit determined that the "only appropriate course ... where an outright dismissal 'could jeopardize the timeliness of a collateral attack,'" would be to stay the proceedings on the exhausted claims until the petitioner either pursued exhaustion or dropped his unexhausted claims.  *Zarvela*, 254 F.3d at 380 (quoting *Freeman v. Page*, 208 F .3d 572, 577 (7th Cir.2000)).

[8] In *Rhines*, the Supreme Court outlined some additional requirements a petitioner must meet in order to be granted a stay of a habeas petition while exhausting state remedies for new claims. "(1) [A] stay should not be granted where the unexhausted claim is meritless; (2) 'stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court,' . . . (3) a 'mixed petition should not be stayed indefinitely,' and 'district courts should place reasonable time limits on a petitioner's trip to state court and back,' . . . and (4) 'if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all."  *Rhines*, 125 S.Ct. at 1535.

petitioner "'a limited period to initiate exhaustion, and a similarly limited time to return to the district court once the claims had been exhausted.'" *Bryant* at *3 (citing *Zarvela*, 254 F.3d at 380-81 (suggesting thirty-day intervals). The *Bryant* court reasoned that this approach would prevent a §2254 petitioner from taking "an undue amount of time to pursue state court remedies," *Bryant* at *3.

In order to determine whether a "stay and abeyance" was warranted, the *Bryant* court analyzed the propriety of granting the conditional stay, to allow Bryant to seek DNA testing in state court, under the four-part test established in *Rhines*. The *Bryant* court first determined that Bryant's unexhausted claim regarding the DNA testing was not plainly meritless. In reaching that determination, the court rejected the argument raised by Bryant's custodian (the Respondent in his §2254 petition) that given the other substantial evidence against him, Bryant's attempt to exonerate himself with DNA evidence would be unsuccessful. *Bryant*, at *4.[9]

The *Bryant* court noted that a New York statute allowed testing if there was a "'reasonable probability' the verdict would have been more favorable to the defendant and were exculpatory." *Bryant*, at *5.[10]   In evaluating whether the claim was "plainly meritless," the court cited Second Circuit precedent which required that the New York

_____

[9]This is the primary argument that the instant respondent now raises. The respondent argues that the evidence against Taylor is so overwhelming that the result of a DNA test would not exonerate him from the two murder convictions and the resulting death sentences. The respondent argues this is the case even if DNA test results excluded Taylor as the donor of the spermatozoa and as the perpetrator of the sodomy.

[10]The New York statute referenced was NYCPL §440.30(1-a). The provisions of this statute are similar to KRS.422.285(2)(a), which allows for DNA testing if a "'reasonable probability' exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing and analysis."

courts be given "the first chance to review their alleged errors so long as they have not authoritatively shown that no further relief is available." *Id.* (Citations omitted).

> In upholding the stay-and-abeyance procedure, the Supreme Court emphasized that "the interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's claims." Rhines, 125 S.Ct. at 1533. The "plainly meritless" standard sets a low bar for precisely this reason. *Id.* at 1535. The Court finds that Bryant has established that his DNA-related claim is not plainly meritless.

*Bryant*, at *5.

The court determined that Bryant had established good cause for failing to exhaust his DNA claims. *Id.* at *5-7. The court concluded that "external factors," including but not limited to the fact that a DNA-matching test had not been performed because it had to be "better perfected," contributed to Bryant's inability to exhaust his claim at an earlier juncture. *Id.* at *6.

In Taylor's case, the murders were committed in 1984 and the trial was held in 1986, long before DNA testing was employed as a means of identification. Taylor states that he first sought DNA testing prior to the enactment of KRS 422.285, which occurred in 2002. The Commonwealth disputes neither this fact nor the fact that the trial court did not immediately rule on the pre-2002 request for DNA testing.

In fact, it appears to be undisputed that while the motion for post-conviction DNA testing was pending in the trial court, the Kentucky General Assembly enacted KRS 422.285. Taylor then challenged the constitutionality of that statute. That challenge ended on November 23, 2005, when the Kentucky Supreme Court denied rehearing.

There was obviously an almost nine-month delay between November, 2005, and September 11, 2006 (the date on which the petitioner filed the motion in this court). This case has spanned over twenty-two years. In the absence of more specific factual information in the trial court record, this court is unable to conclude that Taylor's failure to ask the trial court for DNA testing under KRS 422.285 within a nine-month period was inexcusable.

Under the exhaustion doctrine, remand of this matter to the trial court will provide better insight as to whether Taylor waited too long to file his initial request for DNA testing. In addition to determining if DNA testing can even be accomplished, the trial court may need to consider the evolution of DNA testing in reference to the time lines of this case (between 1986 and when the first DNA motion was filed in the trial court) *if* it first determines that DNA testing is warranted in Taylor's case.[11] Testimony from experts may be needed on these matters, which might affect Taylor's

---

[11] For instance, *Cherrix v. Braxton*, 131 F.Supp.2d 756 (E.D. Va. 2001), the case Taylor cites, discussed that Polymerase Chain Reaction ("PCR") DNA testing was available at least by 1994. There, Petitioner Cherrix argued that a PCR test could not amplify the spermatozoa fractions and identity of the assailant who sodomized the murder victim and left the seminal fluid in her body. *Id.* at 760. In Cherrix' § 2254 petition, he argued that by 2000, DNA technology had significantly advanced and improved. Cherrix sought DNA testing under the newer method, Short Tandem Repeat ("STR") DNA test and the Mitochondrial Test. Cherrix argued that the newer STR test could render a conclusive opinion by evaluating substances other than spermatozoa that are contained within seminal fluid, such as epithelial cells and white blood cells. *Id.* at 761.

In a footnote, *Cherrix* mentioned *Hunt v. McDade*, 205 F.3d 1333, 2000 WL 219755, *3 (4th Cir.2000) (unpublished). *Cherrix*, 131 F. Supp.2d at 675. *Hunt* stated that in cases where individuals have been exonerated post-conviction through use of DNA, there were only single assailants. *Hunt* at * 3. In *Hunt*, multiple assailants were involved in the crime. In Taylor's case, two assailants were involved.

actual innocence claim on the sodomy charge.[12]

In his motion, Taylor relies on *Cherrix*, where the Virginia district court granted the request for DNA testing funds under 21 U.S.C §848(q)(9). There is an important distinction between *Cherrix* and Taylor's case.  In *Cherrix*, the district court granted the request for DNA testing because "Virginia law does not have a post-conviction mechanism for Cherrix to present his request, or even to present the newly-discovered rest results. " *Cherrix*, 131 F.Supp.2d at 767.  Here, Kentucky has such a mechanism.

For this court to entertain the issue of post-conviction DNA testing at this juncture would require the court to engage in unnecessary speculation and/or issuing an advisory opinion.  Because Taylor has available to him a  mechanism under state law (KRS 422.285) through which he can seek post-conviction DNA testing, authorization of funds under 18 U.S.C. §3599(2)(f) is not reasonably necessary at this time.

### 6.  Taylor Has No Liberty Interest in a More "Preferential" Post-Conviction DNA Testing Process

---

[12] *Cherrix* found it critical that although DNA testing had been conducted during the 1994 murder investigation, Cherrix's trial counsel had failed to request new DNA testing in 1997 *after* Cherrix had become a suspect and *after* DNA testing had significantly advanced.  *Cherrix*, 131 F. Supp.2d at 769-770.  The court noted that "The seminal fluid was the Commonwealth's most important evidence of sexual activity in connection with the murder. *Without proof of the sexual assault, the murder may not have been capital murder.  Id.*, n.12 (Emphasis added).

Taylor makes the same argument in his motion for funds.  He argues that co-defendant Wade was acquitted of sodomy and received only a life sentence.  While the court expresses no opinion on this issue in Taylor's case, it would be but one of several issues for the trial court to consider in determining whether DNA testing is warranted under KRS 422.285.  *Cherrix* authorized funds for DNA testing to determine if Cherrix had an ineffective-assistance-of-counsel claim under the Sixth Amendment.  Again, Virginia law provided no means to obtain post-conviction DNA testing.

Taylor objects to the fact that under KRS 422.284, the results of DNA testing must be disclosed to the Commonwealth. Taylor asks the court to award him funds to conduct his own independent DNA test, which would excuse him of the compliance features of KRS 422.285. He contends that he is entitled to DNA testing without being required to disclose the results. The weakness in this argument is that it presupposes that Taylor has a constitutionally protected liberty interest in *any* post-conviction DNA testing at all.

KRS 422.285 does not *guarantee* post-conviction DNA testing to every defendant convicted of capital offenses. As noted, it only sets forth the criteria for determining whether such testing is warranted. As the court has noted, the trial court can order post-DNA testing only if it first determines that "[a] reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing and analysis." KRS 422.285(2)(a).

A defendant has no constitutionally protected right to post-conviction DNA testing. *See Sedley Alley v. William R. Key, et al*, 431 F. Supp.2d 790 (W.D. Tenn. 2006), *aff'd*, 2006 WL 1313364 (6th Cir. (Tenn.) May 14, 2006) (Not selected for publication in the Federal Reporter). Sedley Alley, a Tennessee Death Row inmate, filed an action pursuant to 42 U.S.C. § 1983. Alley alleged that his rights under the Eighth, Ninth, and Fourteenth Amendments of the Constitution of the United States were violated when he was denied post-conviction DNA testing. He grounded his claim on both procedural due process and substantive due process.

The district court rejected both of Alley's arguments. On the procedural due

-23-

process claim, the court concluded that Alley had failed to show that the life interest which he asserted bestowed upon him "the post-conviction legal right to access or discover the evidence relating" to his conviction."   *Alley*, 341 F. Supp. 2d at 801 (citing *Harvey v. Horan*, 278 F.3d 370, 388 (4th Cir. 2002) (King, J., concurring)). The district court thus determined that Alley had no right, under state law,  to the evidence.  The district court found it relevant that no court had concluded that federal law encompasses such a right.

In rejecting Alley's substantive due process claim, the court reiterated that Alley had no constitutionally protected right to *post-conviction* access to the evidence. Specifically, the court opined that to impose such a right would be "an exercise of constitutional divination . . . imprudently undertaken by this Court."  *Id.*  at 802.  The court rejected Alley's argument that the state officials' conduct in denying him access to the crime scene evidence "shocked the conscience" in violation of the Constitution, again noting that there was no "demonstrable state or federal entitlement to post-conviction release of the evidence on demand."  *Id.*

Finally, the district court found that Alley had no substantive due process right of access to the evidence to establish his actual innocence during clemency proceedings.  The court cited *Workman v. Summers*, 111 Fed. Appx. 369, 371 (6th Cir.2004), which held that there is "no constitutional right to clemency proceedings."

One month later, the Sixth Circuit affirmed the district court, stating as follows:

 "*Specifically, we concur with the district court's finding that Alley enjoys no procedural due process right to post-conviction DNA testing.* Nor does Tennessee's Post-Conviction DNA Analysis Act create such a

-24-

right.   Tenn. Code Ann. § 40-30-301 et seq.   *The state-imposed requirements for securing DNA analysis under the Act do not themselves create any unconstitutional deprivation.*   Finally, Alley was not deprived of his right under state law to petition for DNA analysis.  His petition was simply denied under state law."

*Alley v. Key*, 2006 WL 1313364, *2 (6th Cir. (Tenn.) May 14, 2006) (Emphasis Added).[13]

The Sixth Circuit reinforced that point by rejecting another claim which Alley raised.  Alley had argued that the pre-trial disclosure burden on the government, set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), extended into the post-conviction era, and obligated state officials to turn over the evidence for DNA testing.  The Sixth Circuit held that "*Brady* cannot be said to reach post-conviction access for DNA testing in the circumstances presented by the case before us."  *Alley*, 2006 WL 1313364 at 2.

<u>CONCLUSION</u>

For the reasons set forth above, Petitioner Victor Taylor's "Motion for Funds for DNA testing, and Request for Hearing on Motion" [Record No. 8] is **DENIED** as premature.  Taylor should submit his request to the trial court for consideration, and if unsuccessful there,  he must fully exhaust the issue through the state courts.  Accordingly, it is unnecessary  to address the Commonwealth's other arguments against § 3599 funding for DNA testing.

The court will adopt the "stay and abeyance" procedure employed in *Bryant* and

---

[13]Tennessee's Innocence statutory scheme is set forth in Tenn. Code Ann, § 40-30-301 through § 313.  While it is unnecessary for the court to provide or discuss this statutory scheme in detail, the scheme is relatively similar to Kentucky's innocence statute, KRS 422.285.

*Zarvela*.  Taylor's motion for funds for DNA testing under § 3599(2)(f) is **STAYED** to allow him to exhaust his DNA-related claims in state court.  Taylor must return to the district court within thirty days after a final state court decision as to DNA testing motion.  If Taylor fails in complying with these conditions, the court will vacate the stay *nunc pro tunc*. *See Zarvela*, 254 F.3d at 381-82.

Signed on January 17, 2007

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY