UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

**CAPITAL CASE**

CIVIL ACTION NO. 06-CV-181-JBC

VICTOR DEWAYNE TAYLOR                                                               PETITIONER

V.                           **MEMORANDUM OPINION AND ORDER**

THOMAS SIMPSON, Warden                                                             RESPONDENT

\* \* \* \* \*

The Petitioner, Victor Dewayne Taylor, has moved for independent DNA testing of certain exhibits, or alternatively, for an evidentiary hearing relative to those exhibits, R. 27.

The Respondent, Thomas Simpson, has moved to expand the record, R. 33.

Because Taylor has not demonstrated that an expert's services are reasonably necessary for his representation with respect to independent DNA testing, the court will deny Taylor's motion seeking funds for independent DNA testing, as well as his alternative motion for a hearing. The court will grant Simpson's motion to expand the record to include material from both Taylor's state-court criminal trial and the trial of Taylor's co-defendant, George Wade.

**BACKGROUND**

In 1986, Taylor was convicted in the Fayette Circuit Court of murdering Richard Stephenson and Scott Nelson on September 29, 1984, in Louisville, Kentucky. In addition to the two murder convictions, Taylor was convicted of kidnapping, first-degree robbery, and one count of first-degree sodomy. He was sentenced to death on each of the murder charges and twenty years' imprisonment on each of the other charges. Taylor's

co-defendant, George Wade, tried separately, was acquitted of sodomy in the first degree and convicted on all of the other charged offenses and received a life sentence.

When Nelson and Stephenson's bodies were discovered in 1984, their pants were missing and the medical examiner collected anal swabs to search for evidence of sexual activity. William Morris Durbin, a forensic serologist at the Jefferson Regional Crime Lab, testified that he found human sperm on the anal swabs from Scott Nelson, but that he found no sperm on the swab of Richard Stephenson. Durbin identified the anal swab for Nelson as Exhibit No. 38 and created slides from the swab for his testing (Exhibit Nos. 38-1 and 38-2). Durbin's pre-trial serological testing on the swab, to determine ABO blood grouping, failed to produce any result because, Durbin testified, the quantity of sperm was too small for grouping tests. With regard to the swabs themselves, Durbin noted in his report that they were consumed as part of his testing. Taylor's 1986 trial pre-dated modern DNA testing.

In June of 2006, Taylor filed this § 2254 petition for a writ of habeas and requested funds to conduct DNA testing on the anal swab. In January of 2007, this court ordered Taylor to pursue his state remedy under KRS 422.285 to obtain DNA testing; remanded the matter to the trial court; and abated this habeas proceeding until Taylor fully exhausted his state court remedies.

The trial court granted Taylor's request for post-conviction DNA testing and directed the Commonwealth to provide Taylor with a written inventory of items that could be tested for DNA materials. The Commonwealth produced an Inventory of evidence, which listed "Exhibit 38: Anal swab from [one of the victims in this case].

Sometime later, the Commonwealth informed Taylor and the trial court that it had

conducted its own DNA testing on one of the two slides remaining from the anal swab, Exhibit 38-1, contrary to the trial court's previously entered preservation-of-evidence order. The Commonwealth sent one of the slides to Orchid Cellmark Laboratory, and the report indicated it was unsuccessful in obtaining results from its testing. Therefore, one slide remained, and Taylor sought to have it tested under a new form of DNA testing known as mini-Short Term Repeat ("mini-STR") by Bode Technology Group.

The trial court subsequently modified its previous preservation order and directed the Kentucky State Police Jefferson Regional Laboratory to send all evidence related to the anal swabs

> collected from [one of the victims in this case] (KSP exhibit 38); including, if they exist, the anal swabs, all slides developed from the anal swabs, any sticks that were originally part of the anal swabs, any packaging that has been used to hold the anal swabs or slides, and any containers that have been used to process the anal swabs; to Bode Technology Group ... where it shall be subjected to mini-STR DNA testing and analysis.

Bode Technology Group was unable to develop a DNA profile from the two slides submitted by the Commonwealth (one of which had already been subjected to testing by the Commonwealth). Taylor then requested an evidentiary hearing to determine why the Commonwealth had not also sent the anal swab listed in its inventory of evidence to Bode Technology Group, and arguing that a hearing was needed regarding the Commonwealth's testing of one of the slides. The trial court denied Taylor's motion for an evidentiary hearing and dismissed his proceeding. Taylor appealed, but the Supreme Court of Kentucky affirmed the trial court's ruling. *Taylor v. Commonwealth*, 291 S.W.3d 692 (Ky. 2009).

**DISCUSSION**
**1. Taylor's Motion for Funds for Independent**

### DNA testing, or Evidentiary Hearing

Taylor's motion for testing funds or a hearing will be denied because he has not shown the need for such testing. In his motion, Taylor again seeks funds to employ an expert to conduct DNA re-testing of physical evidence on the sperm collected from Nelson's body. Alternatively, he requests a hearing to determine what happened to the anal swabs the medical examiner obtained from Nelson's body. Taylor contends that although the Commonwealth's Inventory expressly listed the anal swabs as in its possession, and despite the trial court's order that all of the Commonwealth's evidence related to Exhibit 38 be tested for possible DNA, the Commonwealth did not send the anal swabs, the evidence most likely to produce a DNA result.

Taylor contends that even if the swabs were "consumed" during serological testing in 1984, that does not mean that they were "destroyed" for DNA testing purposes. Taylor asserts that given today's technology advancements, not available in the mid 1980's, lab technicians could extract DNA from the cotton fibers of the swab. He argues that independent DNA testing of the swabs is reasonably necessary, as favorable results would exclude him as the donor of the sperm collected from Nelson and thus call into question his conviction and the death sentences imposed against him.

Simpson argues that despite an apparent clerical error contained in the Inventory, neither funding nor a hearing is warranted. He contends that in Taylor's initial state-court petition for DNA testing, he acknowledged his understanding that the swabs had been consumed during their analysis prior to the trial and that only the slides existed.

Taylor has not demonstrated either that an expert is reasonably necessary regarding DNA testing on the anal swab, or that his position cannot be fully developed without expert

4

assistance.  The Kentucky Supreme Court correctly determined that because the record established that neither the trial judge nor counsel for either party presumed any actual swabs were still in existence, further DNA testing and evidentiary hearings were unnecessary.  See 18 U.S.C. § 3559(f); *Foust v. Houk*, No. 1:06cv2625, 2008 WL 162786, at *4 (N.D. Ohio Jan.15, 2008).  "Expert services are 'reasonably necessary' when 'a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without professional assistance.' " *Powell v. Kelly*, 492 F. Supp.2d 552, 557 (E.D. Va.2007) (quoting *Wright v. Angelone*, 151 F.3d 151, 163 (4th Cir. 1998)).

The trial court determined that the anal swab which Taylor sought to have tested, Exhibit 38 as identified in Durbin's lab report, no longer existed.  On appeal, the Kentucky Supreme Court addressed two issues:  (1) whether the anal swab was in existence, and (2) the Commonwealth's pre-emptive testing of one of the slides, a technical violation of the trial court's order directing that all evidence be preserved. While noting that the Inventory referred to "swabs," the Kentucky Supreme Court explained that the trial court's order clearly contemplated that the swabs may not have existed, because it directed the Jefferson Regional Laboratory "to send all evidence related to the anal swabs . . . including, *if they exist*. . .  The anal swabs, all slides developed from the anal slides. . . ." *Taylor*, 291 S.W. 3d at 695 (emphasis added).[1]

---

[1]

The court explained the issue as follows:

**Despite the fact that the Commonwealth's inventory of evidence copied a portion of the lab report prepared for the original trial in this case, a review of the record demonstrates that the parties understood that the anal swab had**

5

The court distinguished Taylor's claims from *Arey v. State*, 400 Md. 491, 929 A.2d 501 (2007). In *Arey*, a lower court dismissed the appellant's petition for testing based on a police officer's representation that it was reasonable to conclude the evidence at issue no longer existed. The Maryland appellate court reversed. The Kentucky Supreme Court concluded that *Arey* did not apply because the record demonstrated that the parties understood there were only two slides remaining, and because Durbin's lab report said the anal swab was consumed in testing. *Taylor*, 291 S.W.3d at 695. Accordingly, Taylor's facts fit within Arey's exception for "'written evidence that the evidence had been destroyed. . . .'" *Id*., at 695 (citing *Arey*, 929 A.2d at 504).

The Kentucky Supreme Court thoroughly reviewed of all issues and facts related to Taylor's claims and concluded that the swabs were not in existence by the time the post-conviction DNA proceedings had commenced, and that they had not, in fact, been existence since 1984, when Durbin conducted serological testing on the anal swabs. *Taylor*, 291 S.W. 3d at 694. Factual determinations of the state appellate

---

**been consumed and only the slides derived from the anal swab remained for DNA testing**. The initial petition acknowledged "that the swabs were consumed in analysis . . . However, some sort of a slide must have been made in order for the contents of the swab to have been examined under a microscope so that the determination could be made that human spermatozoa were present...." The trial judge's order specifically directed the Jefferson Regional Laboratory to "send all evidence related to the anal swabs collected from [one of the victims in this case] (KSP exhibit 38); including, **if they exist**, the anal swabs, all slides developed from the anal swabs...." **It is clear from the record that neither the trial judge nor counsel for either party presumed any actual anal swabs were still in existence. The parties specifically referred to and discussed the slides**.

*Taylor*, 291 S.W.3d at 694-95 (Emphasis added).

6

court, just like those of the state trial court, are cloaked in this presumption of correctness, unless successfully rebutted by the petitioner by clear and convincing evidence. *Brown v. Smith*, 551 F.3d 424, 430 (6th Cir. 2008) (citing § 2254(e)(1)); *Matthews v. Ishee*, 486 F.3d 883 (6th Cir. 2007); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001).

Taylor's prior representations in this habeas proceeding demonstrate his understanding that only slides, not swabs, existed. In his September 11, 2006, motion seeking federal funds to employ an expert to conduct DNA testing on anal swabs and/or slides that were produced from the anal swabs, Taylor stated that the anal swabs, "if any," may not exist, and that only the slides created from such swabs might be available for DNA testing. Taylor stated as follows:

> Durbin's Exhibit 38, which was the number he assigned to the Nelson anal swab at the Jefferson Regional Crime Lab, was never introduced into evidence. Durbin's report indicates that the swabs were consumed in analysis. . . . However, some sort of a slide must have been made in order for the contents of the swab to have been examined under a microscope so that the determination could be made that human spermatozoa were present. This slide was never introduced into evidence, either. Petitioner assumes that the remainder of the swabs, if any, and the slide containing the human spermatozoa are still in the possession of the Kentucky State Police Jefferson Regional Crime Lab or the Louisville Metro Police Department.

*See* Taylor's Motion, R. 8, pp. 3-4, ¶ 8.

The trial court record establishes that the anal swabs which Taylor seeks funds to have independently tested for DNA have not been in existence since 1984. The Kentucky Supreme Court's decision denying Taylor's request for independent DNA testing, or an evidentiary hearing, was not "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. 362, 407 (2000); *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004). Further, the Kentucky Supreme Court's decision was not based on an

7

unreasonable determination of the facts, and was neither "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," nor based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2); *Williams*, 529 U.S. at 405-08; *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001).

Taylor has not rebutted by clear and convincing evidence the presumption of correctness given to the Kentucky Supreme Court's factual findings. 28 U.S.C. § 2254(e)(1). He further fails to establish either that a substantial question exists requiring expert testimony for its resolution, *i.e.*, independent DNA testing, or that his position cannot be fully developed without professional assistance. Accordingly, Taylor's motion will be denied.

## 2. Taylor's Due Process Argument

Taylor mentions that he has, or may have, a due process right to DNA testing and that therefore, he is entitled to federal funds with which to obtain independent DNA testing. This claim lacks merit because a convicted prisoner does not have a freestanding constitutional right to DNA evidence. *Dist. Att'y's Office for the Third Judicial Dist. v. Osborne*, --- U.S. ----, 129 S.Ct. 2308, 2322 (2009). Rather, at most, a prisoner may have a procedural due process right to the proper application of a state-created right. *Id*. at 2319-20.

In 2007, this court remanded Taylor's request for post-conviction DNA testing; Bode Technology tested the remaining anal slide for DNA; the testing of the slide yielded no favorable results; and the Kentucky Supreme Court affirmed the trial court's

decision not to hold further evidentiary hearings on the cotton swab issue. Taylor has received the due process to which he was entitled regarding his request for post-conviction DNA testing. Allowing funds for further testing, or conducting an evidentiary hearing as to the whereabouts of non-existent anal swabs, would at best do no more than yield access to evidence which the parties have consistently understood does not exist, and would have no effect on the validity of Taylor's conviction or death sentence. *See Durr v. Cordray*, 602 F.3d 731, 736-37 (6th Cir. 2010).

### 3. Simpson's Motion to Expand the Record

The court will grant Simpson's motion to expand the record, pursuant to Federal Rule of Civil Procedure 7, so it will include materials from the trials of both Taylor and Wade, because these materials will further develop the DNA-related evidence; eliminate the need for funding and/or a hearing regarding anal swab evidence; and will put the Inventory, Taylor's Trial Exhibit 38, in the proper perspective.

Simpson admits that the Inventory referred to Exhibit No. 38 in swab from, rather than slide form. He argues that the following evidence refutes Taylor's claim that the Inventory conclusively establishes that the original anal swabs still exist: (1) the Case Submission Form to Bode Technology and Attachments; (2) the Kentucky State Police Request for Evidence Examination; and (3) excerpts from the testimony of Brian Wraxall and Durbin, from Wade's trial.

Taylor objects, arguing that Simpson's request to expand the record selectively ignores other facts and exculpatory evidence. Specifically, he argues that medical examiner Dr. George Nichols testified at Taylor's trial that during the autopsies, he found no evidence of deviate sexual intercourse in either victim; that after Nichols's testimony, the

9

Commonwealth failed to preserve critical evidence, such as the victims' underwear, which would have been the best source of DNA; and that the Commonwealth improperly tested the anal swabs obtained at the autopsy and later, the slides. Those arguments, however, do not undermine the purposes for which the court will grant the motion to expand the record.

The court will permit expansion of the record with the following materials:

1. <u>Case Submission Form ("CSF") to Bode Technology</u>. On July 16, 2007, Taylor's counsel, Thomas M. Ransdell, completed, signed and sent the CSF to Bode Technology along with Taylor's DNA samples. The CSF included a case background narrative noting that "slides were made from the swabs which showed the presence of semen" and that "[t]he swabs were allegedly consumed in the analysis". In an untitled memo attached to the form, Ransdell again noted that the report generated at Taylor's trial stated that the swabs "were consumed in analysis." Ransdell also noted that "[m]y understanding of the evidence is that you are being sent two slides, one that has spermatozoa on it and the one that Orchid Cellmark consumed." These items reveal that months after the Inventory was filed, Taylor understood that only slides remained, thus placing Taylor's current arguments in the proper perspective.

2. <u>Kentucky State Police Request for Evidence Examination and Attachment</u>. Detective Larry Carroll requested examination of Exhibit 38 for the presence of semen and, if located, that DNA testing be performed. On July 6, 2004, Carroll completed this document and sent it to Dawn Katz of the Jefferson Regional Lab. In the "Exhibits" section of the document, Carroll stated that Exhibit No. 38 contains "anal slides - victim: Nelson." Under the title of "Evidence Left," four (4) items were identified as remaining from Lab Report No.

10

84-2-3096, (Durbin's forensic report). Of the four items remaining, the notes indicated the existence of "Ex. 38 - anal sw. Nelson (2 slides)."

On September 10, 2004, Dawn Katz prepared the attached Report of Forensic Laboratory Examination. She identified the available evidence, submitted it for analysis to determine whether DNA analysis could be performed, as being Exhibit Nos. 38-1 and 38-2 (the two slides). Katz noted a limited amount of semen on both slides and that Exhibit No. 38-1 was being retained for future DNA analysis (eventually performed by Orchid Cellmark). Both Carroll and Katz's notes corroborate that only the two *slides* remained, not the original swabs.

3. <u>July 22, 1985, Order from Wade's Trial</u>**.** The trial court, by its order of July 22, 1985, required the Commonwealth to produce a number of items for testing by Wade's defense expert, Brian Wraxall, including "any slides that exist" and "any swabs that exist." This order relates to testimony by Wraxall, who stated that he received slides but that no swabs were sent because they were unavailable for him to test. This order substantiates that the consumption of the swabs caused their ultimate destruction.

4. <u>Testimony from Durbin and Wraxall at Wade's Trial</u>. These trial excerpts refute Taylor's claims that consumption of the anal swabs was unnecessary and should not have occurred, and that "consumption" of the swabs did not constitute "destruction" of the swabs. Both sets of proffered testimony establish that the swabs were consumed during Durbin's pretrial serological testing and no longer existed after that event. In particular, the following excerpts from Durbin's testimony persuade this court that the original anal swabs which the medical examiner obtained were necessarily consumed, and thus destroyed, during serological testing; that they have not existed since 1984; and that only the slides which

11

Durbin created from those swabs exist. Durbin testified as follows:

Q  Was Exhibit 38 and 26, were they basically consumed in your testing?

A  Yes, sir, these were swabs which the pathologist collected anal swabs. He collected the swab, and in order for me to get the most information I could out of these swabs, I had to consume the swab.

Q  All right, sir. And, did you receive, sir, on any other occasions any exhibits for testing purposes in this case?

A  Yes, sir, I did.

. . . .

MR. JASMIN: Thank you very much, sir. Will you please answer any questions from defense counsel.

CROSS-EXAMINATION BY MR. POSNANSKY:

Q  Good afternoon, Mr. Durbin. I'm going to ask you to sort of go through the procedure that you utilized in testing that you used to test the anal swabs in this case. Could you run through that for us, please?

A  Okay. The anal swabs are submitted, and the first thing that a person does when testing a swab for semen is take a cutting to test for the presence of acid phosphatase. This is an indicator of semen. And, if you have items – a swab, piece of material, or whatever, you're going to want to know where the semen is at on that item. And, this test is a chemical test which you can spray down a whole sheet or in the instance of a swab, take a cutting and test just a small area of it, or you can test the whole thing – spray it down, and a positive result for acid phosphatase comes up as a blue color. A negative result is a yellow color. And, where you have your blue color is where your acid phosphatase is at. Since that is a constituent of semen, that will be where you concentrate your – looking for the sperm cells. And, in a sheet, blue area, you'd go take a cutting of it, and put that into a tube. If it's on a swab, you take a cutting of the tip, test it for semen. If you have an acid phosphatase positive then you know that you've got semen down on the tip area.
   In this instance, on both sets of swabs, I did not have a positive on my tip cutting. So if there is any semen on the swab, it isn't on the tip area. I put the whole swab down in a tube and then I put saline solution on this.

And, this swab is just like a cotton Q-tip a person would use to clean their ears or whatever. This swab is put down in a tube. The saline is put in there to extract any materials that are in that swab out into the saline solution.

After I let that soak, I then take the swab, put it in a small pipette tip, which is just a v-shaped piece of plastic, put the swab in there, put it back in the tube where my liquid is, put it in a centrifuge. And, the principle behind the centrifuge is when you turn it on, all your heavy material is going to go to the bottom of your tubes. I spin down the supernatant out of my swabs, and the heavy material will be on the bottom of the tube with just the liquid on the top of it.

And, I take the liquid and do my ABO grouping test, take the heavy material on the bottom, put that on a slide and let that air dry, and then stain that and look for sperm cells under the microscope. After staining this slide, the material which I took off the tube, the liquid, in my ABO grouping test, I take it and put it in an assortment of tubes, run my grouping tests to determine possible ABO blood grouping of the individual, and if you'll clarify for me any details I left out there.

Q       I think that's sufficient. Let me ask you this. What was the date that you ran the tests that you just described?

A       Okay. The swabs came into the lab on 10-1-84. On 10-2-84, the date on my notes, then my tests.

Q       The tests were run on October 2, 1984?

A       That's when I started those tests, yes, sir.

Q       Was any of the sample – of the sperm sample that you obtained – was any of that saved?

A       The microscope slides I retained on file at the lab, yes, sir.

Q       The microscope slides?

A       Yes, sir, that's the debris which was in the swab material is retained on file.

Q       Was there a sufficient amount, Mr. Durbin, left for anyone else to run a test to indicate whether that sample could have come from someone else? Were the swabs destroyed in the analysis?

A       The swabs were consumed in analysis, yes.

Q       And, in order for the defense or anyone else to run a test on your samples, they would need the swab, isn't that correct?

A       If they were looking for sperm cells all they would need is my slides. The ABO grouping tests which would be extracting the swabs, they would need the swabs.

Q       In other words, you are aware of the fact that it is possible if a sample is preserved – enough of the sample is preserved to exclude an individual as a potential person that could have produced that sperm, is that correct?

A       (No response).

Q       You can exclude an individual based on their blood type from being the person that produced a given sperm sample, isn't that correct?

A       If a person can get an ABO grouping test, yes, sir.

Q       Okay. Now, you destroyed the entire – you destroyed the swab, and, therefore, this test – such a test could not be run in this case, is that correct?

A       I consumed all the swab.

Q       So, therefore, the test could not be run that I just described in order to exclude a person, is that correct?

A       No, sir, another test cannot be run.

Q       Okay. Have you ever been able to save – to save a swab and not destroy it in the analysis?

A       Yes, sir, I have. Like I say, when I had positive and I only had to use a portion of the swab
        – I had enough semen on it that I would not need the entire swab.

Q       But in this case – I'm sorry.

            MR. JASMIN: Would you let him finish?

> A   Or in the instance where there were numerous swabs collected and I only need two to do my analysis and all four showed TMP positive – positive for the presence of acid phosphatase, then two would be adequate since I would be able to get my blood grouping test with the amounts on the two I have.
>
> Q   But in this case you weren't able to do that; you destroyed the entire swab – all the swabs?
>
> A   Yes sir, in this case there were four swabs and they did not have enough semen on the four swabs for my blood grouping test. I had to concentrate what I had there to try to get my test answers, and I did not – I had to use all four, yes, sir.
>
> Q   And, it is true, is it not, sir, that a person can be biologically excluded as having been the donor of that particular sample under certain circumstances, isn't that correct?
>
> A   If you can get a grouping test, yes, sir, you may exclude an individual.

R. 33-6, pp. 1-11.

No reading of the foregoing testimony could reasonably suggest that the original anal swabs (Exhibit # 38) survived Durbin's 1984 serological testing procedures. Durbin testified that because the process involved injecting a saline solution into the swabs and then subjecting the saturated swabs to forceful centrifugal shaking, he consumed and thus destroyed the cotton component of the swabs. Taylor's attempt the distinguish the word "consumption" from the word "destroy" is without merit.

To the extent that Wade was challenging the consumption of the swabs and thereby attacking the Commonwealth's case, Wade was similarly situated to Taylor, and Wade's attorney cross-examined Durbin in detail on this key issue. The testimony from Wade's trial revealed that the swabs no longer existed after Durbin's pretrial testing.

The documents and trial excerpts listed above clarify the Inventory upon which

15

Taylor relies and explain that both the Commonwealth and Taylor assumed and understood that the anal swabs had been consumed during Durbin's serological testing in 1984. This material does not "fundamentally alter the legal claim already considered by the state courts." *West v. Bell*, 550 F.3d 542, 551 (6th Cir. 2008); *see also Vasquez v. Hillery*, 474 U.S. 254 (1986).

While the record already contains sufficient evidence to deny Taylor's motion for funds to obtain independent DNA testing, the court will grant Simpson's motion to expand the record to include all of the attachments identified in his motion.

### CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1) Taylor's motion for DNA testing funds or a hearing, R. 27, is **DENIED**;

(2) Simpson's motion to expand the record, R. 33, is **GRANTED**;

(3) Simpson's attachments to R. 33, specifically R. 33-3 through and including R. 33-8, are **MADE A PART OF THIS RECORD** and the Clerk of Court is directed to note in the docket sheet that said attachments are officially part of this record.

Signed on  September 27, 2010        *Jennifer B. Coffman*
JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY