UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| VICTOR DEWAYNE TAYLOR, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 5: 06-181-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| THOMAS SIMPSON, Warden, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

**\*\*\*\*   \*\*\*\*   \*\*\*\*   \*\*\*\***

In 1986, Victor Dewayne Taylor was convicted in Fayette Circuit Court of two counts of murder, two counts of kidnaping, two counts of robbery, and one count of sodomy. Ultimately, he received two death sentences. Taylor filed a petition for habeas corpus relief in this Court, claiming that he is entitled to a new trial because his conviction resulted from numerous violations of his constitutional rights. [Record No. 1] Finding no merit in his arguments, the petition will be denied.

## I.

The following summary of facts is derived largely from the Supreme Court of Kentucky's opinion in Taylor's direct appeal, *Taylor v. Commonwealth*, 821 S.W.2d 72 (Ky. 1990) (*Taylor I*). In 1984, Taylor and co-defendant George Wade were charged in the Jefferson Circuit Court with the murder, kidnapping, robbery, and sodomy of two Trinity High School students, Richard Stephenson and Scott Nelson. They encountered the students on the evening of September 29, 1984, after the students became lost on the way to a football game. The prosecution presented a statement by Wade that he and Taylor kidnapped and

-1-

robbed the two students.  The boys had stopped at a fast food restaurant to ask for directions when they were approached by Taylor and Wade.  Other witnesses testified that Taylor had a gun and forced the victims into their car.  The four then left in the victims' vehicle.  In his statement, Wade said that he and Taylor robbed the boys and that he had removed both boys' trousers, bound their ankles, and gagged them in a Louisville alley.  Wade indicated that Taylor killed the boys because he was afraid they would identify them. Wade stated that he waited on a nearby street while Taylor shot both boys in the head.  *Id.* at 73–74.

Taylor and Wade were tried in Fayette County following a change of venue.[1]  Wade was called as a prosecution witness at Taylor's trial.  However, Wade, citing his Fifth Amendment right against self-incrimination, refused to testify because his conviction was pending on a direct appeal at the time.  Due to the pending appeal, the trial court found that Wade was unavailable and admitted Wade's custodial statement made to the police that implicated Taylor.  *Id.* at 74.  On April 30, 1986, the jury convicted Taylor of two counts of murder, kidnaping, and first-degree robbery, and one count of first-degree sodomy.  On May 23, 1986, consistent with the jury's recommendation, Taylor received a death sentence on each of the kidnaping and murder charges regarding each victim.  Accordingly, he originally received a total of four death sentences.

---

1       Taylor and Wade were tried separately, with Wade being tried first.  Wade was convicted of two counts of murder, kidnaping, and first-degree robbery, but was acquitted of sodomy.  He received a sentence of life imprisonment.

The Kentucky Supreme Court affirmed Taylor's conviction on direct appeal but remanded for resentencing.[2]  *Id.* at 77.  Thereafter, Taylor moved the trial court, pursuant to RCr 11.42, to set aside the remaining judgments against him.  The Bullitt Circuit Court, Thomas L. Waller, Special Judge, denied that motion and the Kentucky Supreme Court affirmed.  *Taylor v. Commonwealth*, 63 S.W.3d 151 (Ky. 2001) (*Taylor II*).  Taylor then moved for a new trial under CR 60.02 and RCr 10.02.  That motion was also denied and affirmed on appeal.  *Taylor v. Commonwealth*, 175  S.W.3d 68 (Ky. 2005) (*Taylor III*).

On June 2, 2006, Taylor filed the present action pursuant to 28 U.S.C. § 2254. [Record No. 1]  As grounds for this petition, Taylor raises fifty-four claims which he contends entitle him to habeas relief.  In the interests of judicial economy, these are not separately itemized, but are considered below in the same order as presented in the petition.

## II.

Before a federal court may grant relief based upon a claim presented in a federal habeas petition, the petitioner must have presented the claim to the state courts and exhausted all remedies available in the state system.  28 U.S.C. § 2254(b)(1)(A).  To "fairly present" a claim to the state courts, the petitioner must have presented the state courts with both the legal and the factual bases supporting the claim.  *Hanna v. Ishee*, 694 F.3d 596, 609 (6th Cir. 2012) (citing *Williams v. Taylor*, 529 U.S. 420, 437 (2000)).  Fair presentation of a federal constitutional claim requires that the petitioner make the federal basis of the claim explicit to the state court, either by citing federal law or decisions of federal courts.  *Duncan v. Henry*,

---

2    The Kentucky Supreme Court concluded that while Taylor was death-penalty eligible, the Fifth and Fourteenth Amendments of the United States Constitution prohibited imposing the death penalty for kidnaping *and* murder of the same victim. For this reason, the Supreme Court vacated Taylor's two death sentences on the kidnaping charges and remanded for resentencing on those charges as Class A felonies. Taylor's two death sentences on the murder charges remained intact.

513 U.S. 364, 365–66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."); *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999). If a petitioner cites exclusively to state statutes and state court decisions, he may fail to adequately indicate that he is asserting a violation of his federal civil rights. *Baldwin v. Reese*, 541 U.S. 27, 33 (2004) (holding that a petitioner's failure to identify a federal claim or to cite case law which might alert the state court to the federal nature of a claim is not fair presentation); *Gray v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.") If the petitioner has not exhausted a claim, the federal court may nonetheless deny relief if the claim is without merit. 28 U.S.C. § 2254(b)(2).

Exhaustion is an affirmative defense and may be waived if the respondent fails to assert it. *Smith v. Moore*, 415 F. App'x 624, 628 (6th Cir. 2011) ("A respondent failing to raise his procedural default challenge waives it. 'The state may waive a defense,' including procedural default, 'by not asserting it.'") (quoting *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004)). Additionally, if a petitioner's claim has been exhausted in the state courts, he bears the burden of demonstrating any right to federal habeas relief. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (citing *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)).

When a petitioner presents a claim to state courts but those courts do not address the merits of the claim in any manner, the federal habeas court evaluates the merits of the claim *de novo*. *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 340 F.3d 433,

436–37 (6th Cir. 2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 531 (2003)).  *De novo* review is only appropriate if the petitioner affirmatively shows that the state court's decision "did *not* involve a determination of the merits of his claim," such as where the state court denied the claim on procedural grounds.  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784–85 (2011) (emphasis added).

Where the state courts adjudicated the claim presented for federal collateral review, habeas relief is only available if the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d)(2).  These two provisions collectively require a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted) (internal quotation marks omitted).  This deference is required even if the state court provides no explanation for its decision.  *Harrington*, 131 S. Ct. at 784.

To apply the deference required by § 2254(d)(1) to the state court's legal conclusions, "clearly established law" refers to both bright-line rules and legal principles set forth in the decisions of the United States Supreme Court as of the time the state court rendered the pertinent decision.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., opinion of the Court for Part II); *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002).  Conversely, "clearly established law" does not include *dicta* in Supreme Court decisions.  *Williams*, 529 U.S. at 412.  Nor does it include holdings from the federal courts of appeals.  *Id.* at 381–82.

A state court's decision is "contrary to" Supreme Court precedent if the state court reaches the opposite legal conclusion than the Supreme Court has reached in a prior case or arrives at a different outcome when the case presents a "set of materially indistinguishable facts." *Id.* at 412–13. A state court's decision constitutes an "unreasonable application" of Supreme Court precedent only if the issue presented is so one-sided that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S. Ct. at 786–87 ("[T]he state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008). Deference is required "whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Harrington*, 131 S. Ct. at 784.

A state court determination premised on a factual determination is "based on an unreasonable determination of the facts" under § 2254(d)(2) only when it is "objectively unreasonable in light of the evidence presented in the state court-proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The state court factual findings underpinning such determinations are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010).

If there were errors in the state court proceeding, the habeas court must determine if the errors were "structural defects" or "trial errors." Structural defects, such as the denial of

the right to counsel, defy analysis by "harmless error" standards and require reversal of the state-court conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). On the other hand, constitutional trial errors must be assessed to determine if the error had a "substantial and injurious effect" in determining the jury's verdict or other case result. *Jensen v. Romanowski*, 590 F.3d 373, 378 (6th Cir. 2009). If the error had little or no effect, then habeas relief should be denied. However, if the habeas court finds itself in "virtual equipoise" regarding whether the error had a substantial influence on the jury's verdict, it should grant the writ. *Id.* at 378–79 (citing *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). Finally, the Court notes that federal habeas relief is unavailable for errors in the application of state law unless such errors deny the defendant the due process right to a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 68–70 (1991); *Brooks v. Anderson*, 292 F. App'x 431, 437 (6th Cir. 2008).

**A.**  **George Wade's Out-of-Court, Custodial Statement Made to the Police**

The police picked up Wade for questioning at approximately 3:35 p.m., on October 3, 1984, four days after the murders. He was taken to the Louisville Police Department, advised of his rights, and informed that he was a suspect in the murders of Nelson and Stephenson. Wade denied any involvement in these crimes. Roughly an hour later, Wade executed a written waiver of his rights. Wade was then interviewed by two different police detectives, first by Detective Mason for a couple of hours, and then by Detective Wilson, who began his questioning about 6:30 p.m. Around 8:30 p.m., Wade agreed to take a polygraph examination, which was completed about 11:30 p.m. The polygraph administrator, Detective Duff, informed Detective Wilson that Wade had failed the

examination.  Detective Wilson resumed his interrogation of Wade at approximately 11:30 p.m.  He told Wade that he had failed the polygraph.  However, Wade continued to deny any involvement in the murders.

Wade agreed to participate in a line-up, on October 4, 1984, at approximately 12:35 a.m.  The line-up assembled by the police consisted of six participants, including Wade.  All of the participants put their hair in braids.  The line-up began around 2:10 a.m., and was completed at approximately 2:28 a.m.  Cecil Pepper, who claimed to have seen the abduction in this case, identified Wade as one of the victims' abductors from the fast food restaurant. After Detective Duff advised Wade that he had been identified as one of the abductors, Wade changed his story about having no involvement in these crimes.  Duff then took another statement from him.  This tape-recorded statement commenced at approximately 2:40 a.m. Wade completed his statement about 3:30 a.m., approximately twelve hours after he had been picked-up for questioning.  Wade's statement was then transcribed, and he signed it.  In that statement, Wade implicated Taylor for the first time as a participant in the crimes and as the person who shot Nelson and Stephenson.

The first three claims Taylor raises in this petition (Grounds 1, 2, and 3) concern the pretrial statement of George Wade.  Each claim is considered separately.

### Ground 1 - The Admission of George Wade's Statement at Trial Does Not Support Habeas Relief.

Taylor contends that the trial court erred in allowing the Commonwealth to introduce the edited, out-of-court, custodial statement of George Wade, his non-testifying co-defendant, in violation of his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution to confront and cross-examine the evidence against him, resulting in the denial

of a fair trial and a constitutionally infirm conviction. The Kentucky Supreme Court spoke on this issue on three separate occasions: first, in Taylor's direct appeal, *Taylor I*; next, in Taylor's appeal of the denial of his RCr 11.42 motion, *Taylor II*; and finally, in Taylor's appeal of the denial of his CR 60.02 motion, *Taylor III*.

In Taylor's direct appeal, the Kentucky Supreme Court held that the trial court did not err by admitting Wade's statement pursuant to FRE 804(b)(3), which was adopted by the Kentucky Supreme Court as Kentucky law in *Maynard v. Commonwealth*, 558 S.W.2d 628 (Ky. 1977), and *Crawley v. Commonwealth*, 568 S.W.2d 927 (Ky. 1978). *See also Dodson v. Commonwealth*, 753 S.W.2d 548 (Ky. 1988). In reaching this conclusion, the *Taylor I* majority engaged in the following analysis:

> The trial judge in ruling on motions concerning Wade's unavailability as a witness and whether his statement was against his own interest found that FRE 804(e) provides in pertinent part that a witness is unavailable if he is exempted from testifying concerning the subject matter of his statement by a ruling of the trial judge on the grounds of privilege. The trial judge in the presence of Wade, but outside the presence of the jury, determined that Wade would rely on the Fifth Amendment privilege and that the privilege was valid because his conviction was pending on appeal. Accordingly, the trial judge found that Wade was unavailable as a witness pursuant to FRE 804(a)(1) and *Crawley, supra*.

> The trial judge after hearing argument of counsel and considering the provisions of the Federal Rule of Evidence 804(b)(3) as well as Kentucky authority concluded that the out-of-court statement of Wade at the time of its making was so far contrary to Wade's penal interests and subjected him to criminal liability that a reasonable man in such a position would not have made the statement unless it was true. He further concluded that the admissions against Taylor in Wade's statement were essentially consistent with his sworn in-court testimony as well as the testimony of three other prosecution witnesses, and in the context of other admissions against Taylor, exclusion would appear to deprive the finder of fact of relevant and reliable evidence.

Trustworthiness of a hearsay statement against penal interest is a prerequisite to its admissibility. *Crawley, supra*, quoting from *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), set out the four factors the Supreme Court deemed relevant to the trustworthiness of such statements: (1) the time of the declaration and the party to whom made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is against the declarant's penal interest and (4) the availability of a declarant as a witness.

Wade's statement was properly admitted into evidence. His statement was made to the police prior to his arrest but after he had been picked up for questioning. He was *Mirandized* three times, informed that he failed a polygraph test and identified in a lineup prior to his confession. His final waiver of rights was tape-recorded, reduced to writing and signed in the presence of two police officers. The mere fact that Wade had initially denied any involvement in the crimes and confessed only after receiving notice that he had been identified in the lineup does not render the confession involuntary. *Cf. Commonwealth v. Vanover*, Ky., 689 S.W.2d 11 (1985). There is no suggestion that Wade was attempting to curry favor from the arresting officer. He confessed without promises being made. While he was not under arrest, Wade certainly knew he was a suspect. The statement Wade gave to the police was corroborated in part by five different witnesses. Every material detail of Wade's confession was corroborated by independent testimony and physical evidence.

Wade's statement was against his own interest. His confession was not any less a statement against his own penal interest simply because it also implicated Taylor. Wade admitted that he actively participated in the kidnapping and robbery. He said that he bound, gagged and robbed the victims. He also described the events which culminated in the shootings. The determination of whether an out of court statement is against the declarant's penal interest does not require an assessment of the declarant's subjective motivation. The determination should be made upon an examination of the statement made and application of an objective measure of whether it is against penal interest. By such an assessment, Wade's confession was a statement against his own interest for the purpose of FRE 804(b)(3).

Federal Rule of Evidence 804(a), in relevant part, provides that a declarant is not available for the purposes of the hearsay rule if he:

> 1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

>2) persists in refusing to testify concerning the subject matter of
the declarant's statement despite an order of the court to do so . .
. .

Wade informed the Court that in spite of the prosecutor's proffered immunity he would invoke his fifth amendment privilege against self-incrimination if called to testify. The trial judge correctly determined that Wade who had a pending criminal appeal at the time was unavailable as a witness under FRE 804(a).

Courts are reluctant to admit hearsay evidence because of the [sic] its inherent unreliability. Numerous exceptions have been carved out of the general prohibition against admitting hearsay. FRE 804(b)(3), statements against penal interest, allows hearsay statements to be admitted if they are against declarant's penal or proprietary interest, trustworthy, and the declarant is unavailable. No lack of trustworthiness could be implied regarding the content of Wade's confession or the circumstances surrounding it. There was no factual basis for the presumptive suspicion that frequently relates to a codefendant's confession. Wade's confession was corroborated in every material detail by independent testimony and physical evidence. Wade was unavailable, his statement was against his own interest, and from the physical evidence, the testimony of witness and Wade's confession, it was reliable and trustworthy. The trial judge was correct in admitting Wade's statement. As a reviewing court, we find no reason to disturb the action taken. *Reichle v. Reichle*, Ky., 719 S.W.2d 442 (1986).

Taylor argues that the introduction of a nontestifying-codefendant's confession invariably results in a violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). He also contends that Rule 804(b)(3) is unconstitutional. The trial judge correctly ruled that the edited confession was admissible in Taylor's separate trial. The confession was the last item of evidence presented by the prosecution in the case in chief. It was edited to delete all references to other crimes.

*Bruton, supra*, holds generally that a defendant's Sixth Amendment right to confrontation is violated when he is directly incriminated by the confession of a nontestifying codefendant. The rationale for this general rule of constitutional law is the same as that underlying the general prohibition against hearsay evidence, that is the presumptive unreliability of an extra-judicial confession. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), a conspiracy case, discussed the relationship between various Federal Rules of Evidence and the Confrontation Clause, and indicates that out of court statements are only presumed unreliable and the presumption may be rebutted by appropriate proof. It also recognizes the cumulative value

of certain evidence. When taken together the two principles demonstrate that what may be unreliable in isolation may be probative when corroborated by other evidence. *Bourjaily* also indicated that the literal interpretation of the confrontation clause was too extreme and that the societal interest of accurate fact finding requires harmonization with the confrontation provision. Accommodation of these competing interests has in general required the prosecution to demonstrate both the unavailability of the witness and the indicia of reliability surrounding the out of court statements.

A number of federal circuit courts have followed the *Bourjaily* philosophy. *See United States v. Robinson*, 635 F.2d 363 (5th Cir. 1981); *United States v. Katsougrakis*, 715 F.2d 769 (2nd Cir. 1983); *United States v. Harrell*, 788 F.2d 1524 (11th Cir. 1986); *United States v. Kelley*, 526 F.2d 615 (8th Cir. 1975).

A codefendant's confession is not per se untrustworthy but is only presumptively unreliable and the presumption may be rebutted. *Dodson, supra*, held that this type of evidence can be admissible if its presumptive unreliability is sufficiently rebutted by corroborating circumstances which clearly indicate its trustworthiness.

In view of the trial judge's holding that the statement came in as a recognized exception to the hearsay rule, we find no conflict with the confrontation clause. *See Crawley, supra*; *Bourjaily, supra.*

*Taylor I*, 821 S.W.2d at 74–76.

In 2001, in *Taylor II,* the Kentucky Supreme Court addressed Taylor's request to reconsider the admissibility of Wade's confession based on the United States Supreme Court's decision in *Lilly v. Virginia*, 527 U.S. 116 (1999). Although the *Taylor II* Court declined Taylor relief on this issue, it modified the rationale for its holding in *Taylor I* that the admission of Wade's statement did not violate Taylor's constitutional rights. The *Taylor II* Court held:

On direct appeal, both the majority and dissenting opinions addressed and discussed Taylor's Confrontation Clause argument. *Taylor*, 821 S.W.2d at 75–76, 80–82. Thus, the issue of whether Wade's statement was admissible under the Kentucky and U.S. Constitutions was decided against Taylor on direct appeal. Therefore, given *Roberts* either/or two-prong approach to

-12-

admissibility, *Taylor* should be read as holding that Wade's confession was admissible under the second prong of *Roberts*, rather than as a "firmly rooted" exception to the hearsay rule. Consequently, even if *Lilly* was binding precedent, *Lilly* would not *a fortiori* overrule *Taylor*.

Therefore, Taylor's argument is reduced to a plea that we reexamine an issue that was raised and decided against him on direct appeal. This is foreclosed by both the above-discussed rule set forth in *Thacker*, and the law of the case doctrine. Under the law of the case doctrine, "an opinion or decision of an appellate court in the same cause is the law of the case for a subsequent trial or appeal however erroneous the opinion or decision may have been." *Union Light, Heat & Power Co. v. Blackwell's Adm'r*, Ky., 291 S.W.2d 539, 542 (1956). A rarely-employed exception to the law of the case doctrine exists when it can be shown that the former decision was clearly and palpably erroneous, but no such showing is made in this case. *Lilly* does not overrule or render *Taylor* erroneous. Nor is it clearly apparent that *Taylor* reaches the wrong result under the applicable case law.

63 S.W.3d at 167–68.

Subsequently, in 2005, the Kentucky Supreme Court affirmed the denial of Taylor's CR 60.02 motion for a new trial. *Taylor III,* 175 S.W.3d at 77. In that decision, the *Taylor III* Court, *sua sponte*, revisited the issue of the admissibility of Wade's statement in view of the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). *Crawford* held that out-of-court testimonial statements are inadmissible as a violation of the Confrontation Clause "unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54. The *Taylor III* Court acknowledged that Wade was unavailable under KRE 804(a)(1) and that Taylor did not have the ability to cross-examine Wade's statement to the police. Therefore, the *Taylor III* Court concluded that if *Crawford* were applicable, Taylor's constitutional right to confront witnesses against him was violated. 175 S.W.3d at 71–75.

However, the *Taylor III* Court further held that Taylor would only be entitled to a new trial if he were prejudiced by the error. In other words, if the admission of the statement amounted to harmless error beyond a reasonable doubt, then his conviction would not be disturbed. *Chapman v. California*, 386 U.S. 18, 24 (1967). The *Taylor III* Court then reviewed all of the other evidence presented against Taylor at the guilt phase of his trial, including the testimony of Jeffrey Brown, Eugene Taylor, Beverly Shackelford, the testimony of a hair analysis expert, the testimony of a firearm's expert, the coroner's testimony, evidence found at the crime scene, and other evidence obtained from the homes of Taylor's mother, sister, and girlfriend. In the final analysis, the *Taylor III* Court concluded that the admission of Wade's statement was harmless error.

> From this evidence no reasonable jury could have acquitted Taylor of murdering the two Trinity High School students even if Wade's statement were kept from its consideration. Wade's initial statement incriminating Taylor, though persuasive by itself, was little more than cumulative of other evidence. This is especially true in light of the probability that the prosecution would offer this statement into evidence to rebut Wade's recantation. However, with or without the statement, the proof that Taylor kidnapped, sodomized, and murdered the two boys was overwhelming and no jury could fail to find guilt beyond a reasonable doubt.

175 S.W.3d at 73–74.

At the time of Taylor's direct appeal, the test for the admissibility of a statement made by a non-testifying co-defendant was contained in *Ohio v. Roberts*, 448 U.S. 56 (1980). Pursuant to *Roberts*,

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the

-14-

defendant. See *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). See also *Motes v. United States*, 178 U.S. 458, 20 S.Ct. 993, 44 L.Ed. 1150 (1900); *California v. Green*, 399 U.S., at 161–162, 165, 167, n. 16, 90 S.Ct., at 1936–1937, 1938, 1939, n. 16.

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts*, 291 U.S., at 107, 54 S.Ct., at 333. The principle recently was formulated in *Mancusi v. Stubbs* :

> "The focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,' *Dutton v. Evans*, *supra*, at 89, 91 S.Ct., at 220 and to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement,' *California v. Green*, *supra*, 399 U.S., at 161, 90 S.Ct., at 1936. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these 'indicia of reliability.'" 408 U.S., at 213, 92 S.Ct., at 2313.

The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection." *Mattox v. United States*, 156 U.S., at 244, 15 S.Ct., at 340**.** This reflects the truism that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," *California v. Green*, 399 U.S., at 155, 90 S.Ct., at 1933, and "stem from the same roots," *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970). It also responds to the need for certainty in the workaday world of conducting criminal trials.

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the

evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts,* 448 U.S. at 65–66 (footnotes omitted).

Thus, *Roberts* held that the Sixth Amendment requires that hearsay statements, to be admissible, must have "indicia of reliability" — *i.e.*, either fall into a "firmly rooted exception" or have "particularized guarantees of trustworthiness." *Id.* at 66. Further, in *Lee v. Illinois*, 476 U.S. 530, 543 (1986), the Court held that inculpatory hearsay statements by accomplices, such as George Wade's, are "presumptively unreliable," but that the presumption can be overcome by a sufficient showing of indicia of reliability.

On direct appeal, the Kentucky Supreme Court upheld the admission of Wade's statement under the common-law hearsay exception for statements against penal interest pursuant to FRE 804(b)(3), which was adopted by that court in *Crawley*, 568 S.W.2d 927. *Taylor I*, 821 S.W.2d at 74. The rationale for this holding was that the statement also inculpated Wade as an accomplice. Therefore, it was a statement against Wade's penal interest. *Id.* The Kentucky Supreme Court analyzed the trustworthiness of Wade's statement by examining: (i) the time of the declaration and the party to whom made; (ii) the existence of corroborating evidence in the case; (iii) the extent to which the declaration is against the declarant's penal interest; and (iv) the availability of the declarant as a witness. *Id.* (citing *Crawley*, 568 S.W.2d at 931); *Chambers v. Mississippi*, 410 U.S. 284 (1973). In *Taylor I*, the Kentucky Supreme Court, in analyzing the trustworthiness of Wade's statement, memorialized the assurances of its reliability, as detailed above. 821 S.W.2d at 74–75.

At the time of Taylor's direct appeal, the Kentucky Supreme Court's holding and rationale in *Taylor I* were legally sound. Subsequent case law has no effect on the

correctness of the *Taylor I* decision, as it was based on *Roberts*, 448 U.S. 56, controlling precedent from the United States Supreme Court at that time. Thus, Taylor's claim of constitutional error in this instance is without merit. Because Wade's confession had the requisite indicia of reliability and particularized guarantees of trustworthiness, pursuant to *Roberts*, the Kentucky Supreme Court in *Taylor I* correctly analyzed this issue. That analysis was consistent with federal law and U.S. Supreme Court precedent *at the time it was decided*. The *Taylor I* court committed no error in its analysis.

However, before reviewing the other two decisions by the Supreme Court of Kentucky (*Taylor II* and *Taylor III*) concerning the admission of George Wade's custodial statement, it is necessary to determine whether subsequent decisions from the United States Supreme Court as to the issue of the admission of an inculpatory statement by a non-testifying co-defendant have any retroactive effect in Taylor's case. In his petition, Taylor cites to *Lilly v. Virginia*, 527 U.S. 116 (1999) and *Crawford v. Washington*, 541 U.S. 36 (2004), as applicable to his case. *Lilly* and *Crawford* were decided nine years and fourteen years, respectively, after Taylor's direct appeal had concluded. As noted above, in 2001, the Kentucky Supreme Court, in *Taylor II*, modified the rationale for its holding in *Taylor I* that the admission of Wade's statement did not violate Taylor's constitutional rights. 63 S.W.2d at 166–68.

In the interim between *Taylor II* and *Taylor III*, the United States Supreme Court decided *Crawford*, holding that out-of-court testimonial statements are inadmissible as a violation of the Confrontation Clause "unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 54.

The *Taylor III* Court acknowledged that Wade was unavailable under KRE 804(a)(1) and that Taylor did not have the ability to cross-examine Wade's statement to the police. Therefore, the *Taylor III* Court concluded that if *Crawford* were applicable, Taylor's constitutional right to confront witnesses against him was violated. However, the *Taylor III* Court did not end its analysis there. It also concluded that Taylor would only be entitled to a new trial if he were prejudiced by the error. In other words, if the admission of the statement amounted to harmless error beyond a reasonable doubt, then his conviction would not be disturbed. *Chapman*, 386 U.S. at 24.

Looking at this matter through the "harmless error" lens, the *Taylor III* Court reviewed all of the other evidence presented against Taylor during the guilt phase of his trial, including the testimony of Brown, Eugene Taylor, Shackelford, the testimony of a hair analysis expert, the testimony of a firearms expert, the coroner's testimony, evidence found at the crime scene, and other evidence obtained from the homes of Taylor's mother, sister, and girlfriend. In the final analysis, the *Taylor III* Court concluded that the admission of Wade's statement was harmless error:

> From this evidence no reasonable jury could have acquitted Taylor of murdering the two Trinity High School students even if Wade's statement were kept from its consideration. Wade's initial statement incriminating Taylor, though persuasive by itself, was little more than cumulative of other evidence. This is especially true in light of the probability that the prosecution would offer this statement into evidence to rebut Wade's recantation. However, with or without the statement, the proof that Taylor kidnapped, sodomized, and murdered the two boys was overwhelming and no jury could fail to find guilt beyond a reasonable doubt.

175 S.W.3d at 73–74.

Consistent with decisions in other federal circuits, the Sixth Circuit has held that *Crawford* cannot be applied retroactively in habeas cases due to: (i) the limiting language in 28 U.S.C. § 2254(d), and (ii) the non-retroactivity doctrine established in *Teague v. Lane*, 489 U.S. 288, 305–11 (1989). *See Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005); *see also Lave v. Dretke*, 444 F.3d 333 (5th Cir. 2005); *Brown v. Uphoff*, 381 F.3d 1219, 1223–27 (10th Cir. 2004); *Owens v. Frank*, 394 F.3d 490, 501–503, n.8 (7th Cir. 2005) (holding that *Roberts* set the standard for evaluating alleged Confrontation Clause violations in a case which became final on direct appeal prior to *Crawford*); *Mungo v. Duncan*, 393 F.3d 327, 332–36 (2nd Cir. 2004); *Evans v. Luebbers*, 371 F.3d 438 (8th Cir. 2004).

As seen in *Teague*, to be entitled to an exemption from the non-retroactivity doctrine, a habeas petitioner must demonstrate that the interpretation of federal constitutional law on which he relies is the only reasonable interpretation of federal law at the time his conviction became final on direct appeal and that no other interpretation was reasonable. *Lambrix v. Singletary*, 520 U.S. 518, 538 (1997). A showing that a later ruling was the most reasonable interpretation of existing precedent will not suffice. *Id.* Under *Teague*, even the opinions of lower courts must be considered in determining whether the state court's ruling was a reasonable interpretation of then existing Supreme Court precedent. *Caspari v. Bohlen*, 510 U.S. 383, 390–96 (1994).

The 1980 decision in *Roberts* established the standard for evaluating alleged Confrontation Clause violations. In fact, *Roberts* remained controlling precedent when Taylor's case became final on direct appeal in 1990. Subsequently, the law regarding Confrontation Clause violations began to evolve, as seen by the plurality opinion in *Lilly* in

1999. By the time *Crawford* was decided in 2004, the evolution had progressed further. The *Crawford* Court concluded that, "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. at 68. Thus, as to testimonial evidence, *Crawford* essentially rendered *Roberts* and numerous lower courts' opinions obsolete because "the *Roberts* test is *inherently*, and therefore *permanently*, unpredictable." *Id.*, n.10 (emphasis original); *Cf. Earnest v. Dorsey*, 87 F.3d 1123, 1130–34 (10th Cir. 1996).

However, in 1990, the Kentucky Supreme Court's reasoning in the *Taylor I* decision was based on the long-standing rule established in *Roberts* in 1980. It was the only reasonable interpretation of federal law existing at the time and no other interpretation was reasonable. *Lambrix*, 520 U.S. at 538. It was only in the 1990s, post-*Taylor I*, that the law concerning the admissibility of this Confrontation Clause evolved to the point of casting a shadow on the viability of *Roberts*. However, by no means was there a clear consensus on the course that this evolution would take. The plurality opinion in *Lilly* in 1999 illustrates the lack of compelling clarity on the Confrontation Clause issue at that time (as it relates to Taylor's direct appeal in 1990). *See also O'Dell v. Netherland*, 521 U.S. 151, 159–60 (1997) (pointing to the Court's lack of consensus when the issue was decided after O'Dell's direct appeal had been decided). It was not until the *Crawford* decision in 2004 that the law regarding this issue had evolved such that *Roberts* was rendered obsolete.

Nevertheless, *Crawford* does not qualify for an exemption from the *Teague* non-retroactivity doctrine for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Tyler v. Cain*, 533 U.S. 656, 665 (2001).

The second *Teague* exception is available only if the new rule "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Id.* at 666 n.7 (internal quotations and citations omitted). *Tyler* also points out that a new ruling establishing that an error has occurred and that such error is structural is insufficient by itself to require that the new ruling be applied retroactively on habeas review. *Id.* at 666–67.

Further, the new rule in *Crawford* does not establish that trials conducted under the *Roberts* standard requiring indicia of reliability so seriously diminishes "accuracy as to produce an impermissibly large risk of injustice." *Schriro v. Summerlin*, 542 U.S. 348, 356 (2004) (internal quotations and citations omitted). "Because we operate from the premise that such procedures [qualifying under this exception to non-retroactivity] would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge." *Teague*, 489 U.S. at 313; *see Beard v. Banks*, 542 U.S. 406, 415–20 (2004) (noting the Court at that time had yet to find any new rule that qualifies under this exception); *Graham v. Collins*, 506 U.S. 461, 478 (1993).

However, even assuming *arguendo* that *Crawford* qualifies as an exception to the *Teague* non-retroactivity doctrine and that the admission of Wade's statement was a violation of the Confrontation Clause, the error was harmless error under the applicable standard for habeas review contained in *Brecht v. Abrahmson*, 507 U.S. 619, 636 (1993), which is whether the error has substantial and injurious effect on the outcome. *See Stapleton v. Wolfe*, 288 F.3d 863, 867–68 (6th Cir. 2002) (applying *Brecht* but also citing factors set forth in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), which include: (i) the importance of the

witness's testimony in the prosecution's case; (ii) whether the testimony was cumulative; (iii) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (iv) the extent of cross-examination otherwise permitted; and (v) the overall strength of the prosecution's case); *Gilliam v. Mitchell*, 179 F.3d 990, 994–95 (6th Cir. 1999); *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999).

With no consideration being given to Wade's statement, other evidence in the case was overwhelming regarding Taylor's guilt. For instance, Taylor acknowledged the killings to at least three other people — Beverly Shackelford, Eugene Taylor, and Jeffrey Brown. Taylor acknowledged to Brown that he killed the boys because Wade mentioned his name while he was sodomizing one of the victims. An autopsy found sperm in the anus of one of the victims. Eugene Taylor witnessed Taylor admit to the killings, exchange firearms with his sister, and then divide the money stolen from the victims with Wade.

Additionally, two other individuals, Dino Pace and Cecil Pepper, witnessed the gunpoint abduction and identified Taylor and Wade as the abductors. Further, Pace and Pepper exited the parking lot of the fast food restaurant in their vehicle about the same time as Taylor, Wade, and the victims exited the parking lot in the victims' car. Pace and Pepper followed them for a time while Taylor and Wade were riding in the back seat of the victims' car. Pepper had ample opportunity to observe Taylor while he and Taylor were at the counter at the fast-food restaurant, and Pepper observed Taylor holding a gun as he entered the back seat of the victims' car.

Eugene Taylor also saw Taylor and Wade riding in the car with the victims prior to the murders. Live .357 magnum rounds were found in Taylor's home that matched the

bullets at the crime scene (a firearms expert indicated that both victims were killed with the same gun). Numerous items of stolen property, easily identified as belonging to the victims, were in Taylor's possession or found in the homes of Taylor's mother and sister. Taylor gave several of the victims' items to others (friends, family, and his girlfriend) or offered the items to others for sale (*e.g.*, Taylor offered to sell a Trinity High School class ring and a school jacket to Beverly Shackelford). Further, a witness to the abduction stated that Taylor was wearing a beige shirt. A beige shirt was found near the crime scene that contained hairs consistent with Taylor's head and pubic hair.

In summary, there was more than ample evidence of Taylor's guilt without giving any consideration to Wade's statement.[3] The evidence against Taylor *sans* Wade's statement was overwhelming, as the *Taylor III* Court observed: "The other evidence against Taylor is mountainous." 175 S.W.3d at 72. Wade's statement was cumulative and provided details that allowed the evidence to tell a more complete story (such as giving reasons for certain actions - *e.g.*, prior to the killings, Wade threw Nelson's car keys on top of a building because if the victims got loose, he did not want the victims to be able to follow them in their car). Nothing contained in Wade's statement provides *additional* evidence to an element of the crimes that was not already contained in other evidence against Taylor. Thus, Wade's statement was corroborating, but it was not essential to Taylor's conviction. Therefore, if its admission was erroneous, it was harmless error under the *Brecht* standard.

---

3       As noted by the Kentucky Supreme Court in *Taylor III*, if Taylor were retried, Wade could no longer assert a Fifth Amendment privilege and would be required to testify. If Wade were to testify contrary to his earlier statement at issue, portions of this earlier statement would likely be used as prior inconsistent statement. *Taylor III*, 175 S.W.3d at 72 (citing KRE 801A(a)(1) for the admissibility of Wade's pretrial statement if used as a prior inconsistent statement).

Given the legal landscape surrounding the Confrontation Clause at the time of Taylor's direct appeal, specifically, the well-established *Roberts* decision, it is clear that the Kentucky Supreme Court's decision in *Taylor I* was the only reasonable interpretation of federal law existing at the time and that no other interpretation was reasonable. Consequently, the *Taylor I* decision on the admission of George Wade's custodial statement was neither contrary to clearly established federal law nor an unreasonable application of United States Supreme Court precedent. Taylor's argument on this issue is without merit.

**Ground 2 – Taylor's Trial Attorneys Were Not Ineffective Because Wade's Statement Was Admitted As Evidence at Trial.**

Taylor claims that the admission of Wade's statement violated his Sixth Amendment right to the effective assistance of counsel. To be clear, Taylor is not claiming that his counsel was ineffective or that his counsel's performance was deficient but, because his counsel had no opportunity to cross-examine Wade as to this statement, that circumstance operated to deny him effective assistance of counsel. Taylor contends that the resolution of this issue in the state courts in Kentucky was based on an unreasonable determination of the facts in light of the evidence, and that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

Due to the nature of the claim, Taylor did not raise this argument on direct appeal. However, Taylor raised the issue in his collateral proceeding in the trial court, pursuant to RCr 11.42, but the trial court rejected this claim. Taylor then raised it in appealing the denial of his RCr 11.42 motion. The Kentucky Supreme Court in *Taylor II* affirmed the denial of Taylor's RCr 11.42 motion, and acknowledged this claim of ineffective assistance of counsel

by stating, "[i]n conclusion, we note that any allegation of error not specifically addressed above has been considered and rejected as having no merit." 63 S.W.3d at 168.

The trial court transcript reflects that Taylor's counsel made repeated attempts to exclude Wade's statement from being admitted, objecting that its admission was a Confrontation Clause violation because the statement had not been cross-examined and, with Wade not testifying, could not be cross-examined. Counsel moved to exclude Wade's statement [Trial Record ("TR") 37, 5437] and vigorously objected on the record to its admission. Counsel's motion in limine objecting to the admission of Wade's statement and discussion with the trial court is memorialized in thirty pages of trial transcript. [Transcript of Evidence ("TE") 4/10/86, 2–31] Although the trial court ruled that Wade's statement was admissible, Taylor's counsel succeeded in getting Wade's statement redacted to delete evidence of other crimes. Because Taylor's counsel recognized the issue and strenuously objected on Taylor's behalf, his trial counsel cannot be deemed ineffective. The fact that counsel did not prevail on his motion in limine to prohibit the admission of Wade's statement does not change the fact that Taylor received effective assistance of counsel. Thus, there was no violation of Taylor's Sixth Amendment right to counsel. *See Bell*, 535 U.S. at 694–98.

Consequently, the Kentucky Supreme Court's decision in *Taylor II* rejecting this claim as having no merit was not an unreasonable determination of the facts in light of the evidence. Further, it was neither contrary to, nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Taylor's contention otherwise is without merit.

**Ground 3 – Admission of Testimony Regarding Wade's Verbal Acts Was Proper and Did Not Violate the Confrontation Clause.**

The foundation for this claim is based on the following facts: Lieutenant Moody testified that after Cecil Pepper identified Wade in a lineup, he and Detective Duff took Wade to 716 E. Oak Street and 915 S. Jackson Street, where Wade identified the residences at these addresses as Taylor's residences. [TE 4/9/86, 105–10]  Detective Sherrard testified that, on the basis of Wade's information that the residences located at these two addresses were Taylor's, he went to 915 S. Jackson Street to get a description of the residence for a search warrant. [TE 4/8/86, Vol. I, 23–24]

On direct appeal, Taylor claimed that the police officer's testimony was inadmissible hearsay evidence (since Wade did not testify at trial) and argued that no exception to the hearsay rules justified the admission of this testimony. *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky. 1988).  Taylor contended that the jury should not have been allowed to learn why the police knew to search these two particular residences.  Taylor contends that this hearsay evidence amounted to an impermissible vouching for Wade's veracity and bolstered the taped statement Wade made that painted Taylor as the triggerman which Taylor submits was a critical factor in the prosecution's case.

In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding no merit to any of his claims, and addressed this particular claim in the following manner:

> Taylor, through counsel, raises forty-four assignments of alleged error in this appeal.  We have carefully reviewed all of the issues presented by Taylor and this opinion will concentrate on the question of the admissibility of the Wade confession and the propriety of the trial judge's refusal to grant a second change of venue.  **Allegations of error which we consider to be without merit will not be addressed here.**

821 S.W.2d at 74 (emphasis added).

In this habeas petition, Taylor claims that the admission of Lieutenant Moody and Sherrard's testimony violated the Confrontation Clause because Wade's statements to the police while he was in custody were testimonial statements against him by a non-testifying witness. Taylor also contends that the admission of Moody and Sherrard's testimony violated the Due Process Clause because it related to Wade's veracity and his statement implicating Taylor as the triggerman was a critical factor in the prosecution's case. Taylor relies on *Snowden v. Singletary*, which indicates that "[a] denial of fundamental fairness occurs whenever the improper evidence 'is material in the sense of a crucial, critical, highly significant factor.'" 135 F.3d 732, 737 (11th Cir. 1998) (quoting *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir. 1983)).

Federal habeas corpus ordinarily does not lie to review questions about the admissibility of evidence. *McGuire*, 502 U.S. 62. Generally, to rise to the level of a constitutional violation, the state court evidentiary ruling complained of must be so prejudicial that it renders a fair trial impossible. *Lisenba v. People of State of California*, 314 U.S. 219, 228–29 (1941). The evidentiary ruling must be so egregious as to amount to a denial of fundamental fairness. *McGuire*, 502 U.S. at 67; *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). This obviously is a high standard. *See, e.g., Baze*, 371 F.3d at 318.

Although Taylor characterizes the police officers' testimony as "hearsay," his complaint centers on the fact that the police officers escorted George Wade to two different residential addresses that he identified as being Taylor's residences. Armed with this information, the police officers then obtained a search warrant for these residences. Taylor

misrepresents this testimony as hearsay. Wade's act of pointing out Taylor's residences to the police was nothing more than a "verbal act." Moody did not repeat anything that Wade said. Instead, he described what Wade said. For this reason, the hearsay rule does not apply, and there was no need to consider if it were admissible as an exception thereto. *See Preston v. Commonwealth*, 406 S.W.2d 398, 401 (1966). To be admissible, evidence of a verbal act need only be relevant to the facts in issue. *Id.* ("This is not hearsay evidence; it is not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place.") In *Sanborn*, the Court elaborated on the relevancy requirement of verbal act evidence. 754 S.W.2d at 541. The Court noted that a verbal act introduced through the testimony of an investigating police officer is admissible if two requirements are met. First, it must tend to explain why the police officer took certain action, and second, the police officer's taking of that action must involve a fact in issue:

> The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case. Such information is then admissible, not to prove the facts told to the police officer, but only to prove why the police officer then acted as he did. It is admissible *only if* there is an issue about the police officer's action.

*Id.*

As stated in Lawson's *Kentucky Evidence Law Handbook,* § 8.00 (2d ed. 1984), in distinguishing "verbal act" doctrine evidence from hearsay, "[a]n extrajudicial statement has a proper nonhearsay use when its utterance (*not its substance*) is a part of the issues of the case." The fundamental premise underlying the use of such testimony is not the admissibility of "investigative hearsay" but the "verbal act" doctrine because it is admitted

"for the purpose of describing the relevant details of what took place." *Preston*, 406 S.W.2d at 401.

In Taylor's case, this evidence was relevant because it explained why Lt. Moody initiated the search of Taylor's residences. The identification and search of Taylor's residences clearly involved material issues of fact. Thus, the police officer's testimony was admissible under the "verbal act" doctrine. It was not hearsay, and the trial court did not err in admitting it. Because this information was presented only to explain why the officers took action to search Taylor's residences, this testimony was admissible under Kentucky's evidentiary rules. The Kentucky Supreme Court's decision in *Taylor I*, rejecting this claim as having no merit, was not an unreasonable determination of the facts in light of the evidence. Further, it was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

**B.      The Proximity of the Wade and Taylor Trials**

Wade's trial immediately preceded that of Taylor.[4]  Wade's trial concluded on March 5, 1986.  On March 13, 1986, Wade was sentenced and received a life sentence. [TR 50, 7335–38]  Taylor's trial began on March 17, 1986.  There was significant publicity regarding the decision to sentence Wade to a life term rather than impose the death penalty.  As a result of the publicity, on March 10, 1986, Taylor moved for a continuance.  Taylor claimed that the public was outraged that Wade did not receive the death penalty, and he argued that a

---

4      Taylor's claims identified as Grounds 4, 5, and 6 all concern the proximity of Wade and Taylor's separate trials.  In the interests of judicial economy, the following factual background will serve as the basis for these arguments.

continuance would be a suitable alternative to a second change of venue. However, the trial court denied the motion to continue.

On March 17, 1986, the day jury selection began, Taylor filed a second motion to change venue. He cited the continuing publicity regarding the Wade sentence, including numerous newspaper articles and media coverage. The motion was served on the Commonwealth on March 14, 1986, and filed on March 17. Taylor also filed an addendum to the motion on March 17, requesting a change of venue to Boyle County, Anderson County, or Fulton County. The trial court denied Taylor's second motion for a change of venue because Taylor did not give "reasonable notice" to the Commonwealth. [TR 52, 7596] Before trial began, Taylor moved the trial court to reconsider its denial of the motion, but that motion was also denied. However, while denying the motion, the trial court advised counsel that it was keeping an open mind as to a possible change of venue, indicating that a second change of venue was available if difficulty occurred in seating a fair and impartial jury in Fayette County.

### Ground 4 – The Trial Court Did Not Err by Denying Taylor's Request for Change of Venue Due to Pretrial Publicity and Information about Wade's Trial.

On direct appeal, Taylor claimed that he was deprived of a fair trial by the denial of his motion for a second change of venue. Specifically, he argued that pretrial publicity and information about the Wade trial and sentence made it impossible for a fair and impartial jury to be seated in Fayette County. "Supreme Court precedent instructs that, when evaluating whether the pretrial publicity violated the defendant's right to an impartial jury, [the court is] to consider the content, quantity, and timing of the publicity." *Hetzel v. Lamas*, 372 F. App'x 280, 282–83 (3rd Cir. 2010) (citing *Murphy v. Florida* , 421 U.S. 794, 798–

803 (1975)). The Supreme Court has further held that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). However, prejudice from pretrial publicity is rarely presumed. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998).

As noted by the Kentucky Supreme Court in *Taylor I*, 821 S.W.2d at 76–77, and *Taylor II*, 63 S.W.3d at 161, the trial court encountered little difficulty in seating a fair and impartial jury. No prejudice to Taylor occurred as a result of pretrial publicity and information about the Wade trial and sentence. *See Murphy*, 421 U.S. at 798. Both the jury voir dire and actual pretrial publicity were reviewed and ultimately determined to not support Taylor's claim. The level of pretrial publicity was not sufficient to raise a presumption of prejudice. As a result, the Kentucky Supreme Court properly reviewed this claim under prevailing Supreme Court precedent and correctly concluded that no trial error occurred.

### Ground 5 - Taylor Was Not Denied Due Process or a Fair Trial by the Denial of His Motion for a Continuance Following Wade's Trial.

Taylor claims that he was denied a fair trial when the court declined to continue his trial until the public attention to the Wade trial and sentence had subsided. His factual argument focuses on pretrial publicity and is very similar to the one used in support of Ground 4 questioning the denial of his the motion for a change of venue. However, Taylor also cites *Sheppard v. Maxwell*, 384 U.S. 333 (1966), which involves "instances where the media significantly interfere[s] with the trial itself." *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011). Taylor asserts that he, like Sheppard, was denied due process and was entitled to a trial continuance.

Taylor initially raised this claim on direct appeal. In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding no merit to any of his claims. As noted infra, the court addressed this particular claim in the following manner:

> Taylor, through counsel, raises forty-four assignments of alleged error in this appeal. We have carefully reviewed all of the issues presented by Taylor and this opinion will concentrate on the question of the admissibility of the Wade confession and the propriety of the trial judge's refusal to grant a second change of venue. **Allegations of error which we consider to be without merit will not be addressed here.**

821 S.W.2d at 74 (emphasis added).

*Sheppard* was a high-profile murder case in Cleveland, Ohio. In 1954, Sheppard was convicted for the murder of his wife and received a life sentence. The District Court granted Sheppard's § 2254 habeas petition, but the Sixth Circuit reversed on appeal. *See Sheppard v. Maxwell*, 346 F.2d 707 (6th Cir. 1965). The United States Supreme Court granted *certiorari* and reversed and remanded, instructing the District Court to issue the writ and order that Sheppard be released unless the state elected to re-try him. *Sheppard*, 384 U.S. at 335. Publicity surrounded the *Sheppard* case, both prior to and during the trial. The trial court, in large part, gave the press free reign of the courthouse, as described in the following excerpt:

> All of these arrangements with the news media and their massive coverage of the trial continued during the entire nine weeks of the trial. The courtroom remained crowded to capacity with representatives of news media. Their movement in and out of the courtroom often caused so much confusion that, despite the loud-speaker system installed in the courtroom, it was difficult for the witnesses and counsel to be heard. Furthermore, the reporters clustered within the bar of the small courtroom made confidential talk among Sheppard and his counsel almost impossible during the proceedings. They frequently had to leave the courtroom to obtain privacy. And many times when counsel wished to raise a point with the judge out of the hearing of the jury it was necessary to move to the judge's chambers. Even then, news media representatives so packed the judge's anteroom that counsel could hardly return from the chambers to the courtroom. The reporters vied with each other

to find out what counsel and the judge had discussed, and often these matters later appeared in newspapers accessible to the jury.

The daily record of the proceedings was made available to the newspapers and the testimony of each witness was printed verbatim in the local editions, along with objections of counsel, and rulings by the judge. Pictures of Sheppard, the judge, counsel, pertinent witnesses, and the jury often accompanied the daily newspaper and television accounts. At times the newspapers published photographs of exhibits introduced at the trial, and the rooms of Sheppard's house were featured along with relevant testimony.

The jurors themselves were constantly exposed to the news media. Every juror, except one, testified at voir dire to reading about the case in the Cleveland papers or to having heard broadcasts about it. Seven of the 12 jurors who rendered the verdict had one or more Cleveland papers delivered in their home; the remaining jurors were not interrogated on the point. Nor were there questions as to radios or television sets in the jurors' homes, but we must assume that most of them owned such conveniences. As the selection of the jury progressed, individual pictures of prospective members appeared daily. During the trial, pictures of the jury appeared over 40 times in the Cleveland papers alone. The court permitted photographers to take pictures of the jury in the box, and individual pictures of the members in the jury room. One newspaper ran pictures of the jurors at the Sheppard home when they went there to view the scene of the murder. Another paper featured the home life of an alternate juror. The day before the verdict was rendered—while the jurors were at lunch and sequestered by two bailiffs—the jury was separated into two groups to pose for photographs which appeared in the newspapers.

*Id.* at 344–45.

The *Sheppard* Court was understandably concerned about the atmosphere in which the trial was conducted. For instance, the trial court permitted numerous newspaper reporters to sit at a table inside the bar near counsel and the jury. *Id.* at 355. Media coverage was out of control due, in part, to the trial court's failure to establish the parameters of media coverage. "[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." *Id.* The trial court failed to adequately caution the jurors not to read or listen to

anything about the case even though they were subject to newspaper, radio, and television coverage when not at trial. *Id.* at 356–57. The jury's exposure to publicity during the trial was especially problematic because false reporting was rampant, including negative rumors about Sheppard that were never part of the evidence at trial. *Id.* Further, witnesses were not insulated from this publicity. The trial was conducted in a "carnival atmosphere" that could easily have been avoided by the trial court taking control over the courthouse and courtroom. *Id.* at 358.

Additionally, the trial was conducted two weeks before hotly contested elections where both the trial judge and the chief prosecutor were running for judgeships. *Id.* at 354. The *Sheppard* Court suggested that a continuance of the trial until after the elections would have alleviated any concerns with the timing of the elections. *Id.* at 354 n.9. Here, there is no allegation that the election cycle had a bearing on Taylor's case.

Taylor's reliance on *Sheppard* is clearly misplaced. His factual allegations focus on pretrial publicity and fail to reflect a trial atmosphere even close to that described in *Sheppard*. Further, pretrial publicity did not impede jury selection. As detailed by the Kentucky Supreme Court, the trial court had little difficulty seating a fair and impartial jury in Taylor's case, eliminating any need for a continuance. *Taylor I*, at 76–77, and *Taylor II*, at 161. Specifically, the *Taylor I* court noted:

> In regard to the issue of juror bias, a careful examination of the extensive record of jury voir dire indicates that the trial judge took very extended precautions to insure the fairness of the jury panel. The prospective jurors were subject to general and individual voir dire regarding publicity about Wade's sentence and as to their ability to be impartial. All prospective members of the jury received a letter from the Court Administrator advising them not to read or discuss the Wade trial. They all indicated that they had followed the instructions of the court. The record clearly indicates that all

twelve jurors demonstrated that they had little if any knowledge of either Wade or Taylor and only one juror had even heard of the so-called Truth in Sentencing legislation. None of the responses indicated any degree of prejudice as a result of pretrial publicity. The selection of the jury was fair and impartial.

821 S.W.2d at 76–77.

The Kentucky Supreme Court's finding regarding the selection of Taylor's jury is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Patton*, 467 at 1031. Taylor has not overcome that presumption by demonstrating that the trial court had difficulty in seating a fair and impartial jury resulting in prejudice to him. *See Murphy*, 421 U.S. 794. Both voir dire and actual pretrial publicity were reviewed and ultimately determined to not support Taylor's claim. As a result, the Kentucky Supreme Court properly reviewed this claim under the prevailing federal standard and correctly concluded that no trial error occurred.

## CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL[5]

Ineffective assistance of counsel is a mixed question of law and fact that is reviewed under the two-part test established in *Strickland v. Washington*. 466 U.S. 668 (1984). It requires a defendant to show: (i) counsel's performance was deficient by "[falling] below an objective standard of reasonableness," *id.* at 687–88; and (ii) that the defendant was "prejudiced" by such deficient performance. *Id.* at 691–92.

To determine if counsel's performance is deficient, the court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing

---

5    Taylor raises numerous claims of ineffective assistance of counsel in this petition, specifically as Grounds 6, 14, 28, 30–38, and 42. In the interests of judicial economy and efficiency, this Court incorporates by reference the following well-settled test for evaluating claims of ineffective assistance of counsel that will be applied to all of Taylor's claims considered hereafter that his counsel was ineffective. The *Strickland* test is set out below and will not be repeated *verbatim* hereafter.

professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688–89); *Poindexter v. Mitchell*, 454 F.3d 564, 577 (6th Cir. 2006). This review requires consideration of the norms of practice as reflected in the American Bar Association Guidelines. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

To establish prejudice under *Strickland* "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This threshold showing is less than a preponderance of the evidence. *Id.* The Sixth Circuit has held "that a petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability that the result would have been different." *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000).

### Ground 6 – Trial Counsel Was Not Ineffective Due to the Late Filing of the Motion for a Second Change of Venue.

As noted above, on March 17, 1986, the day his trial began, Taylor's counsel filed a motion for a second change of venue, citing the continuing publicity regarding the Wade sentence. The motion was served on the Commonwealth on Friday, March 14, 1986. [Supp. TR, Vol. II, 86] In open court, on Monday, March 17, 1986, Taylor filed an addendum to that motion, requesting a change of venue to Boyle County, Anderson County, or Fulton County. [TR 50, 7400–01] The motion was denied because reasonable notice had not been given to the Commonwealth. Before trial began, Taylor moved the trial court to reconsider its ruling denying his motion for a second change of venue, but it was also denied.

In his post-conviction motion filed pursuant to RCr 11.42, Taylor claimed that his counsel was ineffective for the late filing of the motion for a second change of venue. In denying the motion, the trial court declined to address this particular claim on the merits because it had "been raised on appeal, reviewed by the Kentucky Supreme Court, and resolved in favor of the Commonwealth." [Order Denying RCr 11.42 Motion, p. 4 (PCTR 306); Appendix for Appellee, Inventory Item No. 5(u)] Taylor appealed and the Kentucky Supreme Court in *Taylor II* affirmed that denial, addressing this particular claim as follows:

> Taylor raised forty-four (44) issues on direct appeal. We directly addressed only a select few of these issues in that opinion. The rest we cursorily dismissed by stating: "Allegations of error which we consider to be without merit will not be addressed here." *Taylor*, 821 S.W.2d at 74. Even though some issues were not specifically addressed on direct appeal, they were all considered and resolved against Taylor. *See Commonwealth Transportation Cabinet Department of Highways v. Taub*, Ky., 766 S.W.2d 49, 51–52 (1988). Taylor tries to circumvent this well-settled rule by glossing errors already raised as claims of ineffective assistance of counsel. These issues include:
>
> *Failure to Make a Timely Request for a Change of Venue*
>
> Taylor argues that his attorneys were ineffective for failing to make a timely request for a second change of venue. On direct appeal, we noted that the trial court did not abuse its discretion in denying the motion because the defense did not give reasonable notice. *Taylor*, 821 S.W.2d at 76. But we also noted that the trial court kept the issue open should need arise to revisit the issue and, further, that the trial court had little trouble seating an unbiased jury. *Id*. at 76–77.

63 S.W.3d at 160–61.

Ignoring the fact that Taylor's claim of ineffective assistance of counsel is an attempt to recharacterize his claim raised on direct appeal that the trial court erred in denying his motion for a second change of venue, Taylor's alleged claim of ineffective assistance of counsel on this issue has no merit. The Kentucky Supreme Court determined on direct

appeal that Taylor was not prejudiced by being tried in Fayette County. *Taylor I*, 821 S.W.2d at 77. In the absence of prejudice, there is no viable claim of ineffective assistance. *See Strickland*, 466 U.S. 668. Thus, even if filing the motion late is viewed as deficient performance of counsel, his claim of ineffective assistance lacks merit because he has failed to satisfy both prongs of the *Strickland* test. *See id.* at 697.

On direct appeal, the Kentucky Supreme Court concluded that "[t]he selection of the jury was fair and impartial. Consequently, there was no need for a second change of venue." *Taylor I*, 821 S.W.2d at 77; *see also Taylor II*, 63 S.W.3d at 161. The Kentucky Supreme Court's finding that the selection of Taylor's jury was fair and impartial is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Patton*, 467 U.S. at 1031. Additionally, Taylor's counsel made a strategic choice by filing a motion on March 10, 1986, for a continuance of the trial, rather than moving at that time for a second change of venue. [TR 7344–47] The strategic choices of counsel fall outside of the scope of review. *See Strickland*, 466 U.S. at 681; *Jackson v. Houk*, 687 F.3d 723, 744 (6th Cir. 2012). Further, when denying the motion for a second change of venue, the trial court did not completely foreclose further consideration of the issue. The court stated that it would consider moving the trial if problems in seating an impartial jury occurred. *Taylor I*, 821 S.W.2d at 72. However, because no problems developed in seating a jury, there was no need to revisit the issue. Taylor was not entitled to a second change of venue. *See* KRS § 452.240.

The Kentucky Supreme Court's decision in *Taylor II* rejecting this claim of ineffective assistance of counsel as having no merit was not an unreasonable determination of the facts in light of the evidence. Likewise, it was neither contrary to nor did it involve an

unreasonable application of clearly established federal law as determined by the United States Supreme Court. This claim of ineffective assistance of counsel fails to demonstrate prejudice under the *Strickland* test.

### Ground 7 - Taylor Was Not Denied His Right to be Tried by a Jury Drawn from a Fair Cross-Section of the Community.

Taylor claims that he was denied the right to be tried by a fair cross-section of the community due to the denial of a continuance or a second change of venue. Taylor raised this claim on direct appeal. In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding all of his forty-four claims to be without merit. However, the court addressed only two of Taylor's claims at length. Taylor's remaining forty-two claims, including the present claim at issue, were not addressed in depth. *Taylor I*, 821 S.W.2d at 74.

In addressing Taylor's claim regarding the denial of his motion for a second change of venue, the *Taylor I* court made the following observation about the jury selection in Taylor's case:

> . . . a careful examination of the extensive record of jury voir dire indicates that the trial judge took very extended precautions to insure the fairness of the jury panel. The prospective jurors were subject to general and individual voir dire regarding publicity about Wade's sentence and as to their ability to be impartial. All prospective members of the jury received a letter from the Court Administrator advising them not to read or discuss the Wade trial. They all indicated that they had followed the instructions of the court. The record clearly indicates that all twelve jurors demonstrated that they had little if any knowledge of either Wade or Taylor and only one juror had even heard of the so-called Truth in Sentencing legislation. None of the responses indicated any degree of prejudice as a result of pretrial publicity. The selection of the jury was fair and impartial.

*Id.* at 76–77.

Taylor argues that the pool of potential jurors was reduced to such an extent that his petit jury was drawn from a jury pool so small that it no longer represented a fair cross-section of the community. Taylor's jury pool was comprised of 119 persons.[6] From the pool of 119, 38 potential jurors were qualified for Taylor's trial. After 38 veniremen were qualified, the trial court determined that no additional jurors needed to be qualified. The jury pool of 38 was deemed large enough to accommodate the parties' exercise of their peremptory strikes and seat a petit jury with alternate jurors. Taylor contends that since only approximately 32% of the total jury pool was qualified [TR 51, 7503–06], his jury was not drawn from a fair cross-section of the community.

Taylor correctly points out that petit jurors must be drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522 (1975); *Smith v. Commonwealth*, 734 S.W.2d 437, 442 (Ky. 1987). However, this requirement applies to jury pools, not the petit jury itself. *Taylor*, 419 U.S. at 537. A jury cannot fulfill its objective if "large, distinctive groups [of the community] are excluded from the pool." *Id.* at 530. Potential jurors comprising the large jury pool that share an attitude (*e.g.*, opposition to the death penalty) do not qualify as a distinctive group in the constitutional sense. *Buchanan v. Kentucky*, 483 U.S. 402, 415–16 (1987); *Lockhart v. McCree*, 476 U.S. 162, 174 (1986). Similarly, potential jurors excused from jury service due to pretrial publicity, economic hardship, and medical reasons, do not comprise such a distinctive group. *See Stanford v. Commonwealth*, 734 S.W.2d 781, 784–85 (Ky. 1987), *aff'd on other grounds*, *Stanford v. Kentucky*, 492 U.S. 361 (1989).

---

6       The Master List of jurors consisted of 154 persons. [TR 51, 7503-06] Thirty-five individuals were excused from jury service prior to the commencement of the voir dire examination, leaving a pool of 119 persons.

Taylor does not claim that the jury pool of 119 veniremen did not represent a fair cross-section of the community. Instead, he argues that the trial court should have qualified more than 38 jurors from the pool to seat his petit jury. He asserts that due to pretrial publicity, the jury was drawn from a pool that had been reduced by 68%, a reduction that is too large in the constitutional sense. However, Taylor cites no authority — and the court is not aware of any such authority — establishing a bright-line rule regarding the point when a jury pool is reduced to such a degree that it no longer represents a fair cross-section of the community. "'[T]he point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn . . . .' Thus, the court's use of a facially neutral procedure in questioning a panel of potential jurors does no harm to a defendant's due process rights." *Stanford*, 734 S.W.2d at 785 (quoting *Pope v. United States*, 372 F.2d 710, 725 (8th Cir.1967), *vacated on other grounds*, 392 U.S. 651 (1968)). In short, the reduction of Taylor's potential jury pool due to pretrial publicity was a facially neutral reduction and is of no constitutional significance.

The Supreme Court of Kentucky's finding that the jury selection was fair and impartial is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *see Patton*, 467 U.S. at 1036 (stating that it is a question of historical fact whether "a juror [swore] that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed"). Taylor has not overcome this presumption by demonstrating that the trial court had difficulty in seating a fair and impartial jury resulting in prejudice to him. *See Murphy*, 421 U.S. 794. Because the jury voir dire and actual pretrial publicity was reviewed and ultimately determined to not support Taylor's

claim, the Kentucky Supreme Court properly reviewed this claim under the prevailing federal standard and correctly concluded that no trial error occurred.

### Ground 8 - Excusing Five Jurors Who Were Adverse to the Death Penalty Did Not Violate Taylor's Right to be Tried by an Impartial Jury.

During jury selection, the trial court excused five jurors for cause: Lewis, Newsome, Brown, Newman, and Chandler. Each was opposed to capital punishment. Taylor claims that by excusing these jurors the trial court deprived him of his right to be tried by an impartial jury. Taylor raised this claim on direct appeal. This claim was not addressed in detail by the Supreme Court of Kentucky. *Taylor I*, 821 S.W.2d at 74.

The standard to be used by a trial court in determining whether a juror should be excused for cause is summarized in *Buchanan v. Kentucky*.

> A "death-qualified" jury is one from which prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that "would 'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). The prosecutor may remove such potential jurors according to the guidelines set out in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as refined by the decision in *Witt*. For the sake of shorthand, see *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), jurors properly excluded are called "*Witherspoon*-excludables."

483 U.S. at 407 n.6.

It is within the province of the trial judge to disqualify veniremen from jury service for bias based upon determinations of demeanor and credibility. *Wainwright v. Witt*, 469 U.S. 412, 428 (1985). As the Court noted in *Witt*, "deference must be paid to the trial judge who sees and hears the juror," *id.* at 425–26, as the trial judge's "predominant function in

determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Id.* at 429. The trial court's finding on the issue of a potential juror's impartiality "'ought not be set aside by a reviewing court, unless the error is manifest.'" *Irvin v. Dowd*, 366 U.S. 717, 723–24 (1961) (quoting *Reynolds v. United States*, 98 U.S. 145, 156 (1878)).

Having reviewed the responses of the five jurors to questions posed by the court and counsel, it is clear that each was substantially impaired by their own beliefs, religious or otherwise, concerning the death penalty. None could "temporarily set aside their own beliefs in deference to the rule of law." *Lockhart*, 476 U.S. at 176.

Consequently, the decision of the Supreme Court of Kentucky on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent. The Supreme Court of Kentucky properly reviewed this claim under the prevailing federal standard and correctly concluded that no trial error occurred.

### Ground 9 – The Trial Court's Denial of Taylor's Motion to Strike Three Jurors for Cause Did Not Violate Taylor's Right to be Tried by an Impartial Jury.

During jury selection, Taylor moved to strike three veniremen for cause: Fisher, Parsons, and Phillips. He argued that they should be stricken because of their beliefs that a person who commits murder should receive the death penalty. Taylor asserts that the jurors' beliefs were so strongly held that they were unable to consider all of the possible range of penalties that could be imposed. Ultimately, these veniremen were seated. Taylor alleges that the court erred in denying his motion, resulting in the deprivation of his right to be tried by an impartial jury. Taylor raised this claim on direct appeal. However, it was not addressed in detail by the Supreme Court of Kentucky. *Taylor I*, 821 S.W.2d at 74.

As outlined above, the standard to be used by a trial court in determining whether a juror should be excused for cause is summarized in *Buchanan*, 483 U.S. at 407, n.6.  This Court has reviewed the responses of the three jurors to questions posed by the trial court and counsel.  It is clear that, while each stated that they believed the death penalty was appropriate under certain conditions, none was so entrenched in his or her beliefs, religious or otherwise, that they could not "temporarily set aside their own beliefs in deference to the rule of law." *McCree*, 476 U.S. at 176.  Consequently, the decision of the Supreme Court of Kentucky on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.  The Kentucky Supreme Court properly reviewed this claim under the prevailing federal standard and correctly concluded that no trial error occurred.

### Ground 10 – Juror Leach Honestly and Fully Answered Voir Dire Questions. Her Inclusion on the Jury Did Not Deny Taylor His Right to an Impartial Jury.

Taylor claims that during juror Leach's post-conviction testimony, he learned that she failed to disclose her true religious beliefs regarding capital punishment during voir dire.  As a result, Taylor alleges that the juror was substantially impaired by her belief that one convicted of murder should receive the death penalty.  Taylor moved for a new trial on that ground pursuant to RCr 10.02 and CR 60.02, asserting that Leach would have been excused for cause had her answers been completely truthful during voir dire.  Taylor also claims that, regardless of whether juror Leach would have been excused for cause, he was impaired in the fair exercise of his peremptory challenges because he was forced to exercise them on less than complete and honest information.

The trial court denied Taylor's motion for a new trial on this claim. Taylor appealed and, in *Taylor III*, the Kentucky Supreme Court concurred with Taylor that the trial court had misapplied RCr 10.04. However, Taylor failed to show that juror Leach had answered dishonestly or that she should have been stricken for cause. The Supreme Court of Kentucky found that juror Leach had given honest answers to the voir dire questions and affirmed the denial of his motion for a new trial.[7] 175 S.W.3d at 74–75. The Court stated:

The second part of Taylor's CR 60.02 motion for a new trial was that a juror answered falsely when questioned during voir dire as to whether she could consider the full range of penalties for one convicted of murder. Specifically, Taylor argues that one particular juror failed to disclose religious beliefs that impaired her ability to consider a penalty other than death. During the post-conviction hearing, the juror in question said that "God's word does say that the death penalty is appropriate for murderers." It is Taylor's contention that because this information about the juror's belief in the death penalty was not shared with the defense when asked if she had any philosophical, religious or moral beliefs concerning the death penalty, his defense team could not use this information to move to strike her for cause or to use his peremptory challenges against her. It follows, he argues, that he is entitled to a new trial.

While Taylor is correct that the lower court misinterpreted RCr 10.04, he fails to show that a new trial is appropriate due to the juror's answers during *voir dire*. RCr 10.04 states that "[a] juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot." However, we have not interpreted this rule as the clear-cut exclusionary rule that its text appears to suggest. Indeed, we could not read it in such a way because the rule must give way to various constitutional requirements, such as due process of law. Our predecessor court noted as much in *Ne Camp v. Commonwealth* when it refused to allow the rigidity of the rule to stifle reversal where "[t]he misconduct [was] obvious." FN11 And later this Court, in an opinion that cited RCr 10.04, noted that a defendant is free to establish that a juror did not truthfully answer on *voir dire*, but that it could not be established upon evidence of anything that occurred in the jury room. FN12 So Taylor is correct that he may challenge the juror's answers at *voir dire* with her testimony given during the post-conviction hearing. But he must still meet the burden of proving those answers merit a new trial.

---

7    The Kentucky Supreme Court did not expressly address Taylor's claim that he was impaired in the use of his peremptory challenges. However, with the finding that juror Leach was honest in her answers, the Court by implication determined that this claim lacked merit.

FN11. 311 Ky. 676, 680, 225 S.W.2d 109, 112 (1949).

FN12. *Hicks v. Commonwealth*, 670 S.W.2d 837, 839 (Ky. 1984).

As this Court has recently stated, to merit a reversal because of the juror's allegedly improper responses (or lack of a response), a defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." FN13 When applying this test to the facts, it is clear that Taylor does not merit a new trial.

FN13. *Adkins v. Commonwealth*, 96 S.W.3d 779, 796 (Ky. 2003) citing *McDonough Power Equip. Co. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984).

Essentially there are three elements a defendant must show to deserve a new trial because of juror mendacity during *voir dire*. First, a material question must have been asked. Second, the juror must have answered the question dishonestly. And finally, the truthful answer to the material question would have subjected the juror to being stricken for cause. Here, there was a material question asked to the juror. A question about whether a potential juror believes she can consider the full range of penalties upon a conviction for murder is about as material as they come. However, Taylor fails to show that the juror answered the question dishonestly or that she should have been stricken for cause. During *voir dire* the juror was directly asked by the judge about her beliefs about capital punishment:

Judge: Do you have any belief, religious, philosophical or moral, regarding capital punishment, either for or against?

Juror: Do I need to answer that with a yes or no?

Judge: Any way you wish to.

Juror: I feel that there are circumstances where it is a justified reason for capital punishment but I think the evidence would have to weigh this before I made a decision.

Judge: Would it be fair that in your mind you have no fixed position, that you are neither opposed for moral or religious or whatever reasons or for either way?

Juror: No.

Judge:  That your mind is open on that issue?

Juror:  Yes sir.

      And she was also questioned by the defense counsel.

Counsel:  I don't want to try and lead you or anything but what I would like for you to do if possible is just tell me how you feel about the death penalty in general. What would be your viewpoint on it?

Juror: I think that there are situations where the death penalty is justifiable and I think there again, it goes back to the situation and the evidence presented that would justify whether or not a person's life should be taken.

Counsel:  Do you feel that everybody convicted of murder should get the death penalty?

Juror:  Not necessarily.

Counsel:  You have heard about aggravating factors, such as robbery or something like that. Do you feel that people who are convicted of murder plus an aggravating factor should automatically get the death penalty?

Juror:  No, sir, I don't think so.

Taylor acknowledges these statements by the juror, but argues that she did not say the complete truth, and that if she had she would have been stricken for cause.  We disagree.  The statement the juror made at the post-conviction hearing that Taylor bases his argument on is that "God's word does say that the death penalty is appropriate for murderers."  But this was already stated, albeit in a different way, as a response to both the judge and defense counsel. Taken in context, the juror's responses indicate that she was willing to take the evidence as it was presented and to reach a conclusion consistent with what the facts would allow.  There is no reversible error in that.  We hold that the juror answered honestly, and that the trial judge was correct in denying Taylor's CR 60.02 motion for a new trial based on her answers during *voir dire*.

*Taylor III*, 175 S.W.3d at 74–75.

      As demonstrated by her answers, Juror Leach had an open mind on the death penalty

issue.  She did not believe that all convicted murderers should necessarily or automatically

receive the death penalty. It is clear from her answers that, while believing that the death penalty may be appropriate for one convicted of murder, she could consider the full range of penalties as well as the defendant's circumstances and the evidence in making that decision. On appeal, the Kentucky Supreme Court found that Leach "was willing to take the evidence as it was presented and to reach a conclusion consistent with what the facts would allow. There is no reversible error in that. We hold that the juror answered honestly, and that the trial judge was correct in denying Taylor's CR 60.02 motion for a new trial based on her answers during *voir dire*." *Id.* at 75. This finding is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Ayers*, 623 F.3d at 308.

Further, the Kentucky Supreme Court recognized and applied the appropriate federal standard for a new trial. As the Sixth Circuit has noted, "[t]he *McDonough* test governs cases where it is alleged that a juror intentionally concealed information." *Dennis v. Mitchell*, 354 F.3d 511, 520–21 (6th Cir. 2003) (citing *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995)). The *McDonough* test states that a defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip. Co. v. Greenwood*, 464 U.S. 548, 556 (1984). The Kentucky Supreme Court reasonably applied *McDonough* and properly concluded that Taylor failed to carry his burden of proof on this issue. *Taylor III*, 175 S.W.3d at 74 n.13. It further held that the trial court did not abuse its discretion in denying Taylor's motion for a new trial on this ground. *Id.* at 75.

The decision of the Kentucky Supreme Court on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent. The Kentucky Supreme Court properly reviewed this claim under the prevailing federal standard and correctly concluded that no trial error occurred.

### Ground 11 – The Prosecutor's Statement to Jurors During Voir Dire That Their Verdict Could be Based Only on the Facts and Not Sympathy Did Not Deprive Taylor of His Right to Have Jury Consider Any Penalty Other Than Death.

Taylor claims that his Eighth Amendment right to have the jury consider all factors in mitigation of the death penalty was violated when the prosecutor told prospective jurors during voir dire that their verdict could be based only on facts and not sympathy. [TE 3/17/86, Vol. II, 190, 218; TR 52, 7609; TE 4/24/86, Vol. I, 10; TE 4/28/86, Vol. III, 193–194] Jurors Martin and Leach ultimately sat on Taylor's jury and heard the prosecutor's statements. Taylor objected, arguing that sympathy was a non-statutory mitigating circumstance upon which a juror could justifiably decline to impose the death penalty. The trial court instructed the prosecutor to refrain from making such comments in reference to the penalty phase. [TE 3/17/86, Vol. II, 229–30] Taylor raised this claim on direct appeal. However, the Kentucky Supreme Court did not address the claim at length. *Taylor I*, 821 S.W.2d at 74.

At the outset, it is clear that the prosecutor's statements to the prospective jurors referred to their verdict regarding guilt and not to the mitigation of any penalty. Upon Taylor's objection, the trial judge admonished the jurors and instructed them regarding what to consider when contemplating a sentence.

In *California v. Brown*, the United States Supreme Court noted that,

An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S., at 305, 96 S.Ct., at 2991. Indeed, by limiting the jury's sentencing considerations to record evidence, the State also ensures the availability of meaningful judicial review, another safeguard that improves the reliability of the sentencing process. See *Roberts v. Louisiana*, 428 U.S. 325, 335, and n. 11, 96 S.Ct. 3001, 3007, and n. 11, 49 L.Ed.2d 974 (1976) (opinion of Stewart, POWELL and STEVENS, JJ.).

479 U.S. 538, 543 (1987).

Because the prosecutor's statement referred to the guilt phase, it is reasonable to conclude that he was referring to the idea that jurors should base their verdict on the evidence, not on sympathy for the victims. It appears that the prosecutor's comments were intended to ensure Taylor a fair trial with a verdict, regardless of whether he was found innocent or guilty, based solely on the facts of the case and the evidence presented during trial.

Further, the prosecutor's comments were made during voir dire at the very beginning of the trial and not during the penalty phase. Even if jurors Martin and Leach recalled the prosecutor's remarks about sympathy, there is no indication that the prosecutor's comments influenced the jury's sentencing decision. Each juror took an oath, affirming that he or she would only decide the case as instructed, and the jury was instructed to base its decision solely on the facts. Thus, no error was committed regarding this issue.

The Eighth Amendment requires that, when imposing sentence, the jury must be able to consider any aspect of the defendant's character or record and any circumstances of the offense that the defense offers as a basis for a sentence less than death as a mitigating factor. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). In Taylor's case, the prosecutor's comments did not prevent the jury from considering any relevant mitigating factor that Taylor might have been able to show at trial. *Id.* at 607–08. The decision of the Kentucky Supreme Court on this issue on direct appeal was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

## C.    *Batson* Claims

Grounds 12 and 13 address Taylor's right to equal protection under the United States Constitution and *Batson v. Kentucky*, 476 U.S. 79 (1986).

### Ground 12 – The Prosecutor's Decision to Strike Some African-American Jurors Did Not Violate *Batson* or Taylor's Equal Protection and Due Process Rights.

The prosecutor in Taylor's case excluded four African-American jurors who had been qualified. Taylor, an African-American,[8] claims that the Commonwealth unlawfully exercised its peremptory challenges by excluding these jurors solely on the basis of race, in violation of his right to equal protection under the United States Constitution and *Batson*, 476 U.S. 79. *Batson* was decided on April 30, 1986, the same day Taylor's jury trial concluded. In 1987, the Supreme Court held that *Batson* should be applied retroactively to all criminal cases, such as Taylor's, pending on direct appeal or not yet final at the time the decision was rendered. *Griffith v. Kentucky,* 479 U.S. 314, 328 (1987). Taylor raised this

---

8    Taylor is a member of a cognizable racial group. The murder victims in this case were both Caucasian.

claim at trial and on direct appeal. Again, in *Taylor I*, the Supreme Court of Kentucky did not address this claim in detail. 821 S.W.2d at 74.

Taylor moved the trial court, pursuant to RCr 11.42, to vacate, set aside, or correct his sentence. In a proposed amendment, Taylor again raised his claim of unlawful discrimination in jury selection and later introduced evidence in support of that claim at an evidentiary hearing. The trial court denied Taylor's RCr 11.42 motion, and that denial was affirmed on appeal. The Kentucky Supreme Court in *Taylor II*, addressed his claim of unlawful racial discrimination in jury selection as follows:

> At the evidentiary hearing, Taylor placed into evidence testimony and material concerning his claim that the office of the Jefferson County Commonwealth's Attorney had a pattern and practice of systematically striking African–Americans from the jury venire. Taylor argued that this conduct violated his right to equal protection under the Fourteenth Amendment as held in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). However, *Swain* was overruled by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Further, *Batson* applied retroactively to Taylor's case because his case was still pending review in this Court when *Batson* was decided and, consequently, was "not yet final" within the meaning of *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649, 661 (1987). Therefore, *Batson*, not *Swain*, applies to Taylor's case.

> *Swain* holds that a "State's purposeful or deliberate denial" to African–Americans of the opportunity to serve as jurors solely because of race violates the right to equal protection under the Fourteenth Amendment. *Swain*, 380 U.S. at 203–04, 85 S.Ct. at 826–27, 13 L.Ed.2d at 763. To show a prima facie case under *Swain*, a criminal appellant has to show "through direct or indirect evidence, such as testimony or statistical proof, that the prosecutor had a systematic and intentional practice of excluding blacks from petit juries in criminal trials through the exercise of peremptory challenges, and that this practice continued unabated in [the appellant's] trial." *Love v. Jones*, 923 F.2d 816, 818 (1991). *Batson* overruled that portion of *Swain* that sets forth the necessary evidentiary showing needed to establish a prima facie case of racial discrimination.

> The *Batson* Court held that a defendant "may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence

concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish a prima facie case under *Batson*, a defendant has to show that he is a "member of a cognizable racial group," that the prosecutor exercised "peremptory challenges to remove from the venire members of the defendant's race," FN1 and that those "facts *and any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.*, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88 (emphasis added). Upon making out a prima facie case, the burden shifts to the prosecutor to come forward with a race-neutral explanation for the challenged peremptory strikes. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

> FN1. We note that we are aware that subsequent cases interpreting *Batson* have altered these two requirements. We are not holding otherwise in this opinion.

The *Batson* Court noted that lower courts had interpreted *Swain* as placing a "crippling burden of proof" which had effectively rendered a prosecutor's peremptory challenges immune from constitutional scrutiny. *Id.* at 92–93, 106 S.Ct. at 1720–21, 90 L.Ed.2d at 84–85. Thus, *Batson* overruled *Swain* in order to remove this disability on a defendant's constitutional challenge to a prosecutor's peremptory challenges. Nonetheless, Taylor claims error under *Swain* and its "crippling burden of proof" rather than *Batson* because he alleged a *Batson* violation on direct appeal. The issue was decided against Taylor on direct appeal and, therefore, cannot be raised in his RCr 11.42 motion. *See Thacker v. Commonwealth*, Ky., 476 S.W.2d 838, 839 (1972), which holds, "It is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by this court." The *Swain* claim is an attempt to get around this long-established rule. Even if we were to hold that *Swain* and not *Batson* was controlling, Taylor's claim would still fail for the same reason his *Batson* claim failed on direct appeal.

The evidence presented by Taylor at the evidentiary hearing focused on the first part of his burden under *Swain*, *i.e.*, whether the prosecutor's office had a systematic and intentional practice of excluding blacks from juries in criminal trials. But he presented no evidence that this practice "continued unabated" at his trial. In addition to a prosecutor's exclusion of minority members from the venire via peremptory strikes, *Batson* also requires—to establish a prima facie case—a showing of "other relevant circumstances" that create an inference that the prosecutor struck the jurors on the basis of their race. *Commonwealth v. Hardy*, Ky., 775 S.W.2d 919, 920 (1989). In the case at bar, there was no showing of other relevant circumstances at the time defense counsel objected

to the seating of the jury and no such argument on this point was made on direct appeal. Moreover, the trial court specifically noted that there was no evidence that African–Americans were systematically excluded from the venire. *Notice of Death Sentence Review* at 9, *Commonwealth v. Taylor*, 84–CR–1549 (Jefferson Circuit Court entered June 3, 1986). Therefore, since a prima facie case was not made under *Batson*, it certainly was not made under the much more restrictive holding of *Swain*.

*Taylor II*, 63 S.W.3d at 156–57.

Whether Taylor's claim is characterized as a *Batson* claim, a *Swain* claim, or a hybrid thereof, it is not procedurally defaulted as Respondent contends. Taylor has exhausted this claim and he may pursue it in the present habeas petition. Taylor raised a *Batson*-type challenge at trial and on direct appeal, and he attempted to raise a similar claim in his RCr 11.42 proceeding in his proposed "Amendment to RCr 11.42 Motion," was not addressed by the trial court. Subsequently, Taylor raised this same claim in appealing the denial of his RCr 11.42 motion. Because Taylor has, at every opportunity, presented his *Batson*-type claim to the state courts in Kentucky, it is exhausted and not procedurally defaulted.

Qualification of jurors in Taylor's trial began on March 17, 1986. After potential jurors from the original Master List of 154 veniremen had been released for various reasons, a pool of 119 veniremen remained to be qualified. Each potential juror was questioned individually by counsel and the court. On April 1, 1986, after 38 jurors had been qualified, the court determined that the pool was sufficient to permit the exercise of peremptory challenges while leaving a jury of 15, which would include 3 alternates. At that time, 10 veniremen who had not been questioned were released by the trial court. Taylor's jury pool consisted of 38 potential jurors, 7 of whom were African-Americans. One of the African-

American jurors was excused for cause during the selection process leaving six African-American jurors remaining prior to the exercise of peremptory strikes.

Counsel did not exercise peremptory challenges on April 1, 1986, but returned the next day to do so. Before the trial recessed for the day on April 1, Taylor verbally moved for reconsideration of the court's decision denying his motion for a second change of venue. He pointed out that out of 119 veniremen, the court had only qualified 38. Counsel argued that this low number indicated the community's mood and that the community had been saturated by publicity of the Wade case, resulting in a jury that did not constitute a fair cross-section of the community. [TE 4/1/86, 338–40 - Inventory Item No. 6(j)]

The Commonwealth objected to Taylor's oral motion for reconsideration, contending that the 38 qualified jurors indeed represented a cross-section of the community. As grounds for that statement, the Commonwealth asked the court to allow it to supplement the record with a chart made by the prosecutor. The chart listed the jurors by various categories including occupation, age, and education, and reflected that:

> the jurors that we have currently potentially sat are in effect a cross-section of the community. The Commonwealth request[ed] that the 38 people be put in a sealed jury form envelope so that there would be appropriate information for the appellate court to look at if the counsel pursues in its appeal of this issue.

[*Id.* at 340–41 - Inventory Item No. 6(j)] The court granted the Commonwealth's request to supplement the record with the chart and denied Taylor's oral motion to reconsider the decision on the second change of venue. [*Id.* at 341] Trial was then adjourned until April 2.

The trial court reconvened on April 2, 1986, at 12:14 p.m., solely for the purpose of allowing counsel to exercise their peremptory strikes from the 38 qualified jurors. Counsel concurrently submitted their peremptory challenges. Taylor was given 14 peremptory strikes

and exercised all of them. One of the jurors that Taylor struck was African-American. The Commonwealth was allotted 9 peremptory strikes and exercised 8 of them, striking 4 Caucasian jurors and 4 African-American jurors. Thus, on April 2, 1986, counsel knew which jurors had been stricken and which jurors would be seated for trial. After the peremptory strikes had been exercised, Taylor did not object to the Commonwealth's strikes. The hearing for the exercise of peremptory strikes lasted approximately six minutes, beginning at 12:14 p.m. and concluding at 12:20 p.m. The trial then recessed until April 7, 1986. After their parties excused their peremptory strikes, one African-American juror remained on the jury.

Between April 2 and April 7, Thompson, one of the jurors remaining after the exercise of peremptory strikes, asked to be excused. The court took up this jury matter before trial began on April 7. As grounds, Thompson informed the court that she had recently resigned from one job to take another job. She further stated that she was to start the new job later that week and that her prospective employer had informed her that if she could not start this job as scheduled, she would not be hired. As proof, Thompson provided a letter from her prospective employer for the court's consideration. Without objection, the court excused Thompson for economic hardship. Over the objection of Taylor's counsel, the court replaced Thompson with Parsons, Juror No. 442, who had been drawn by lot after the exercise of peremptory challenges but had not yet been excused.

During a bench conference following the excusal of Juror Thompson, Taylor's counsel stated:

MR. JEWELL: Okay. Note our objection to the seating of the panel on the grounds we've just stated plus previous grounds we stated last week, not being

-56-

able to interview the entire panel, the fact that the qualified group was drawn from a panel in which less than 33 percent – in fact, 32 percent qualified. The majority disqualified due to publicity, and due to the fact we believe this jury is not representative of a cross-section of the community, in that the panel – the jury that we have now contains only one minority member. It is noted that the Commonwealth used, I believe, half of their strikes to exclude two-thirds of minority members left on the panel. We would object to the seating of this jury.

[TE 4/7/86, 9–10]

In response, the prosecuting attorney represented that he had lawfully exercised his peremptory strikes, based on a California decision. The prosecutor acknowledged that it would have been objectionable if the Commonwealth had stricken all African-Americans. [*Id.* at 10]

In addressing this matter, the trial court indicated that the California case was not binding and that a case was pending before the United States Supreme Court on the issue. The court did not recall the name but, presumably, was referring to *Batson*. The trial court then stated, "I believe the issue being addressed at this time as to whether it is permissible to exercise your peremptory strikes whichever way you wish to. I don't know, but the record's clear as to what has been done in this case." [TE 4/7/86, 11]

Taylor raised this *Batson*-type claim for the first time during the bench conference, while objecting to the court's decision to replace juror Thompson with Parsons immediately before trial began. Taylor's request was based solely on the fact that the prosecutor, in exercising his peremptory challenges, removed four African-American jurors from the jury.

A defendant has the burden to establish purposeful discrimination. *Batson*, 476 U.S. at 93. This burden may be established from all circumstances and inferences drawn therefrom, including the prosecutor's "pattern" of strikes, questions, and statements. *Id.* at

96–97.  In Taylor's case, the prosecuting attorney, an African-American, struck four out of six African-American jurors.  In and of itself, that fact is insufficient to establish a *prima facie* case under *Batson*.  Mere numbers alone are not enough.  *See Commonwealth v. Hardy*, 775 S.W.2d 919, 920 (Ky. 1989) (holding that *Batson* requires more than merely stating that the prosecutor struck a certain number of African-Americans from the jury panel).  In *Wells v. Commonwealth*, 892 S.W.2d 299, 302 (Ky. 1995), the prosecutor exercised his peremptory strikes to remove three of four African-American persons from the jury.  The Supreme Court of Kentucky held that Wells had failed to make a *prima facie* showing of discrimination under the circumstances.  *Id*. at 303.

*Batson* notes that it is relevant to examine the prosecutor's questions and statements during voir dire and while exercising peremptory challenges.  476 U.S. at 96–97.  In Taylor's case, the prosecutor asked no questions on voir dire suggesting that race was a factor.  Instead, he asked the same series of questions to all of the prospective jurors regardless of race.  He asked whether they believed the death penalty was a proper function of government.  [*See, e.g.*, Voir Dire Transcripts, pp. 677–86.]  He also asked about the prospective jurors' experiences with the criminal justice system, their views regarding television's portrayal of the criminal justice system, their views on television's portrayal of attorneys, the function of objections in the courtroom, the differences in the guilt and penalty phases of a trial, the jury's function in determining who is telling the truth, and each juror's ability to be fair and impartial to both parties.  [*Id*.]  There is nothing in the prosecutor's questions or remarks to indicate any racial bias.

Given the foregoing, Taylor failed to establish a *prima facie Batson* violation. In addition to a prosecutor's exclusion of minority members from the venire via peremptory strikes, a *Batson* violation also requires a showing of "other relevant circumstances" that create an inference that the prosecutor struck the jurors on the basis of their race. *Batson*, 476 U.S. at 94; *Hardy*, 775 S.W.2d at 920. Taylor merely established that the prosecutor used peremptory strikes to remove minority members from the venire. He made no showing of "other relevant circumstances" creating an inference that the prosecutor struck the jurors solely on the basis of their race. In the absence of a *prima facie* case, the burden of persuasion did not shift to the Commonwealth to provide race-neutral reasons for the removal of the four minority members from the venire.

However, assuming arguendo that Taylor did establish a *prima facie Batson* claim, the record is replete with information establishing race-neutral reasons for the prosecutor's use of peremptory challenges. On April 1, prior to Taylor's assertion of the *Batson* claim on April 7, the court had permitted the prosecutor to supplement the record by filing under seal: (i) the juror sheets and questionnaires the 38 jurors had submitted; and (ii) a chart he had prepared from those sheets which contained certain demographic information about the jurors that he used in deciding which jurors to strike. The prosecutor's chart listed the following categories of information: age, education (more than high school, high school, less than high school), employment (employed or unemployed), and if employed, job classification (blue collar, administrative, college, professional, and housewife).

The prosecuting attorney preferred jurors who were employed and had higher levels of education. With this standard in mind, the prosecutor struck three jurors who were

unemployed: Gooch (African-American), Singleton (Caucasian), and Cowan (African-American).  [TE Voir Dire, Vol. IV, 510; *See* chart and jury questionnaires attached to Sealed Appendix]  He also struck three jurors with "blue-collar" jobs:  Jefferson (African-American), Love (Caucasian), and Guldi (African-American).  Next, he struck the following jurors who had only high school educations: Love (African-American), Guldi (Caucasian), Gooch (African-American), Estepp (Caucasian), and Singleton (Caucasian).

In addition to education and employment criteria, most of the jurors who were stricken had reservations about capital punishment. A prosecutor may exercise a peremptory challenge to remove jurors who express such reservations.  *Brown v. North Carolina*, 479 U.S. 940, 107 S.Ct. 423, 424 (1986) (O'Connor, J., concurring in denial of writ of cert.) ("Permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon* [v. *Illinois*, 88 S. Ct. 1770 (1968)].").

With the foregoing race-neutral reasons for the prosecutor's decision to strike four African-Americans already in the record prior to April 7, the prosecutor had no obligation to provide additional reasons for his decisions.  The record fails to support Taylor's *Batson* claim, as the Kentucky Supreme Court correctly determined on direct appeal and reiterated thereafter.  *Taylor I*, 821 S.W.2d at 74; *Taylor II*, 63 S.W.3d at 156–57.  The decision of the Kentucky Supreme Court on this issue on direct appeal and in Taylor's subsequent appeals was neither contrary to federal law nor an unreasonable application of United States Supreme

Court precedent. The Kentucky Supreme Court properly reviewed this claim under the prevailing federal standard and correctly concluded that Taylor's *Batson* claim had no merit.

### Ground 13 – Taylor's Counsel was Not Ineffective for Failing to Support His *Batson* Claim With Evidence Alleging a Pattern and Practice of Racial Discrimination in Prior Jury Selections by the Prosecutor.

As a continuation of Taylor's *Batson* claim outlined in Ground 12, Taylor also asserts that it was the prosecutor's practice to violate *Swain* and *Batson* during jury selection. He further alleges that his counsel was ineffective for failing to support his *Batson* claim with evidence of the prosecutor's pattern and practice of racial discrimination during jury selection.

Taylor raised this claim in appealing the trial court's denial of his RCr 11.42 motion. The Kentucky Supreme Court recognized that *Batson* overruled that portion of *Swain* which required the defendant to show a *prima facie* case of racial discrimination "through direct or indirect evidence, such as testimony or statistical proof, that the prosecutor had a systematic and intentional practice of excluding blacks from petit juries in criminal trials through the exercise of peremptory challenges, and that this practice continued unabated in [the appellant's] trial." *Taylor II*, 63 S.W.3d at 156 (quoting *Love*, 923 F.2d at 818). The *Taylor II* Court acknowledged that *Batson* was retroactively applicable to Taylor's case and that Taylor's burden of proof to establish a *prima face* case under *Batson* was less onerous than under the *Swain* standard. *Id.* As a result, Taylor was not required to show the prosecutor's pattern and practice of racial discrimination in the exercise of peremptory challenges. Instead, Taylor was only required to show that the prosecutor committed a *Batson* violation at his own trial. The court also recognized that Taylor had raised a *Batson* claim on direct

appeal and that the claim was decided adversely to Taylor. Thus, Taylor was procedurally barred from relitigating the *Batson* claim even if it was labeled as a *Swain* claim. The Kentucky Supreme Court explained as follows:

> Nonetheless, Taylor claims error under *Swain* and its "crippling burden of proof" rather than *Batson* because he alleged a *Batson* violation on direct appeal. The issue was decided against Taylor on direct appeal and, therefore, cannot be raised in his RCr 11.42 motion. *See Thacker v. Commonwealth*, Ky., 476 S.W.2d 838, 839 (1972), which holds, "It is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by this court." The *Swain* claim is an attempt to get around this long-established rule. Even if we were to hold that *Swain* and not *Batson* was controlling, Taylor's claim would still fail for the same reason his *Batson* claim failed on direct appeal.

*Taylor II*, 63 S.W.3d at 157.

For the reasons previously stated in consideration of Taylor's other *Batson* claim identified as Ground 12, Taylor failed to establish a *prima facie Batson* violation. On direct appeal, the Kentucky Supreme Court in *Taylor I* correctly determined that Taylor's *Batson* claim was without merit. Further, the Kentucky Supreme Court in *Taylor II* correctly determined that Taylor was procedurally barred from relitigating this same claim in his appeal from the denial of his RCr 11.42 motion. Taylor's alternative claim that his counsel was ineffective for failing to provide the trial court with proof of the prosecutor's longstanding pattern and practice removing African-Americans from a jury is also without merit. Under *Batson*, his counsel had no obligation to show a prosecutor's pattern and practice of racial discrimination in jury selection. Thus, the decision of the Kentucky Supreme Court in *Taylor II* on this claim was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent. The Kentucky Supreme

Court properly reviewed this claim under the prevailing federal standard and correctly concluded that this claim had no merit.

**Ground 14 - Taylor Did Not Receive Ineffective Assistance of Counsel and Was Not Denied Conflict-Free Counsel Because the Same Public Defender's Office Represented Both Taylor and Eugene Taylor.**

Taylor argues that a conflict existed because his trial counsel was employed by the same Public Defender's Office that represented one of the prosecution's witnesses. Taylor was represented by appointed counsel Frank Jewell and Mike Lemke from the Jefferson District Public Defender's Office. Taylor's cousin, Eugene Taylor, was a witness for the prosecution at Wade's trial and at Taylor's trial. At various times, Eugene Taylor was represented by appointed counsel Udell Levy, an attorney also employed by the Jefferson District Public Defender's Office. Udell Levy represented Eugene Taylor on separate criminal charges unrelated to Victor Taylor's criminal charges. Because Eugene Taylor had unrelated criminal charges pending against him at the time of Victor Taylor's trial, Udell Levy was present with Eugene Taylor when he testified at Victor Taylor's trial. Levy was present solely for consultation purposes to ensure that Eugene Taylor's Fifth Amendment right against self-incrimination was not violated. Victor Taylor and Eugene Taylor were not co-defendants. Thus, these attorneys from the Jefferson District Public Defender's Office were not representing co-defendants, nor were they representing individuals involved in the same charges.

Taylor claims that he was denied effective assistance of counsel and denied the right to conflict-free counsel at trial because his counsel and counsel for Eugene Taylor were employed by the same public defender's office. Taylor cites to *Cuyler v. Sullivan*, 446 U.S.

335 (1980), and *Strickland*, 466 U.S. 668, in support of this claim. Taylor raised this claim in his appeal from the trial court's denial of his RCr 11.42 motion. In affirming the denial of that motion, the Kentucky Supreme Court, without elaborating as to all issues raised therein, rejected this claim, stating, "[i]n conclusion, we note that any allegation of error not specifically addressed above has been considered and rejected as having no merit." *Taylor II*, 63 S.W.3d at 168.

Respondent submits that this claim is procedurally defaulted in that it was not preserved for review in his RCr 11.42 appeal. Respondent points out that Taylor did not raise this claim in his original RCr 11.42 motion when it was filed on September 2, 1994. [Inventory Item No. 5(a)] However, Taylor raised this claim more than two years later on February 26, 1997, in his "Amendment to RCr 11.42 Motion." [Inventory Item No. 5(q)] Even so, this amendment was improper, as Taylor filed it without also moving the trial court for leave to do so and did not subsequently seek leave to amend his RCr 11.42 motion. Therefore, Taylor never received permission from the trial court to file the amendment.

Nevertheless, in denying Taylor's RCr 11.42 motion, the post-conviction judge did address this claimed conflict of interest. The Order denying the RCr 11.42 motion states, in relevant part, that

> The Court has considered the additional issues raised by the movant with respect to the representation by the Jefferson District Defender of both Movant and his cousin witness, Eugene Taylor, testimony of Jeffrey Ira Brown, and effectiveness of Appellate counsel, and for reasons heretofore stated in this opinion finds them to be entirely without merit.

[Order, p. 10, Inventory Item No. 5(u)] In rejecting this claim, it is unclear whether the judge considered this claim to be procedurally barred or whether he considered it on the merits.

Respondent presents a strong argument that Taylor waived this claim by making no objection at trial that this claim is untimely, and that Taylor procedurally defaulted the claim by not obtaining relief from the trial court to amend his RCr 11.42 motion. Thus, Respondent argues that Taylor was procedurally barred from raising this claim in appealing the denial of his RCr 11.42 motion and, likewise, in his habeas petition. However, the bases for the rejection of this claim by the trial court and the Kentucky Supreme Court in *Taylor II* are unclear. Thus, out of an abundance of caution, this Court has considered the claim on the merits.

As set forth in *Cuyler*, a defendant must show more than a potential conflict of interest:

> [T]o establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.
> . . . .
>
> . . . But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.
>
> . . . We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.

446 U.S. at 348–50 (internal citations omitted).

Consistent with *Cuyler*, the Sixth Circuit in *United States v. Mays*, held that "to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's

performance." 77 F.3d 906, 908 (6th Cir. 1996). In *Mays*, the Sixth Circuit specifically

rejected a *per se* rule, explaining that,

> to establish a conflict of interest, defendant must point to specific instances in
> the record to suggest an actual conflict or impairment of his interests.
> Defendant must demonstrate that the attorney made a choice between possible
> alternative courses of action, such as eliciting (or failing to elicit) evidence
> helpful to one client but harmful to the other. If he did not make such a choice,
> the conflict remained hypothetical. There is no violation where the conflict is
> irrelevant or merely hypothetical; there must be an actual significant conflict.

*Id.* (quoting *United States v. Hopkins*, 43 F.3d 1116, 1119 (6th Cir. 1995)). The foregoing

standard requires an actual conflict for a claim to succeed. A theoretical division of loyalties

is insufficient. The record establishes that Taylor has failed to prove an actual conflict of

interest or that the situation resulted in any adverse effect on his trial counsel's performance.

The circumstances of this case fail to establish an actual conflict of interest. *See*

*United States v. McCullah*, 76 F.3d 1087, 1099 (10th Cir. 1996), *cert. denied*, 520 U.S. 1213

(1997) (holding that defendant failed to show actual conflict of interest by mere fact that

prosecution witness was being represented by another public defender in the same office);

*see also United States v. Trevino*, 992 F.2d 64, 66 (5th Cir. 1993) ("The potential for such

conflicts, however, does not necessarily exist when . . . codefendants are represented by

different attorneys, albeit in the same public defender office."). Neither government

prosecutors nor government public defenders have any personal stake in whether an office

colleague or co-employee is successful in representing a client, unlike attorney-partners in

private law firms. Instead, a public defender's office is comprised of individual attorneys

exercising individual judgment in representing their clients.

Taylor also asserts that his trial counsel was ineffective by the manner in which his attorney questioned Eugene Taylor at trial. Specifically, Taylor claims that his trial counsel did not cross-examine Eugene Taylor regarding the criminal charges pending against Eugene at the time of trial. Taylor's argument is refuted by the record. The trial court permitted wide latitude in Eugene Taylor's cross-examination, which is replete with questions from Taylor's counsel regarding pending charges and charges that were filed against Eugene and then dismissed. Taylor's counsel established that in August of 1984, Eugene had been arrested for rape, sodomy, assault and robbery [TE 4/16/86, 231], and that in October of 1984, Eugene was arrested for robbery second degree [*Id.* at 240–41]. In May of 1985, he was arrested for receiving stolen property over $100.00, burglary in the third degree, and possession of marijuana. However, the burglary and possession of marijuana charges were dismissed, and the receiving stolen property over $100.00 was amended to a misdemeanor charge. [*Id.* at 257–58]

Taylor's counsel also established that Eugene Taylor had the following criminal charges pending against him at the time of Taylor's trial: (i) one count of first-degree burglary, (ii) one count of second-degree arson, and (iii) one count of second-degree burglary. During cross-examination, the court took a brief recess so that Eugene could consult with his counsel regarding the exercise of his Fifth Amendment right against self-incrimination. Taylor's counsel properly did not object to the recess, as Eugene had the right to confer with counsel about his Fifth Amendment right against self-incrimination at Taylor's trial.

Taylor also claims his attorney was ineffective in cross-examining Eugene Taylor by limiting questions about the October 31, 1985 statement. The following background information is necessary for a proper analysis of this claim.

In addition to Eugene Taylor's testimony at Taylor's trial, Eugene made three other statements prior to trial which contained some inconsistencies. On October 16, 1984, Eugene Taylor was picked up by the police on unrelated criminal charges. While he was in custody, he agreed to make a statement to the police about the night the victims were murdered. In that statement [Inventory Item No. 4(a)], Eugene claimed that he saw Taylor and George Wade in a car with two white boys and that later he (Eugene) went to his aunt's house (Victor Taylor's mother's house). Not long thereafter, Eugene stated that Taylor and Wade arrived at the house with noticeable smiles, that Taylor bragged about killing two white boys, and that he saw Taylor give a gun to his sister Renee.

After Eugene Taylor gave the October 1984 statement, he was arrested again on unrelated criminal charges and was housed in the Community Treatment Center, which offers work release programs. In October of 1985, Eugene was on a work release program painting a room at the Jefferson Hall of Justice. [TR 5895–96]. While there, he encountered Taylor, who told Eugene that if he testified at trial, that he was to say that he (Victor Taylor) was not involved in these murders "or else." [Eugene Taylor Deposition, pp. 11–12, 64–67 - Inventory Item No. 4(g)] Shortly thereafter, at the request of Taylor's trial counsel, Jerry Smothers, an investigator with the Jefferson District Public Defender's Office, interviewed and took a statement from Eugene on October 31, 1985. That statement, although not taken under oath, was taped and later transcribed. [Inventory No. 4(b)] In this October 1985

statement to Jerry Smothers, Eugene denied that Taylor had threatened Eugene about his testimony. [October 31, 1985 statement, p. 11- Inventory Item No. 4(b)] This was contrary to deposition testimony, in which he had stated that Taylor had threatened him and that, with the exception of Taylor's mother, he was afraid of Taylor's family. [Eugene Taylor Deposition, p. 81 - Inventory Item No. 4(g)]

Eugene claimed that he denied Taylor's threats in his October 31, 1985, statement to Jerry Smothers because he was being threatened, and Eugene knew that Taylor would have the opportunity to review his statement to Jerry Smothers while at the jail. Thus, in cross-examining Eugene Taylor at trial, Taylor's counsel avoided questions about that October 1985 statement. Taylor's counsel knew that any questions about the statement would open the door to testimony that Taylor made threats to Eugene if he implicated Taylor in the murders. Therefore, to avoid this potentially harmful testimony, Taylor's counsel focused on the medications Eugene was taking at the time of his statement to Jerry Smothers. Taylor's counsel purposefully avoided questions that might reveal the inconsistencies between the October 1984 and October 1985 statements to avoid testimony that Victor Taylor had threatened Eugene and that Eugene was afraid of Victor.

The strategy of Taylor's counsel is supported by the fact that during Eugene's deposition, his counsel thoroughly explored the circumstances surrounding this statement. [*Id.* at p. 57 - Inventory Item No. 4(g)] Counsel questioned Eugene about statements that he: (i) had seen George Wade with blood on his shoes, [*Id.* at p. 64]; (ii) had seen George Wade wearing a gold rope around his neck, [*Id.* at p. 58]; and (iii) was unsure where the victims were in the car. [*Id.* at p. 60] Due to differences between Eugene's October 1984 statement

and the October 1985 statement, Taylor's counsel then asked Eugene if he was trying to confuse Smothers and lead him astray. Eugene's answer was that he did not remember telling him that because "I was on medication." [*Id.* at p. 64]

In short, Taylor's trial counsel learned at Eugene's deposition that his October 1985 statement was unreliable and had the potential to be very damaging to Taylor at trial. Consequently, trial counsel strategically avoided asking any questions that would have led to the disclosure of Taylor's alleged threat. [TE 4/16/86, 276 - Inventory Item No. 4(h)] Thus, Taylor's claim that his attorney was ineffective in his questioning of Eugene Taylor at trial fails under *Strickland*. To the contrary, the strategic questioning of Eugene Taylor at Taylor's trial constituted effective assistance of counsel and Taylor's claim to the contrary is without merit.

In summary, the decision of the Kentucky Supreme Court in *Taylor II* on his claim that, with respect to Eugene Taylor, he was denied conflict-free counsel and that he received ineffective assistance of counsel was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent. The Kentucky Supreme Court properly reviewed this claim under the prevailing federal standard and correctly concluded that this claim had no merit.

### Ground 15 – The Trial Court Did Not Err by Limiting the Defense Questions on Cross-Examination to Eugene Taylor. This Limitation Did Not Deny Taylor His Right to Confront Witnesses Against Him.

On August 16, 1984, prior to the charges filed against Victor Taylor, a warrant was issued against Eugene Taylor for assault, rape, and sodomy. [TE 4/16/86, 235–38] The complaining witness was his girlfriend, Regina Glenn. [*Id.*] On October 16, 1984, following

the murders on September 29, 1984, and after Victor Taylor and Wade had been charged, Eugene Taylor was arrested on the unrelated assault, rape, and sodomy charges lodged against him earlier by his girlfriend Regina Glenn, as well as an unrelated charge for second-degree robbery. While in jail on the evening of his arrest, Eugene Taylor volunteered to police that he had information about the underlying murder case then under investigation. Subsequently, Eugene provided a taped statement disclosing his knowledge of the murders. Eugene was a prosecution witness at both Wade and Taylor's trials. His testimony at these trials is of record in Inventory Item No. 4(a) and 4(h), respectively.

Some background information is necessary for a proper understanding of Eugene's statement to the police and the proper analysis of Taylor's claim. As noted above, Victor Taylor and Eugene Taylor are first cousins. Victor Taylor's mother, Anna Taylor, is Eugene's aunt. In Eugene's statement to the police, Eugene indicated that about 8:00 p.m. on September 29, 1984, while he was en route to Anna Taylor's house, he saw Taylor and George Wade in a car with two white boys. Taylor was driving, Wade was in the front passenger seat, and the boys were in the back seat. Eugene continued to Anna Taylor's house, arriving there at approximately 9:00 p.m. At that time, Anna Taylor, John Cole (Anna Taylor's boyfriend), Victor's two sisters (Renee Woods and Swa), Victor's two brothers, Ray Ray and Mikee Taylor, and Victor's girlfriend (Sherry) were there. The group was playing cards and drinking. Eugene stated that approximately thirty minutes later, Victor and Wade arrived noticeably smiling as they entered the residence. They were carrying a Trinity High School bag containing "gray shoes – tennis shoes, a pair of blue jeans, a cassette, Led Zeppelin cassette, some fire crackers." [TE 4/16/86, 208] Eugene also observed that "Victor

Duane Taylor had on a watch and a ring with '84 on it, and George had a gold necklace around his neck." [*Id.*]

Eugene stated that, while he was standing in the kitchen doorway, Victor's sister Renee and Victor were talking in the kitchen. He overheard Victor ask if they had heard about the two white boys that got killed. After Renee responded that they had not heard the information, Victor stated that he had killed two white boys. Eugene saw George Wade give Victor's brother Ray Ray a handful of firecrackers that were in the Trinity High School bag. Additionally, Eugene heard Victor and Renee talking about a gun, and he thought that Victor gave her a .357 caliber handgun and, in exchange, she gave Victor a .25 caliber automatic handgun. However, Eugene did not see the guns or an exchange of weapons. Eugene also observed Victor and Wade dividing money between them. And while Eugene was unsure of the amount, he estimated it to be about $100.00. Eugene stated that after Victor and Wade later left the house, he did not see them again that evening.

Eugene Taylor was released on his own recognizance the day after giving the October 1984 statement to police. Ultimately, all of the October 14, 1984 charges on which he was arrested were dismissed. At Taylor's trial, Eugene testified that he did have to appear in court on the charges of rape, sodomy, assault, theft, and burglary, but that the prosecuting witness failed to appear, and the charges were dismissed. Eugene also volunteered that he was innocent of these charges.

In May of 1985, Eugene was charged with receiving stolen property over $100.00, third-degree burglary, and possession of marijuana. [TE 4/16/86, 257] The charge involving receipt of stolen property over $100.00 was later amended to a misdemeanor, and Eugene

agreed to plead guilty to the amended charge. [*Id.* at 258] The burglary charge and the possession of marijuana charge were dismissed. [*Id.*] Eugene received a one-year sentence, to serve six months in jail, with the remaining sentence probated for two years. [*Id.*] At the time of Victor's trial, other criminal charges of first-degree burglary, first-degree arson, and second-degree burglary were pending in Jefferson Circuit Court against Eugene Taylor. [*Id.* at 259]

The trial court limited Taylor's cross-examination of Eugene with respect to the resolution of the criminal charges on which Eugene was arrested on October 16, 1984. It did not permit defense counsel to question Eugene regarding the robbery charge, which had been dismissed. The court determined that whether Eugene had admitted his guilt on the robbery charge to the police officers at the time of his arrest was a collateral matter.

Taylor claims that the trial court violated his right to confront witnesses by limiting the cross-examination of Eugene Taylor on the charges on which he was arrested on October 16, 1984 (rape, sodomy, assault, and robbery), that were ultimately dismissed.[9] This claim is based on Eugene Taylor's testimony that the charges were dismissed because the complaining witness failed to appear in court, with Taylor then volunteering that he was innocent of the charges. Victor Taylor's defense attorney attempted to impeach Eugene by asking him whether, prior to the dismissal of these charges but after making his statement to the police about his knowledge of the murders, he had actually admitted to committing the robbery before being released on his own recognizance. However, the trial court did not permit that line of inquiry. As grounds for this habeas claim, Taylor contends that Eugene

---

9      This is one of the forty-two claims that was not addressed at length in *Taylor I.* 821 S.W.2d at 74.

Taylor substantially misled the jury by gratuitously stating that he was innocent of these charges as a way to enhance his credibility. This arguably left the jury with an erroneous impression. Taylor contends that limiting cross-examination of Eugene on this matter was a constitutional violation.

As noted, federal habeas corpus relief is not available for the review of admissibility of evidence under state law. *McGuire*, 502 U.S. 62. To rise to a constitutional claim, the state court's evidentiary ruling must be so egregious that it is a denial of fundamental fairness. *Id.* at 67; *Jeffers*, 497 U.S. at 780 (stating that federal habeas corpus relief does not lie for errors of state law). A trial court has wide latitude in imposing reasonable limitations based upon many considerations, including concerns about harassment, prejudice, confusion of issues, witness safety, and interrogation that is repetitive or only marginally relevant. *Van Arsdall*, 475 U.S. at 679.

During cross-examination of Eugene Taylor, defense counsel questioned Eugene about the fact that he was arrested for rape, sodomy, and assault, as well as an unrelated robbery charge, but was released the next day after making his statement to the police implicating Victor and Wade in the murders. Eugene responded that he was released because he had done nothing wrong. In an effort to impeach Eugene's credibility, defense counsel sought to introduce an arrest slip indicating that Eugene had confessed to police about the robbery after his arrest. [TE 4/16/86, Vol. II, 243–44 - Inventory Item No. 4(h)] Ultimately, the trial court concluded that inquiring into Eugene Taylor's possible guilt on those charges was a collateral issue. As a result, cross-examination was limited. [*Id.* at 247]

Limitations on cross-examination are within the discretion of the trial court. *Holt v. Commonwealth*, 259 S.W.2d 463, 465 (Ky. 1953).

At the time of the trial court's ruling limiting the cross-examination of Eugene Taylor, Victor Taylor's counsel had already undermined Eugene's credibility with his criminal convictions and numerous criminal charges. Additionally, evidence had been presented regarding Eugene's immunity from prosecution. Thus, Victor Taylor's counsel had already attacked his credibility and shown his potential bias. Nevertheless, Taylor contends that his right to confront Eugene with additional questions regarding the dismissal of these criminal charges was necessary to further attack his credibility, show his bias, and demonstrate that he had received preferential treatment from Louisville prosecutors with the dismissal of those criminal charges in exchange for his testimony against Taylor.

This Court will assume *arguendo* that the trial court's limitation of the cross-examination of Eugene at trial was erroneous. In *Fry v. Pliler*, 551 U.S. 112 (2007), the Court clarified that, in a § 2254 proceeding, a reviewing court must weigh the prejudice of constitutional error under the standard established in *Brecht*, 507 U.S. 619. The Court in *Brecht* held that the standard for determining whether habeas relief should be granted is whether this type of error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Eugene Taylor was an important witness for the prosecution. He testified that he saw Victor and Wade in a small, blue car around 8:00 p.m., on the evening of the murders in the area of Clay and Lampton Streets. Victor was driving, Wade was riding in the front

passenger seat, and the victims were located in the back seat. Eugene saw Victor and Wade again later that evening, while he was at Anna Taylor's residence, after they arrived about 9:30 p.m., entering with a Trinity High School bag containing various items. Eugene testified that he heard Victor ask his sister Renee if they had heard that two white boys had been killed that night, and then stated that he had killed them. Eugene also testified that he overheard Victor and his sister Renee discuss an exchange of guns, exchanging a .357 for a .25 caliber automatic, and that he observed Victor and Wade dividing some money. [TE 4/16/86, 202–04, 216–17, 267–68, 271–75]

The jury also heard that Eugene Taylor had a history of criminal charges, with the 1984 charges being dismissed, with some later charges in 1985 being resolved by Eugene agreeing to plead to a reduced charge while the remaining charges were dismissed. The jury further heard that Eugene had criminal charges pending against him at the time he testified at Taylor's trial in April 1986. It was unnecessary for the jury to hear any additional information about Eugene's criminal charges and how they were resolved for the jury to have a full and complete picture and understanding of that witness. Eugene's criminal history as presented was sufficient to enable the jury to gauge his credibility. Therefore, even assuming there was constitutional error in limiting the scope of Taylor's cross-examination of Eugene Taylor, this error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Consequently, the decision of the Kentucky Supreme Court in *Taylor I* on Taylor's claim that he was denied a fair trial by the trial court's error in limiting his cross-examination of Eugene Taylor was not contrary to federal law and was not an unreasonable application of United States Supreme Court precedent.

**Ground 16 – The Denial of Taylor's Motion Under CR 60.02 and RCr 10.02 for a New Trial was Not Erroneous Based on the Recanted Testimony of Wade.**

The trial court conducted an evidentiary hearing on Taylor's post-conviction RCr 11.42 motion. Taylor called co-defendant George Wade as a witness at that hearing, as Wade no longer could decline to testify under a Fifth Amendment privilege. At this RCr 11.42 hearing, Wade recanted his pre-trial statement to the police and his prior testimony during his own trial that Victor Taylor had committed these offenses. Wade now testified that it was Eugene Taylor who had committed these offenses. Wade further testified that he made the pre-trial statement implicating Victor in October of 1984 after nearly twelve hours of interrogation because he believed the police wanted to hear that Victor Taylor was the murderer. Wade thought it would be in his best interest if he told them what they wanted him to say. However, at Victor Taylor's RCr 11.42 hearing in 1997 — eleven years after Taylor's conviction — Wade testified that his prior statements that Victor Taylor had committed these crimes were false.[10]

Based on Wade's recantation of his pre-trial statement and testimony implicating Victor Taylor, he moved for a new trial pursuant to CR 60.02 and RCr 10.02. Following a hearing on the motion, the trial court denied it under the following rationale:

> While George Wade did not testify at trial, the Commonwealth was permitted to introduce his statement to police into evidence. It has been held that the recanted testimony of a trial witness is viewed with suspicion and does not normally require the granting of a new trial. *Carwile v. Commonwealth*, Ky. App., 694 S.W.2d 469 (1985); *Hensley v. Commonwealth*, Ky., 488 S.W.2d 338 (1972).

[Order Denying Defendant's . . . 60.02 Motion, p. 7 - Inventory Item No. 15(c)]

---

10      Based on the trial court's conclusion that Wade's testimony at Taylor's RCr 11.42 hearing was "newly discovered evidence," it was placed into the record by avowal only.

Taylor appealed the denial of his CR 60.02 and RCr 10.02 motion to the Kentucky Supreme Court. In *Taylor III*, the Kentucky Supreme Court affirmed that denial for the following reasons:

> Taylor's CR 60.02 motion can be separated into two issues. We take them one at a time. First, Taylor argues that he is entitled to a new trial because Wade recanted his statement to the police that Taylor was with him when he kidnapped, sodomized and killed the boys. Wade made this statement at Taylor's RCr 11.42 evidentiary hearing in 1997, which was more than eleven years after Taylor's conviction. The trial court ruled that Wade's new testimony that contradicted his previous testimony was not enough to entitle Taylor to a new trial, and that ruling is reviewed for an abuse of discretion. In denying relief pursuant to CR 60.02, the trial court cited *Hensley v. Commonwealth* for the proposition that recanted testimony of a trial witness is viewed with suspicion and does not normally warrant a new trial. In *Hensley*, a "vital witness" testified that the defendant was the only one shooting when the decedent was killed. That "vital witness" later recanted and stated in an affidavit that he was not sure who shot the decedent and that "others were shooting at the time the decedent . . . fell." Justice Palmore, in an opinion rich in brevity, noted that this recantation was to be given little weight, and, as such, was not sufficient to entitle the defendant to a new trial. The truism that recanted testimony is not reliable and should therefore be given little weight is even more relevant to this case. This is so because Wade recanted his statement that Taylor committed the heinous crimes against the Trinity students more than eleven years after Taylor's conviction, and only after the Parole Board denied him parole and ordered him to serve out the remainder of his sentence. The trial court did not find Wade's recantation credible. Therefore, we agree with the trial court's ruling that Taylor is not entitled to a new trial because of the recanted testimony.

175 S.W.3d at 71 (footnotes omitted).

The *Taylor III* Court correctly determined that its review of the trial court's denial of Taylor's CR 60.02 motion for a new trial was for an abuse of discretion. In applying that standard, the *Taylor III* court noted the general proposition that "recanted testimony of a trial witness is viewed with suspicion and does not normally warrant a new trial." *Id.* Ultimately, the *Taylor III* Court concluded that the trial court did not abuse its discretion in denying

Taylor's motion for a new trial because the recanting of Wade's testimony implicating Victor Taylor, eleven years post-conviction, was insufficient to warrant granting Victor a new trial, noting that the "other evidence against Taylor is mountainous." *Id.* at 72. Summarizing that evidence, the *Taylor III* court stated:

> The evidence that led the jury to return a guilty verdict against Taylor is too voluminous to recount in full. What follows is some of the highlights. Dino Pace and Cecil Pepper witnessed the events that took place at the restaurant where the boys were kidnapped, and they both identified Taylor as the man that kidnapped the boys at gunpoint. In fact, Taylor had stood in line next to them as they were ordering food. After the abduction, Pace and Pepper followed the car until it pulled off onto a side street. Pace and Pepper had ample opportunity to view Taylor. And though Taylor was not picked out in a photo line-up, both witnesses identified Taylor at trial as the gunman, and identified Wade in a line-up. Taylor was never placed in a line-up.

*Id.*

Given the "mountainous" evidence against Taylor and given the lens through which recanted trial testimony is viewed, the decision of the Kentucky Supreme Court in *Taylor III* on this claim was not contrary to federal law and was not an unreasonable application of United States Supreme Court precedent.

**D.    *Brady* Issues**

Taylor raises seven claims at Grounds 17, 18, 19, 20, 21, 22, and 23, contending that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, a petitioner must show: (i) that the evidence was exculpatory or impeaching; (ii) that the prosecution failed to disclose this evidence, either willfully or inadvertently; and (iii) that prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004). Further, the party seeking to collaterally attack the

conviction has the burden to prove the elements of a *Brady* violation. *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

*Strickler v. Greene* concerned a capital murder conviction and death sentence from the Commonwealth of Virginia. The Court reiterated the *Brady* standard and provided a brief overview of post-*Brady* decisions illustrating the evolution of "*Brady* violation" law.

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id.*, at 438, 115 S.Ct. 1555. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

> These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). (footnote omitted)

> This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust. Thus the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady*

material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. (footnote omitted)

527 U.S. at 280–82.

In the final analysis, the *Strickler* Court affirmed the denial of his habeas petition, concluding that he had not met all three requirements necessary to establish a "*Brady* violation."

Petitioner has satisfied two of the three components of a constitutional violation under *Brady*: exculpatory evidence and nondisclosure of this evidence by the prosecution. Petitioner has also demonstrated cause for failing to raise this claim during trial or on state postconviction review. However, petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed. He therefore cannot show materiality under *Brady* or prejudice from his failure to raise the claim earlier.

*Id.* at 296.

With this standard in mind, the Court examines Taylor's individual *Brady* claims.

**Ground 17 – The Prosecution's Failure to Disclose a Reward Offer Does Not Constitute a *Brady* Violation.**

Taylor claims that the prosecution failed to disclose that the police had offered reward money in the amount of $12,000.00 for information leading to a conviction of the murderers. More particularly, Taylor contends that prosecution witnesses Dino Pace and Cecil Pepper were aware of this reward offer, and that he was prejudiced by not having this information for impeachment purposes at trial.

Taylor raised this claim in the appeal of the denial of his RCr 11.42 motion. In affirming the denial of that motion, the Kentucky Supreme Court analyzed this alleged *Brady* violation, as follows:

> Taylor argues that the Commonwealth failed to disclose that two of the witnesses against him, Cecil Pepper and Dino Pace, had been offered a reward of $12,100 if a conviction was obtained against Taylor. The Commonwealth argues that the defense was aware of this reward offer and, thus, there was no failure to disclose the information. We agree with the Commonwealth.
>
> A general reward of $12,000 for "information leading to the arrest and conviction of the boys' killer" was offered by Harvey Sloane, who was the Mayor of Louisville at the time. The "boys" referred to were the two teenage boys Taylor was ultimately convicted of kidnapping and murdering. Information regarding the reward was publicized in the media and was public knowledge. In fact, defense counsel noted the reward in an attachment to Taylor's motion for a change of venue. Thus, this information was not withheld from the defense and was available to the defense for impeachment purposes at trial.
>
> There was no Brady violation with respect to the offer of a $12,000 reward.

*Taylor II*, 63 S.W.3d at 157–58.

The prosecution does not violate *Brady* if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question or if the information was available from another source. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Further, as noted in *Coe v. Bell*:

> . . . *Brady* obviously does not apply to information that is not wholly within the control of the prosecution. There is no *Brady* violation "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' or where the evidence is available . . . from another source," because in such cases there is really nothing for the government to disclose. (citations omitted).

161 F.3d at 344.

Contrary to Taylor's implied argument, the $12,000.00 reward offer at issue was not made by the police *exclusively* to Dino Pace and Cecil Pepper as a means to encourage them to identify Taylor. Instead, it was made by then-Louisville Mayor Sloane to the general public. Notice of the reward was contained in a newspaper article dated October 4, 1984, which stated, "[t]he arrests came one day after Mayor Harvey Sloane announced a $12,000 reward for information in the case, although Yates said authorities don't believe the reward figured in the apprehension of the men." [TR 22, 3282]

The prosecution also disclosed this reward offer to Taylor in an attachment to the Commonwealth's supplemental response to Taylor's petition for a change of venue filed on April 14, 1985. This was nearly one year prior to Taylor's trial. [TR 22, 3278] Further, Taylor's attorneys were aware of the reward. An article from the Louisville Times, dated October 4, 1984, that mentioned the reward offer to the general public was attached to Taylor's motion for a change of venue. This article stated, "[a]lso hoping to turn up more clues, Mayor Harvey Sloane yesterday announced a $12,100 reward for information leading to the arrest and conviction of the boys' killer." [TR 55, Exh. A-11] These circumstances do not constitute a *Brady* violation.

The Kentucky Supreme Court in *Taylor II* correctly determined that Taylor's claim that there was a *Brady* violation in respect to the $12,000.00 reward offer was without merit. The decision was not an unreasonable determination of the facts in light of the evidence. Likewise, it was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

**Ground 18 – The Alleged Failure to Disclose the "Redlining" of Cecil Pepper Does Not Constitute a *Brady* Violation.**

Cecil Pepper allegedly witnessed Taylor and Wade abduct the victims from the parking lot of the fast food restaurant on the evening of September 29, 1984. Pepper was a witness for the prosecution at Taylor's trial and testified that he was in the fast food restaurant that evening while Taylor was there. Pepper stated that both he and Taylor were at the counter around the same time ordering food to carry-out. After he exited the restaurant and was getting into his car to leave the parking lot, Pepper observed Taylor holding a gun and getting in the back seat on the driver's side of a blue vehicle. He also saw two Caucasian boys in the front seat of the vehicle. Pepper exited the parking lot in his vehicle around the same time as Taylor, Wade, and the victims. He saw their car in traffic until it turned into an alley. After he learned about the murders, Pepper told the police what he had witnessed and later identified Wade in a line-up at the police station. Pepper was unable to identify Taylor at that time in a photo array, but he later made an in-court identification of Taylor during trial.

In his RCr 11.42 motion, Taylor claimed that the Commonwealth committed a *Brady* violation by failing to disclose that the Jefferson District Court had "redlined" Pepper in April of 1985.[11] Taylor asserted that his due process rights were violated by this non-disclosure because the information was relevant to Pepper's credibility and could have been used for impeachment purposes at trial. The trial court rejected this claim and denied Taylor's RCr 11.42 motion. [Order, 3/16/98 - Inventory Item No. 5(u)]

---

11     At that time, "redlining" was a practice used by the judges of the Jefferson District Court to restrict the number of warrants one person may swear out against another.

Taylor raised this claim in appealing the denial of his RCr 11.42 motion.  In affirming the denial of the motion, the Kentucky Supreme Court addressed Taylor's "redlining" claim, as follows:

> Next, Taylor argues that the Commonwealth failed to reveal that Cecil Pepper, who identified Taylor at trial, had been red-lined, a local procedure formerly employed by Jefferson District Court Judges to restrict the number of warrants one person may swear out against another.  Its purpose was to curb abuse of the warrant procedure.  While only a district judge could red-line an individual, Taylor points out that the Jefferson County Attorney's Office had access to records concerning red-lining.  Taylor argues that this was valuable impeachment evidence that could have seriously undermined the credibility of Pepper's testimony.  Among other arguments, the Commonwealth states that there was no proof that the prosecution knew that Pepper had been red-lined.  Again, we agree with the Commonwealth.

> There is nothing in the record to indicate that the Commonwealth was aware that Pepper had been red-lined.  Nor can that knowledge be imputed upon the Commonwealth.  The *Brady* rule "encompasses evidence known only to police investigators and not to the prosecutor.  In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 280–81, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 301 (1999) (internal citations and quotation marks omitted).  The district courts are part of the judicial branch of the Commonwealth's government, whereas the Commonwealth Attorney and the County Attorney belong to the executive branch.  Therefore, information known to the district court cannot be imputed to the Commonwealth Attorney who prosecuted this case.

> There was no *Brady* violation with respect to the red-lining of Cecil Pepper.

*Taylor II,* 63 S.W.3d at 158.

As noted by the *Taylor II* Court, the "red-lining" procedure at issue was an internal policy employed at that time by the judges of the Jefferson District Court to limit the unnecessary issuance of warrants.  It was not an investigative tool of the Commonwealth, and it was not an action taken for purposes of the Commonwealth's case against Taylor.

Further, the "redlining" information known to the district court, a judicial branch of state government, cannot be imputed to members of the executive branch of state government. Consequently, the Kentucky Supreme Court in *Taylor II* correctly determined that there was no *Brady* violation regarding the alleged "redlining" of Cecil Pepper. That decision was not an unreasonable determination of the facts in light of the evidence. Likewise, it was neither contrary to nor did it involve an unreasonable application of, clearly established federal, as determined by the United States Supreme Court.

### Ground 19 – The Commonwealth's Alleged Failure to Disclose the Mental Inquest Warrant Issued Against Cecil Pepper Did Not Constitute a *Brady* Violation.

In his RCr 11.42 motion, Taylor claimed that the Commonwealth also committed a *Brady* violation by failing to disclose that around five months after Taylor's arrest on the murder charges, Pepper was hospitalized at the Central State Mental Hospital on a mental inquest warrant obtained by the Louisville Police Department. During the evidentiary hearing conducted on Taylor's RCr 11.42 motion, the Bullitt Circuit Court determined that information concerning this mental inquest warrant was inadmissible because "[a]n officer's opinion as to whether someone is mentally ill has no medical significance whatsoever." [Evidentiary Hearing, 3/18/97, 201] Taylor's counsel concurred with that assessment but nevertheless argued that the existence of the mental inquest warrant should have been disclosed to the defense. [*Id.*] Taylor waived any objection to the court's ruling on the admissibility of the mental inquest warrant.

Taylor alleges that the failure to disclose this information violated his due process rights and *Brady* because the information was relevant to Pepper's credibility and could have

been used for impeachment purposes during Taylor's trial. The trial court rejected this claim and denied Taylor's RCr 11.42 motion. [Order, 3/16/98 - Inventory Item No. 5(u)]

Taylor then raised this claim in appealing the denial of his RCr 11.42 motion. In affirming the denial of Taylor's RCr 11.42 motion, the Kentucky Supreme Court in *Taylor II* addressed this claim, as follows:

> Next, Taylor argues that the Commonwealth failed to disclose that Cecil Pepper had been arrested on a mental inquest warrant five months after Taylor had been arrested. Taylor argues that this evidence of mental illness could have affected Pepper's credibility and, therefore, should have been disclosed under the *Brady* rule. The Commonwealth argues that the evidence was not admissible and, thus, no violation occurred.

> Under the *Brady* rule, the prosecution has a duty to disclose evidence concerning the credibility of a witness when the reliability of that witness "may well be determinative of guilt or innocence . . . ." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972). The question then becomes whether the mental inquest evidence meets this criteria.

> Pepper's arrest on a mental inquest warrant would not in and of itself be admissible at trial. Apparently, the warrant was sworn out by a police officer. The officer's lay opinion as to Pepper's mental state clearly would not have been admissible. Citing to *Bartholomew v. Wood*, 34 F.3d 870 (9th Cir. 1994) (per curiam), Taylor argues that the "question is not whether exculpatory evidence is independently admissible, but whether it would lead to the discovery of admissible evidence." He then argues that knowledge of Pepper's arrest on a mental inquest warrant would have led to admissible evidence concerning Pepper's mental state. We disagree.

> The U.S. Supreme Court overruled the very case cited by Taylor on the very same point in *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). At issue in *Wood* was whether the prosecution violated the *Brady* rule by failing to disclose the results of polygraph examinations given to two of the witnesses against the appellant at trial. *Id*. at 4–5, 116 S.Ct. at 9–10, 133 L.Ed.2d at 6. The *Wood* Court reasoned that there had been no violation: . . .

> While *Wood* does not hold that disclosure of inadmissible evidence is never required under the *Brady* rule, the opinion makes clear that there can only be a violation when there is a "reasonable probability" that disclosure of the inadmissible evidence would have resulted in a different outcome at trial. *Id.*

at 8, 116 S.Ct. at 11, 133 L.Ed.2d at 8. In the case at bar, the nondisclosure of the mental inquest warrant does not meet this standard.

Even if disclosure of the mental inquest warrant may have put the defense on notice to closely examine the issue of Pepper's mental state, there is nothing in the record to indicate that there exists or existed any *admissible* evidence on this issue. For evidence of Pepper's mental state to be relevant to his credibility, Taylor must "demonstrate[ ] that there was a mental deficiency on the part of the witness, either at the time of the testimony or at the time of the matter being testified about." *Commonwealth v. Huber*, Ky., 711 S.W.2d 490, 491 (1986). No such demonstration had been made in this case.

There was no *Brady* violation with respect to the mental inquest warrant for Cecil Pepper.

63 S.W.3d at 158–59.

It is well-settled that the prior mental treatment of a witness is irrelevant to the witness's credibility *unless* it can be demonstrated that the witness had a mental deficiency at the time the witness testified or at the time of the matter about which the testimony was given. *Stanford*, 793 S.W.2d at 116. Absent such a showing, a witness' psychiatric issues or problems are not a proper subject for impeachment purposes. *Id.* Further, "[t]he mere fact that a particular witness has been treated for any kind of psychiatric problem in the past is of no significance in the impeachment of that witness unless it can be shown that the psychiatric problems relate in some way to the credibility of the witness." *Commonwealth v. Huber*, 711 S.W.2d 490, 491 (Ky. 1986).

Taylor has made no showing that Cecil Pepper's past psychiatric problems, if there were any, related to his credibility. Therefore, the Commonwealth had no duty under *Brady* to disclose the mental inquest warrant at issue. Hence, there was no *Brady* violation. The decision of the Kentucky Supreme Court in *Taylor II* on this claim was not an unreasonable determination of the facts in light of the evidence. Further it was neither contrary to, nor did

it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

**Ground 20 - Taylor Was Not Denied His Right to Due Process by the Destruction and/or Loss of Physical Evidence Regarding the Sodomy Charge. Likewise, Counsel Was Not Ineffective for Failing to Request a Missing Evidence Instruction.**

This claim relates to the loss and destruction of certain evidence relating to the sodomy conviction and overlaps Ground 36, *infra*.[12] Taylor was convicted of sodomizing Nelson. Autopsies were performed on the bodies of Nelson and Stephenson. Regarding the loss of physical evidence, at the time of autopsy, Nelson was wearing white, jockey-type underpants. [TR 11, 1590; TE Trial 4/7/86, 74] The pathologist gave the victims' clothing, including the underpants, to Louisville Police Detective Sohl. [TE Trial 4/7/86, 78, 92] Detective Burden instructed Detective Sohl to take the underpants and the rest of the victims' clothing to the Evidence Technician Unit Office. Later, when Burden and Sohl inventoried the clothing items at Louisville police headquarters, they discovered that Nelson's underpants were missing. Burden and Sohl returned to the autopsy room to look for the missing underpants but did not find them. According to Burden, Sohl was the last person to be in possession of the underpants but he did not know what happened to this article of clothing. [TE Trial 4/9/86, 63–64] Nelson's underpants were never located.

---

12      Taylor alleges in Ground 20 that the Commonwealth violated his "6th and 14th Amendment rights to due process of law and to present a meaningful defense when crucial pieces of physical evidence (anal swabs and underwear) . . . were lost or destroyed in violation of court order." [Record No. 1-3, p. 37] In Ground 36, Taylor alleges that his "6th, 8th, and 14th Amendment rights to the effective assistance of counsel were violated when his trial defense counsel failed to request a missing evidence instruction." [Record No. 1-5, p. 7] For ease of reference, the factual basis for these claims is restated in this section.

Regarding the destruction of evidence, during the autopsies, anal swabs were taken of the victims to be tested for the presence of human sperm. The quantity of human sperm on the anal swabs from Nelson was insufficient for conclusive blood group ABO testing. As a result, serologist William Durbin could not eliminate or include Taylor as the source. [TE Trial 4/10/86, 123, 142–43, 146–47] Durbin's lab report reflects that he received the anal swabs on October 1, 1984, at 11:35 a.m. The testing was performed on October 2, and was completed by October 4, 1984. [Tape 1/7/86, 14:24:25–27: 10; TR 11, 1629] The anal swabs were fully used during the analysis. [TR 11, 1629] Durbin testified that it was necessary to use all of the swabs in the test, and they were destroyed as part of the testing procedure. [Tape 1/7/86, 14:52:08–35; 14:54:25–40]

Prior to trial, Taylor moved to dismiss the sodomy charge. Taylor argued that the destruction of the anal swabs precluded independent testing and violated an order entered by the Jefferson District Court on October 4, 1984, requiring the Commonwealth to preserve such evidence.[13] He further asserted that Nelson's lost underpants had potentially exculpatory value to the defense. The trial court denied the motion to dismiss. Taylor preserved this claim on direct appeal. [Inventory Item No. 1, pp. 67–72]

In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding all of his forty-four claims raised on appeal to be without merit. However, this particular claim was not addressed in detail. *Taylor* I, 821 S.W.2d at 74. Subsequently, in his post-conviction RCr 11.42 motion, Taylor raised a similar issue, vis-a-vis Nelson's lost

---

13      There is no evidence that the Commonwealth or its agents intentionally violated the Order of the Jefferson District Court dated October 4, 1984, directing the Commonwealth to preserve the evidence. Since the Order was entered on October 4, 1984, the same day the tests of the anal swabs were completed, it would appear that there was no evidence then available to preserve, as the testing occurred on October 2, and was completed on October 4.

underwear. He contended that his trial attorneys were ineffective in several respects, including their failure to request a missing evidence instruction.

In denying Taylor's RCr 11.42 motion, the trial court addressed his claim of ineffective assistance of counsel, as follows: "Having reviewed the entire record in this case, the Court is of the opinion that the conduct of Movant's trial counsel not only falls within the acceptable range of reasonable and effective assistance of counsel as is guaranteed by the Constitution, but far exceeds this standard." [Order, 3/16/98, p. 2 - Inventory Item No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming that denial, the Kentucky Supreme Court in *Taylor II*, analyzed Taylor's claim of ineffective assistance of counsel with respect to counsel's failure to request a missing evidence instruction.

> Inexplicably, the two murdered boys' underwear disappeared and was never located. Defense counsel moved to dismiss the sodomy charges against Taylor because "the loss of the undershorts of the victims not only results in the loss of material evidence to which the defendant had a right to have tested, but also means the loss of potentially exculpatory evidence." The trial court denied the motion. Subsequently, defense counsel did not request a missing-evidence instruction based on the missing underwear. Taylor argues that this failure resulted in ineffective assistance of counsel.

> At first blush, it appears that Taylor would have been entitled to a missing evidence instruction if defense counsel had moved for one. *See Collins v. Commonwealth*, Ky., 951 S.W.2d 569, 573 (1997). Such an instruction would have informed the jury that it could, but was not required to, infer that the underwear evidence if available would have been favorable to Taylor. But Taylor was tried in 1986. *Collins* was rendered in 1997. The use of a missing-evidence instruction was first approved of in 1988 in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 539 (1988). Thus, there was no Kentucky authority for allowing the use of a missing-evidence instruction at the time of Taylor's trial. Failure to anticipate changes in the law cannot constitute ineffective assistance of counsel. *Sanborn v. Commonwealth*, Ky., 975 S.W.2d 905, 913 (1998), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 361 (1999). Further, even if failure to request the instruction was

error, the effect of such an instruction on the jury in this case is pure speculation.

The jury may or may not have made the inference allowed by the instruction. Even if it had, it still could have found Taylor guilty of sodomy. In light of the totality of evidence presented against Taylor, we cannot say that there exists a reasonable probability that the jury's verdict would have been different.

63 S.W.3d at 164–65.

This Court finds no fault with the Supreme Court of Kentucky's decision in *Taylor II* that the failure of Taylor's trial counsel to request a missing evidence instruction regarding the lost underpants does not equate with ineffectiveness of counsel. At the time of Taylor's trial in 1986, there was no Kentucky authority approving the use of a missing-evidence instruction. Such approval did not occur until the 1988 decision in *Sanborn*, *two years after Taylor's trial*. *Sanborn v. Commonwealth*, 754 S.W.2d 534, 539 (Ky. 1988). As the *Taylor II* Court observed, failure to anticipate changes in the law cannot constitute ineffective assistance of counsel.

In considering Taylor's due process claim relative to the missing evidence itself (i.e., the underpants) and the anal swab evidence that was destroyed during the testing process, this Court is guided by *Arizona v. Youngblood*, 488 U.S. 51 (1988). Youngblood claimed that his Fourteenth Amendment due process rights were violated by the state's destruction of anal swab evidence and failure of the police to preserve the victim's clothing for future testing in a sexual assault case.[14] The Arizona Court of Appeals reversed Youngblood's conviction, holding that law enforcement officers have a duty to preserve semen samples in a

---

14    The police collected the victim's clothing on the night of the crime, but it was not refrigerated, and no tests for the presence of semen were performed on the clothing at that time. Youngblood was not arrested until six weeks later. By that time, the evidentiary value of the clothing evidence had deteriorated.

sexual assault case, including a duty to refrigerate them, and that his conviction required dismissal due to the state's failure to properly preserve semen samples collected from the sexual assault victim. *State v. Youngblood*, 153 Ariz. 50, 734 P.2d 592 (Ariz. Ct. App. 1986). The Supreme Court of Arizona denied discretionary review. The United States Supreme Court granted *certiorari* and reversed and remanded the case to the Arizona Court of Appeals for further proceedings. *Youngblood*, 488 U.S. at 59.

The Court in *Youngblood* held that the failure of police to preserve potentially useful evidence was not a denial of due process of law, absent the defendant's showing of bad faith by the police.

> Our decisions in related areas have stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government . . .
>
> . . . .
>
> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, *supra*, 467 U.S., at 486, 104 S.Ct., at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, see *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves

by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

In this case, the police collected the rectal swab and clothing on the night of the crime; respondent was not taken into custody until six weeks later. The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent. None of this information was concealed from respondent at trial, and the evidence—such as it was—was made available to respondent's expert who declined to perform any tests on the samples. The Arizona Court of Appeals noted in its opinion—and we agree—that there was no suggestion of bad faith on the part of the police. It follows, therefore, from what we have said, that there was no violation of the Due Process Clause.

*Youngblood*, 488 U.S. at 57–58; *see also United States v. Spalding*, 438 F. App'x 464, 466 (6th Cir. 2011); *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).

Similar to *Youngblood*, Taylor has made no showing that the Louisville police acted in bad faith by losing Scott Nelson's underwear or that the state serologist, William Durbin, acted in bad faith by employing testing procedures regarding the anal swabs from Scott Nelson that destroyed that evidence during the testing process. Defense serologist Bryan Wraxall testified that, in his opinion, the anal swabs evidence did not need to be entirely consumed in the analysis [VT1-7-86, 15:24:53-26:17], and that if he had first tested the anal swabs evidence, he would have used testing procedures that would not have consumed all of the evidence. [*Id.* at 15:18:35-20:06] However, as set out in *Youngblood*, police do not have a constitutional duty to perform any particular tests, and the Due Process Clause is not violated when they fail to use a particular investigatory tool. *Youngblood*, 488 U.S. at 58.

This Court has conducted a *de novo* review of the Kentucky Supreme Court's decision in *Taylor I* to summarily reject Taylor's claim that he was denied due process of law

by the loss of the underwear and the destruction of the anal swab evidence and the Kentucky Supreme Court's decision in *Taylor II* to reject his claim that his counsel was ineffective for failing to request a missing evidence instruction. Following review, this Court concludes that the Kentucky Supreme Court's decision regarding each of these claims was not an unreasonable determination of the facts in light of the evidence. The decision was neither contrary to nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### Ground 21 - Taylor Was Not Denied His Right to Due Process nor a Fair Trial by the Prosecution's Use of Beverly Shackelford's Testimony.

Taylor claims that he was denied a fair trial by the prosecution's use of witness Beverly Shackelford, who he claims gave fantastic, delusional, and incredible testimony. To support his claim that she could not be believed, Taylor states that Shackelford contacted the police on October 3, 1984, the day after the $12,000.00 reward offer was publicized. During the interview, occurring around 7:00 p.m. (a few hours before Taylor was arrested) she told the police that her brother and a guy named "Pee Wee" saw the victims in a bar at Jackson and Caldwell Streets in Louisville, that the victims left the bar with a couple of prostitutes, and that shortly thereafter a guy named Victor Spencer also left the bar. Taylor asserts that the police discounted this information.

Taylor states that Shackelford then contacted the prosecutor on January 10, 1986, and provided a completely different story. That story was uncorroborated in most of its details, but implicated Taylor. Shackelford testified during Taylor's trial that she witnessed Taylor confess to these crimes on three occasions. Two of the confessions were alleged to have occurred before her initial interview with the police on October 3, 1984. The third

confession Shackelford allegedly heard was made at a time when Taylor was already in custody. Taylor states that Shackelford's trial testimony was uncorroborated, was contrary to her earlier statement, and was refuted by some of the known facts in his case. For example, Shackelford testified that Taylor offered to sell her a Trinity High School jacket and a Trinity High School ring. Taylor argues that neither of the victims owned a high school ring and there was no evidence that a Trinity jacket was taken during the crimes.[15]

Taylor raised this claim in his post-conviction RCr 11.42 motion, and Shackelford's psychiatric records were introduced during the RCr 11.42 evidentiary hearing. Taylor contends that Shackelford's hospitalization for psychiatric treatment—albeit three years after his trial—supports his claim that the prosecutor must have known at his trial that her testimony was unreliable. However, he asserts that such testimony was used regardless, in violation of his right to a fair trial.

In denying Taylor's RCr 11.42 motion, the trial court addressed his claim as follows: "[i]n the opinion of the Court, the credibility of witnesses is the sole province of the jury. The jury in this case passed on the credibility of Ms. Shakelford [sic]. Not being clairvoyant, the Court assumes that the Commonwealth does not have the ability to look into the future and predict that Ms. Shakelford [sic] would have future emotional problems." [Order, 3/16/98, pp. 3-4 - Inventory Item No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming that denial, the Kentucky Supreme Court in *Taylor II*, analyzed the claim that

---

15      However, contrary to Taylor's argument, Eugene Taylor testified that he saw Victor Taylor wearing a ring with '84 on it at Anna Taylor's home on the evening of the murders. Eugene's testimony suggests that the ring might have been a Trinity High School ring.

the Commonwealth knowingly used perjured testimony from Beverly Shackelford at his trial, as follows:

> Taylor argues that Beverly Shackelford's testimony was totally unreliable because she had a history of mental illness and her testimony was contradictory to the "known facts" of the case. Taylor equates this to the knowing use of perjured testimony. We disagree.
>
> First of all, "questions of credibility and weight of the evidence are jury matters." *Estep v. Commonwealth*, Ky., 957 S.W.2d 191, 193 (1997). Moreover, Shackelford's mental and emotional problems manifested themselves after Taylor's trial.
>
> The Commonwealth breached no duty with respect to Shackelford's testimony.

63 S.W.3d at 160.

It is the sole province of the jury to assess the credibility of witnesses and to assign the appropriate weight to a witness' testimony. The Supreme Court of Kentucky's decision in *Taylor II*, regarding the claim that the prosecutor knowingly used unreliable, perjured testimony from Beverly Shackelford was not erroneous. The decision of the Kentucky Supreme Court on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

### Ground 22 - Taylor Was Not Denied His Right to Due Process or a Fair Trial by the Commonwealth's Withholding of Brown's Prison Medical Records. This Action Did Not Violate *Brady*.

Jeffrey Ira Brown was a prosecution witness at Taylor's trial. Brown testified that Taylor had confided in him and had confessed to the crimes while they both were confined in the Jefferson County Jail. Taylor submits that Brown's trial testimony did not match the circumstances surrounding the abduction of the victims, but it was damaging to Taylor because it was the only direct evidence concerning the alleged sodomy of Scott Nelson.

Taylor essentially characterizes Brown as an unreliable jailhouse snitch, who fabricated his statement implicating Taylor to receive a deal on his own pending charges.

Taylor claims that the Commonwealth violated its duty to disclose Brown's history of mental problems prior to trial, contending that the "Commonwealth had to know about Brown's mental problems because Brown was in jail at the time he gave the statement against Taylor, and the evidence of Brown's mental illness was in his prison records." [Record No. 1, pp. 97–98]  Taylor was unaware of Brown's history of mental health issues at trial and learned of that history post-trial, prior to the evidentiary hearing on his RCr 11.42 motion.  Taylor received the information in response to a court order permitting the disclosure of Brown's prison medical records.  Taylor states that Brown's mental problems included delusions, hearing voices, paranoia, and a suicide attempt shortly after testifying at Taylor's trial.  Brown's prison medical records were introduced at the RCr 11.42 evidentiary hearing.

The trial court found no merit to this claim because "there is no evidence in the record that the Commonwealth was aware of any history with respect to the mental health of witness, Jeffrey Ira Brown, or that the Commonwealth had any obligation to investigate the possibility that such evidence even existed."  [TR, Vol. III, 9]  The trial court also rejected all other claims in Taylor's RCr 11.42 motion.  [Order, 3/16/98 - Inventory Item No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming the denial of Taylor's motion, the Supreme Court of Kentucky in *Taylor II* analyzed Taylor's claim that the Commonwealth violated *Brady* by its non-disclosure of the history of Brown's mental illness to Taylor prior to trial, as follows: "Taylor argues that the

prosecution failed to disclose the mental history of Jeffery Brown, who testified against Taylor at trial. This argument fails for the same reason the argument that failure to disclose the mental inquest warrant for Pepper fails. Additionally, the argument is vague and conclusory." 63 S.W.3d at 159–60. Specifically, the *Taylor II* Court found that Taylor had not met the standard required to show a *Brady* violation for the nondisclosure of inadmissible evidence. The *Taylor II* Court described this standard in its assessment of the Cecil Pepper claim, stating:

> While *Wood* does not hold that disclosure of inadmissible evidence is never required under the *Brady* rule, the opinion makes clear that there can only be a violation when there is a "reasonable probability" that disclosure of the inadmissible evidence would have resulted in a different outcome at trial. *Id.* at 8, 116 S.Ct. at 11, 133 L.Ed.2d at 8. In the case at bar, the nondisclosure of the mental inquest warrant does not meet this standard.

63 S.W.3d at 159 (citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995)).

In assessing the correctness of the *Taylor II* Court's evaluation of this claim, this Court notes that the record before the trial court, with respect to Taylor's RCr 11.42 motion, reflects that the Commonwealth asked Jeffrey Brown in his interview with an officer of the Louisville Police Department whether he "had any mental problems that would cause [him] any problems with understanding what's being said here today." Brown replied, "No sir." [TR 6009] Based on the record below, there is no error in the Supreme Court of Kentucky's decision to reject Taylor's claim that the Commonwealth violated *Brady* by not disclosing Brown's history of mental health problems. There is no evidence that the Commonwealth was ever put on notice of Brown's mental health issues prior to Taylor's trial or the possibility that such evidence existed. The decision on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

**Ground 23 - Taylor Was Not Denied His Right to Due Process or a Fair Trial by the Commonwealth's Failure to Disclose That Its Agents Had Threatened to Charge Eugene Taylor if He Did Not Testify at Taylor's Trial.**

Taylor states that in April of 1994, Eugene Taylor was the subject of a mental inquest warrant and was hospitalized in Central State Hospital. During his hospitalization, Eugene told his treating psychiatrist that he was a prosecution witness for Taylor's trial. A portion of Eugene's psychiatric records (perhaps a notation made by Eugene's treating psychiatrist) contains a statement that "an attempt by the legal system to involve him in the crime and that being part of the reason why he testified." [Record No. 1, p. 100]

Taylor insinuates that the Commonwealth had threatened to charge Eugene Taylor with these offenses unless he agreed to testify at Taylor's trial. Taylor contends that he was unaware of this alleged threat until Eugene's hospitalization in a psychiatric hospital in April of 1994, eight years after his trial. Taylor asserts that the Commonwealth violated *Brady* by failing to disclose its threat of prosecution prior to trial.

Taylor raised this claim in his RCr 11.42 motion. The relevant portions of Eugene Taylor's psychiatric records from the April 1994 hospitalization were introduced during the RCr 11.42 evidentiary hearing. Taylor argues that the Commonwealth's threat of prosecution must have been a primary motivation for Eugene Taylor's testimony against him. The trial court rejected this claim, stating, "[t]he Court finds no merit in this issue raised by the Movant with respect to an entry in Eugene Taylor's Central State Hospital records eight years after trial." [Order, 3/16/98 , p. 4 - Inventory Item No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming that denial, the Kentucky Supreme Court in *Taylor II*, analyzed Taylor's claim

that the Commonwealth violated *Brady* by not disclosing prior to trial its threat of prosecution to Eugene Taylor.

> Finally, Taylor argues that the Commonwealth failed to reveal that it had threatened to prosecute a witness, Eugene Taylor, for Eugene's alleged connection with the murders at issue in this case, if Eugene did not testify against Taylor. The basis of this charge is a statement made by Eugene some eight years after Taylor's trial. Taylor presents no other evidence that such a threat was ever made; consequently, there is simply not a sufficient factual basis to reach the merits on this issue.

63 S.W.3d at 160.

Conclusory allegations are insufficient to warrant habeas relief. *See Murphy v. Dretke*, 416 F.3d 427, 436–37 (5th Cir. 2005); *Wiggins v. Lockhart*, 825 F.2d 1237, 1238 (8th Cir. 1987); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) ("[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding."); *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970) ("The petition should set out substantive facts that will enable the court to see a real possibility of constitutional error."). In support, Taylor relies *only* on a cryptic hearsay notation contained in Eugene's psychiatric records made eight years after Taylor's trial. This information is insufficient to state a viable habeas claim. Therefore, the decision of the Kentucky Supreme Court on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

### Ground 24 - Taylor Was Not Denied His Right to Due Process or a Fair Trial Based on the Claim That the Trial Judge Was Biased or the Assertion That He Had Decided to Impose the Death Penalty Before the Final Sentencing Hearing.

Taylor's conviction became final in 1992 when his petition for a writ of certiorari to the United States Supreme Court was denied. *Taylor v. Kentucky*, 502 U.S. 1100 (1992). Subsequently, on September 2, 1994, Taylor moved the trial court to vacate, set aside or

correct sentence pursuant to RCr 11.42. [Inventory Item No. 5(a)] While his RCr 11.42 motion was pending, on May 16, 1995, Taylor filed an *ex parte* motion for leave to interview members of the petit jury that convicted him. [Inventory Item No. 5(j)] Taylor acknowledged the trial judge's Order of March 17, 1986, forbidding any party or attorney from having any communication with any juror, and the General Order of the Fayette Circuit Court dated April 19, 1990, forbidding any post-trial contact or interview with jurors, except as permitted by the Court upon a proper showing of good cause. As grounds for his request, Taylor submitted that the death penalty he was facing constituted a showing of good cause that warranted an exception to the orders. The trial court granted Taylor's motion and permitted his counsel to interview the members of his petit jury.

Taylor states that during the course of interviewing the jurors he discovered that, after trial but before the sentencing hearing, the trial judge had met with the jurors. He alleges that, during that meeting, the trial judge told the jurors that they had done the right thing by recommending that Taylor receive the death penalty. Taylor claims that this statement reveals that the trial judge had already decided to impose the death penalty prior to the sentencing hearing, in violation of Taylor's constitutional rights. He relies on the following testimony from juror Karen Phillips as evidence of bias:

> He did say because the fact that Kentucky Law prohibited jurors from knowing prior records of defendants in a current case that we, you know, could not have possibly known. But he did I think tell us that he had been - - that he and Mr. Taylor had been - - this is not the first time that he and Mr. Taylor had been across from each other from the bench. That he had known Victor up through juvenile courts and that he felt that we had done the right thing. He didn't have anything ugly to say. That is basically what he said.

[Record No. 1-4, p. 104]

Taylor then filed an "Amendment to RCr 11.42 Motion," asserting additional claims in support of his RCr 11.42 motion, including the following claim:

> Movant's right to present sentencing information, *Woodson v. North Carolina*, 428 U.S. 280 (1976), was impaired, and his constitutional right to an unbiased decision-maker, *Johnson v. Mississippi*, 403 U.S. 212 (1971), was violated, because the trial judge already made up his mind to impose the death penalty immediately after the verdict and before the judicial sentencing hearing which is required by RCr 11.02. The trial judge told jurors, right after they recommended the death sentence, that they had done the right thing. Consequently, rights guaranteed movant by the 6th and 14th Amendments to the U.S. Constitution and by § 11 of the Kentucky Constitution were violated.

[Amendment to RCr 11.42 Motion, p. 2 - Inventory Item No. 5(q)]

In addressing Taylor's claim that he was prejudiced by a biased sentencing judge, the trial court stated:

> In reviewing the trial record in this case, the Court finds that the Trial Judge conducted this extremely complex trial in an exemplary manner. There is no basis to charge bad faith by the Trial Judge and to the contrary, the conclusions drawn by the Kentucky Supreme Court following their review pursuant to KRS 532.075(3) found nothing in the record indicating that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. <u>Taylor v. Commonwealth</u>, Ky., 321 S.W.2d 72 (1990).

[Order, 3/16/98, p. 10 - Inventory Item No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court.

However, the Kentucky Supreme Court rejected this claim.

> Taylor argues that the trial judge prematurely decided that the death penalty was the appropriate punishment in this case. Taylor bases this argument on the testimony—at the evidentiary hearing on his RCr 11.42 motion—of a single juror who sat on his case. She testified that, after the verdicts had been rendered, the trial judge stated to the jury that it had done "the right thing" by returning a recommendation for death. This was not corroborated by any other evidence. The trial judge did not testify at the RCr 11.42 hearing. The evidence of bias is woefully insufficient to set aside Taylor's sentence,

especially in view of the evenhandedness demonstrated by the trial judge throughout the trial.

*Taylor II*, 63 S.W.3d at 165–66.

Taylor's claim is based upon: (i) the fact that while Judge McAnulty was a juvenile judge he had prior cases involving Taylor, and (ii) Judge McAnulty's alleged statement to the jury, as perceived by juror Phillips, that the jury "had done the right thing." It is well-settled that "'opinions held by judges as a result of what they learned in earlier proceedings' cannot alone establish 'bias' or 'prejudice' against an individual or his case." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)); *see also Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994) (explaining that a trial judge's exposure to evidence, standing alone, does not demonstrate bias). Thus, Judge McAnulty's knowledge of Taylor's record as a juvenile when Judge McAnulty was a juvenile judge, without more, is insufficient to establish bias.

Other than the testimony of juror Phillips, Taylor has no other evidence to support his claim of bias on the part of the trial judge. Further her testimony is ambiguous, at best. Phillips stated that the judge "felt that we had done the right thing." It is unclear whether she meant that the judge thought the jury had done the right thing by finding Taylor guilty of the charged offenses or whether the judge thought the jury had done the right thing by recommending Taylor receive the death penalty. Clearly, such an ambiguous statement does not establish that Judge McAnulty was biased against Taylor. Based on the record below, this Court finds no error with the Supreme Court of Kentucky's decision that Taylor failed to show that the trial judge was biased against him in violation of his constitutional rights. The

decision of the Supreme Court of Kentucky on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

> **Ground 25 – Taylor Did Not Receive a "Fundamentally Unfair Trial" Based on the Claim That He Was Incompetent at the Time of Trial and Unable to Rationally Assist Counsel in Presenting His Defense.**

Taylor's competency was raised prior to trial. To resolve this issue, Taylor was examined by four mental health professionals: two of his retained experts, Dr. Thomas Colley and Dr. Gary S. Weinstein, and two court-appointed psychologists, Dr. Frank Flenning, a forensic psychologist at the Kentucky Correctional Psychiatric Center ("KCPC"), and Dr. Nancy Gordon Moore, a licensed clinical psychologist. With the exception of Dr. Colley, each expert prepared a report of his or her examination, including tests administered and his or her findings regarding Taylor's competency. Pursuant to KRS § 504.100(3), the trial court conducted a competency hearing on January 14, 1986, and again on March 10, 1986.

One of Taylor's experts, Dr. Gary S. Weinstein, testified that Taylor had a paranoid personality and was not competent to stand trial. [Tape 3, 1/13/86, 12:14:34, 12:17:45, 12:21:10] However, Dr. Weinstein administered only one test to Taylor, which asked him to complete sentences in twenty-two statements relating to trial procedure and legal counsel. [Record XLIII, p. 6241] Based on Taylor's performance, Dr. Weinstein concluded that Taylor was not competent to stand trial.

Dr. Thomas Colley's purpose in evaluating Taylor was to assess whether he was psychotic or neurotic and to give more of a general diagnosis, as opposed to one specifically related to competency. [Tape 3, 1/13/86, 14:47:30] Dr. Colley testified that his role was

more to observe the competency evaluation performed by the court-appointed clinical psychologist. [*Id.* at 14:21:32] He concluded that Taylor was intellectually limited, possessed a conduct disorder, and that Taylor's participation in his own defense would be detrimental to him. [*Id.* at 14:32:56] Dr. Colley also stated that his diagnosis of Taylor alone should not be used to make a competency evaluation and that it should be viewed with an examination of Taylor's history over time. [*Id.* at 14:32:10]

Taylor was admitted to the KCPC for a competency evaluation and he remained there for nearly one month. During this evaluation, he was evaluated by Dr. Frank Flenning. Taylor was also observed on a daily basis by social workers, psychiatric workers, and correctional officers. [*Id.* at 16:01:37] Dr. Flenning administered the Warrens Present Competency Test, a portion of which is devoted to determining whether a defendant can participate rationally in his own defense. This test also provides an indication of whether a defendant can cooperate with his attorney. [*Id.* at 16:04:16 - 16:06:22] Dr. Flenning concluded that Taylor's answers on this test were adequate and that he was competent to stand trial. Further, he determined that Taylor could assist his counsel in his defense. Dr. Flenning based this conclusion on his examination of Taylor and a review of KCPC staff observations. [*Id.* at 16:06:48; 16:17:00; 16:17:30; 18:35:14]

On January 14, 1986, the court received testimony from all of the experts. Further, the Court learned that Dr. Frank Flenning had failed to comply with the provisions of KRS § 504.080(5) when he evaluated Taylor. Specifically, Dr. Flenning failed to conduct Taylor's evaluation in the presence of Taylor's expert. In light of that failure, the court appointed Dr.

Nancy Gordon Moore, a forensic psychologist, to examine Taylor and report on Taylor's mental condition. [TR 7350 - Inventory Item No. 18(v)]

In compliance with KRS § 504.080(5), Dr. Moore examined Taylor in the presence of his own defense expert, Dr. Thomas E. Colley. [Tape 4, 3/10/86, 11:26:56] She first examined Taylor for two and one-half hours on January 14, 1986, and then again on March 7, 1986. [*Id.* at 11:56:10] During her evaluation, Dr. Moore gave Taylor the following tests: the Lawrence Present Mental Competency Interview, the Vocabulary Subtest of the Wechsler Adult Intelligence Scale-Revised (WAIS-R), and the 16 Personality Factor Questionnaire Form E (16 PF). [*Id.* at 11:29:13 - 11:33:49] Based on her observations and the results of these tests, Dr. Moore concluded that Taylor had the capacity to understand the charges against him and to cooperate with his counsel in his own defense. [*Id.* at 11:34:54] Pursuant to the definition of mental capacity in KRS § 504.020, Dr. Moore testified that Taylor could participate rationally in his own defense. [*Id.* at 11:34:54; 11:48:25; 11:56:10]

Dr. Moore's report to the court stated, in part, "[i]n accordance with the court order, this evaluation was conducted under the observation of Thomas E. Colley, Ph.D., expert witness for the defense. Dr. Colley excused himself from the evaluation after the completion of the Lawrence Present Mental Competency interview. He was informed that additional formal testing would occur, however, he indicated that he did not need to be present to observe this." [TR 49, 7118] In her report to the court, Dr. Moore found that Taylor was competent. She indicated:

> Finally, there is no strong evidence to suggest that Mr. Taylor would be unable to tolerate the stress of a trial. He has been under considerable stress in the past year but has not decompensated. He does appear to feel more depressed and helpless than was reported in Dr. Colley's evaluation. Mr. Taylor stated

that he feels as if his "back is against the wall" and that he is "in a corner." He noted that the pressure on him is building but "if I explode they'll say I'm crazy." Much of this appears to be his coming to grips with the reality of his situation and the possibility of an unfavorable outcome.

[TR 49, 7123]

The trial court gave more weight to the opinion Dr. Moore, the court-appointed licensed clinical psychologist. Based on the evidence presented at Taylor's competency hearings, the court concluded that Taylor had the capacity to appreciate the nature and consequences of the proceedings against him, that he could participate rationally in his own defense, and that he was competent to stand trial. [TR 7350–51; Inventory Item No. 18(v)]

On direct appeal, Taylor claimed that he was incompetent at the time of trial and unable to rationally assist his attorneys in presenting a defense. In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding all of his forty-four claims raised on appeal to be without merit. However, his competency claim was not addressed in detail. *Taylor I*, 821 S.W.2d at 74.

Taylor again raised this claim in his collateral proceeding before the trial court, filed pursuant to RCr 11.42. The trial court did not address it, noting that it had been raised on appeal and resolved against Taylor. Taylor then raised it in appealing the denial of his RCr 11.42 motion. The Kentucky Supreme Court in *Taylor II* affirmed the denial of Taylor's RCr 11.42 motion, and addressed Taylor's claim that he was incompetent at the time of trial, noting that, "any allegation of error not specifically addressed above has been considered and rejected as having no merit." 63 S.W.3d at 168.

A determination of competency to stand trial is reviewed for an abuse of discretion. *Hopewell v. Commonwealth*, 641 S.W.2d 744, 748 (Ky. 1982). The defendant has the

burden to prove that he was incompetent to stand trial. *See Medina v. California*, 505 U.S. 437 (1992); *Mozee v. Commonwealth*, 769 S.W.2d 757, 758 (Ky. 1989). KRS § 504.060(4) defines "incompetency to stand trial" to mean, "as a result of mental condition, lack of capacity to appreciate the nature and consequences of the proceedings against one or to participate rationally in one's own defense." The ability to participate in one's own defense does not refer to the legal questions involved but to such phases of a defense as an "account[ing] of the facts, names of witnesses, etc." *Lee v. Wiman*, 280 F.2d 257, 265 & n.21 (5th Cir. 1960).[16]

It is well-settled that a state court's findings on factual issues are not easily disturbed on habeas review.

> A state court's determinations on the merits of a factual issue are entitled to a presumption of correctness on federal habeas review. A federal court may not overturn such determinations unless it concludes that they are not "fairly supported by the record." See 28 U.S.C. § 2254(d)(8). We have held that a state court's conclusion regarding a defendant's competency is entitled to such a presumption. *Maggio v. Fulford*, 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983).

*Demosthenes v. Baal*, 495 U.S. 731, 735 (1990).

At Taylor's competency hearing, the trial court received conflicting testimony from four experts. Two found that Taylor was competent to stand trial, and two concluded that he

---

16  In *Drope v. Missouri*, the United States Supreme Court reiterated the following test for incompetence applicable to federal cases:

> It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. . . . Accordingly, as to federal cases, we have approved a test of incompetence which seeks to ascertain whether a criminal defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S., at 402, 80 S.Ct. 788, 4 L.Ed.2d 824.

420 U.S. 162, 171–72 (1975).

was not.  After considering this testimony, the court gave more weight to the opinion of court-appointed expert Dr. Nancy Moore and concluded that Taylor was competent to stand trial.  Dr. Moore's opinion was based not only her observations and interactions with Taylor during the evaluation, but also on the results of various tests that were more specifically geared to determine competency.  The trial court did not err in finding that Taylor was competent to stand trial as it was more than "fairly supported by the record."  28 U.S.C. § 2254(d)(8).  Consequently, the decision of the Kentucky Supreme Court on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

### Ground 26 – The Trial Court Did Not Err by Not Granting a Mistrial After Taylor's Emotional Outburst in Courtroom During Cross-Examination of His Mother.

During the penalty phase of trial, Taylor offered in mitigation the testimony of: (i) a psychologist; (ii) a priest; (iii) several family members; and (iv) his mother, Anna Lee Taylor, who testified concerning Victor's treatment as a child.  [TE 4/28/86, Vol. II, 95–110] His mother testified that he was placed in foster care at an early age.  [*Id.* at 103–06]  During cross-examination, the Commonwealth attempted to determine the particular time Taylor lived with his grandmother before being placed in a foster home.  [*Id.* at 105–07]

Ms. Taylor was not clear in her responses to the Commonwealth's questions, giving contradictory testimony at times.  To clarify her testimony, the prosecutor presented a series of questions in an effort to determine when Taylor was in foster care and when he lived with his grandmother.  Although the prosecutor was not badgering while questioning his mother,

Taylor had an emotional outburst, causing his removal from the courtroom. The trial transcript reflects the following exchange:

> Q:     Ms. Taylor, would you like to have a drink of water or would you like to have a break for a few seconds before you answer any more questions? I hope you please understand I'm just trying to understand what you are saying.
>
> VICTOR TAYLOR: Take my mother down off there now. Goddamn it, take her down off there.
>
> MR. LEMKE:     Could we have a break.
>
> VICTOR TAYLOR: Take her down off there, I'm not gonna have my mother sittin' up there cryin', make him leave–
>
> THE COURT:     Remove the defendant from the courtroom.
>
> VICTOR TAYLOR: (Continuing) my mother alone, she told you, she's done told you, that's all she's gonna tell you. She done told you what she's gonna tell you, shit.
>
> MS. TAYLOR:     (Screaming and Crying)
>
>     (OFF THE RECORD)
>
> THE COURT:     Let the record reflect that the witness under interrogation, Anna Lee Taylor, be concluded. The Court has ordered the defendant's removal. . . . and the Court will be in recess for approximately a half an hour.

[*Id.* at 107–08]

Taylor's counsel then moved for a mistrial, contending that Taylor was no longer able to cooperate with counsel. [*Id.* at 108–09] The trial court did not resolve the motion and proceedings were concluded for the day. The next day, the trial court obtained assurances from Taylor that he would conduct himself appropriately and that there would be no further outbursts during the proceedings. [*Id.* at 2–3] Taylor's counsel renewed their motion for a mistrial. After hearing argument of counsel, the trial court denied the motion. On direct

appeal, Taylor claimed that his due process rights were violated by the trial court's denial of his motion for a mistrial following his outburst in the courtroom. In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding all claims raised on appeal to be without merit. However, this claim was not addressed in detail. *Taylor I*, 821 S.W.2d at 74.

Upon *de novo* review of this claim, this Court concludes that Taylor's due process rights were not violated by the manner in which the trial court handled Taylor's sudden outburst. Likewise, these rights were not violated by the denial of his motion for a mistrial. While Taylor had the constitutional right to be present during all critical stages of his trial, that right is not so absolute as to allow him to disrupt the proceedings. The trial court precluded any possibility of prejudice to Taylor by taking immediate action to maintain control of the courtroom by ordering Taylor to be removed and taking a thirty-minute recess, which ultimately resulted in proceedings being adjourned for the day. The decision of the Supreme Court of Kentucky on this issue was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

### Ground 27 – The Trial Court Did Not Err by Denying Taylor's Motion for Hybrid Representation.

This claim was raised in Taylor's § 2254 petition, but was later withdrawn. [Record No. 38, p. 121] Taylor's counsel conceded that it is not a federal claim. Thus, it will not be addressed herein.

**Ground 28 - Taylor's Counsel Was Not Ineffective for Opposing His *Pro Se* Motion for Partial Self-Representation. Likewise, His Appellate Counsel Was Not Ineffective for Failing to Raise This Claim of Ineffective Assistance of Counsel on Direct Appeal.**

Although Taylor was represented by counsel,[17] in August of 1985, Taylor filed a *pro se* motion styled "Motion To Permit The Defendant To Examine Witnesses And To Participate In All Bench Conferences At Trial." [TR 5382–83; Inventory Item No. 18(b)] Notably, Taylor expressed no dissatisfaction with his counsel, and he did not request that his counsel be relieved from representing him or that substitute counsel be appointed. Taylor appeared to be seeking permission to assist counsel in his defense at trial – a form of hybrid representation. His motion was unsupported with any authority. In response, Taylor's counsel filed an *ex parte* "Memorandum Regarding Self-Representation," noting that a defendant has a right to self-representation. *Faretta v. California*, 422 U.S. 806, 822 (1975); *Wake v. Barker*, 514 S.W.2d 692, 696 (Ky. 1974). However, his counsel cautioned against granting Taylor's *pro se* motion to assist in his defense.

The trial court heard Taylor's *pro se* motion in an *ex parte* hearing closed to the public. In an Opinion/Order entered on October 18, 1985, the trial court characterized Taylor's motion as one "essentially requesting the Court to permit him to conduct his own defense." For numerous reasons, including the unresolved issue of Taylor's competency, the court denied the motion. [TR 7313-7314 - Inventory Item No. 18(b)] Taylor claims that his trial attorneys were ineffective for opposing his *pro se* motion to assist in his defense at

---

17    Taylor was represented at trial by Frank Jewell and Mike Lemke, appointed counsel from the Jefferson District Public Defender's Office.

trial and that his appellate counsel[18] was also ineffective by not raising this claim of ineffective assistance of trial counsel on direct appeal. Taylor cites to *Faretta*, 422 U.S. 806, and *Strickland*, 466 U.S. 668, as authority for this claim.

Taylor raised this claim in his post-conviction RCr 11.42 motion filed in the trial court. Regarding Taylor's claim of ineffective assistance of trial counsel, the court found no merit to the argument as it had been "previously held that the representation afforded by the Movant's defense team far exceeded [the] standard of review with respect to ineffective assistance of counsel as set forth by [the] United States Supreme Court and the Kentucky Supreme Court." [Order, 3/16/98, p. 6 - Inventory Item 5(u)] The trial court also rejected Taylor's claim of ineffective assistance of appellate counsel, finding that the "[i]ssues concerning the alleged ineffectiveness of Appellate counsel [were] not properly brought before the Court under RCr 11.42." [Order, 3/16/98, p. 7 - Inventory Item 5(u)]

Taylor appealed the trial court's rejection of these claims and the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming the denial of that motion, the Kentucky Supreme Court rejected his claims of ineffective assistance of trial counsel. It found that "Taylor makes a number of claims of various failure on the part of defense counsel that are so trivial, so contrary to the record, or so without foundation that they do not merit separate analysis." *Taylor II*, 63 S.W.3d at 165. It further acknowledged Taylor's claims of ineffective assistance of appellate counsel, stating:

> Taylor raises a number of claims of ineffective assistance of appellate counsel claims. Such claims cannot be raised in a RCr 11.42 motion. *Harper v. Commonwealth*, Ky., 978 S.W.2d 311, 318 (1998), *cert. denied*, 526 U.S.

---

18    On direct appeal, Taylor was represented by Frank W. Heft, Jr. and Daniel T. Goyette, appointed counsel from the Jefferson District Public Defender's Office.

1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). Therefore, these claims will not be considered.

*Id.*

Taylor's trial attorneys were not ineffective by opposing the motion to assist counsel in his defense. Given the complexity of Taylor's capital murder case, he did not have the professional background and working knowledge of the applicable rules of civil and criminal procedure to effectively examine witnesses and participate in bench conferences. Contrary to Taylor's claim, his counsel would have been ineffective had they not opposed Taylor's *pro se* motion. The decision of the Supreme Court of Kentucky in *Taylor II* affirming the trial court's rejection of this claim of ineffective assistance of counsel was neither contrary to federal law nor an unreasonable application of United States Supreme Court precedent.

### Ground 29 – The Trial Court Did Not Err by Excluding Certain Testimony from Father William Medley During the Penalty Phase of Trial.

and

### Ground 30 - Taylor's Counsel Were Not Ineffective for Failing to Disclose the State Social Services Records to the Commonwealth During Discovery.

Taylor's claims identified as Ground 29 and Ground 30 will be considered together. The claim raised in Ground 30 is an extension of the claim in Ground 29, and both claims arise from the same circumstances.

The last witness to testify in mitigation during the penalty phase of Taylor's trial was Father William Medley, an Associate Pastor of the Cathedral of The Assumption, in Louisville, Kentucky. Father Medley began meeting with Taylor soon after his arrest and regularly before trial in response to a request to the Catholic Church from Taylor's counsel.

To assist Father Medley in becoming acquainted with Taylor and in providing pastoral services, Taylor's counsel provided him with information about Taylor which included some state social work files on Taylor.

The Commonwealth cross-examined Father Medley about his sources of information concerning Taylor. On redirect examination, the Court held a bench conference with counsel to discuss the court's concern with Father Medley testifying about what he had learned from the state social services record. In particular, the court stated that it would not allow Father Medley to testify regarding "what is said in the social services record." [TE 4/29/86, Vol. III, 18] In response, the prosecutor advised the judge that, simultaneously with the judge's request for a bench conference, he was objecting to such testimony because it was "clearly, clearly hearsay." [*Id.*] At the conclusion of the bench conference, the court sustained the Commonwealth's objection. Taylor's counsel also objected, and requested that Father Medley be permitted to testify regarding what he learned about Taylor from the state social service records on avowal. [*Id.* at 18-22] Subsequently, Father Medley offered the following by avowal:

> Q. Okay. The other item I want to cover on the avowal, Father Medley, is the record that you looked at, the social work records. Could you relate briefly what you gained from them?
>
> A. Okay. What I found was that when Victor was approximately two years of age, allegations were made that the home in which he lived was an abusive home, and a neglected home. There wasn't appropriate or proper parental care and supervision. There was a hearing, and Victor and his siblings were all removed from the custody of their parents at that time, and placed in foster homes. From the age of two to the age of seven, Victor lived in five different foster homes; in those five years, two of those foster mothers died. Victor and his siblings were returned to the custody of his mother when he was seven, I believe, and there were subsequent to that, other allegations and investigations of both abuse by his father and neglect by his mother.

Q.    And did you gain from this that during some of those times he would also be resided with, I believe, a maternal grandmother?

A.    There was some indication of that, yes.

MR. JEWELL: Okay.  I have no further questions.

[*Id.* at 26–27]

On direct appeal, Taylor claimed that the trial court erred in sustaining the Commonwealth's objection to the avowal testimony.  In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding no merit to any of his claims, but did not address this particular claim in detail.  *Taylor I*, 821 S.W.2d at 74.  Taylor raised this same claim regarding the exclusion of the foregoing avowal testimony of Father Medley in his post-conviction RCr 11.42 motion filed in the trial court.  However, this time Taylor repackaged the claim as one of ineffective assistance of counsel.  Taylor alleged that his counsel was ineffective for failing to disclose the state social service reports to the Commonwealth during discovery, resulting in Father Medley being unable to testify regarding the information contained in those reports.

In addressing this claim on the appeal of the RCr 11.42 motion, the Kentucky Supreme Court stated,

> The defense called Father William Medley to present mitigating evidence during the penalty phase of Taylor's trial.  Defense counsel sought to elicit testimony from Father Medley concerning Taylor's social history.  The Commonwealth objected on grounds that Father Medley's testimony was based on social reports that were not disclosed to the Commonwealth during reciprocal discovery.  The trial court sustained the objection.  Taylor argues that his defense counsel was ineffective for not making the required disclosure.  As a result, Taylor claims that the jury was deprived of hearing powerful mitigating evidence concerning his family background, which was placed into the record by avowal.

The avowal testimony based on the social service reports—which were not prepared by Father Medley—was classic hearsay. Taylor has made no argument that the testimony was admissible pursuant to an exception to the hearsay rule. Thus, the avowal testimony was not admissible and, therefore, the failure to produce the reports could not have resulted in ineffective assistance. See *Stanford v. Commonwealth*, Ky., 854 S.W.2d 742, 748 (1993), *cert. denied*, 510 U.S. 1049, 114 S.Ct. 703, 126 L.Ed.2d 669 (1994). Further, the evidence was mostly cumulative to the testimony of Taylor's sister, which was admitted during the penalty phase of Taylor's trial. Finally, as explained above, defense counsel was not ineffective in the presentation of mitigating evidence at the penalty phase of Taylor's trial.

There was no ineffective assistance of counsel concerning the failure to produce the social service reports during discovery.

*Taylor II*, 63 S.W.3d at 162.

Taylor asserts that the exclusion of this mitigation evidence violated his constitutional rights under the Eighth and Fourteenth Amendments. Further, he alleges that his counsel were ineffective for not disclosing the state social service records to the Commonwealth during discovery. However, federal habeas corpus does not ordinarily lie to review questions about the admissibility of evidence. *McGuire*, 502 U.S. at 67–68. Generally, to rise to the level of a constitutional violation, the state court evidentiary ruling in question must be so prejudicial that it renders a fair trial impossible. *Lisenba*, 314 U.S. at 228–29. It must be so egregious as to amount to a denial of fundamental fairness. *McGuire*, 502 U.S. at 67–68; *see also Jeffers*, 497 U.S. at 780. This is a high standard. *See, e.g., Baze,* 371 F.3d at 318.

Taylor argues that the trial court's exclusion of certain portions of Father Medley's testimony violated *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Both cases require admission and consideration of all evidence relating to "any aspect of a defendant's character or record and any of the circumstances of the offense that

the defendant proffers as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110; *Lockett*, 438 U.S. at 604.  However, *Lockett* states that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604 n.12.

Similar to the trial court's authority to exclude irrelevant testimony, the trial court is authorized to exclude improper opinion testimony. *Stanford*, 734 S.W.2d at 790.  In Taylor's case, Father Medley was not qualified to offer opinion evidence regarding the effect of foster home care on Taylor.  His knowledge of Taylor was minimal, as demonstrated by his testimony at trial that he could not get Taylor to open up to him.  Further, even if it were admissible, Father Medley's avowal testimony was cumulative to the testimony of Taylor's mother and two sisters.  Taylor's mother, Anna Lee Taylor, testified that Taylor had been placed in foster care at a young age.  [TE 4/28/86, Vol. II, 103–06]  His sister Delores Thompson testified that Taylor was placed in two or three different foster homes at any early age and that he had been treated poorly by his foster parents.  [*Id.* at 77, 80]  Another sister, Roberta Taylor, testified that Taylor's father used to beat him and would appear at Taylor's school and harass him.  [*Id.* at 86–87]  Also, Taylor's expert clinical psychologist, Dr. Thomas Colley, testified in mitigation to the adverse effect that being moved from place to place would have on him. [*Id.* at 77]

The foregoing mitigation testimony from members of Taylor's family, all of which preceded Father Medley's testimony, was much more detailed and was based on their personal knowledge and observations of Taylor as a child.  Additionally, the expert

testimony from Taylor's expert, Dr. Thomas E. Colley, was based on his expert opinion formed from his own observations and competency evaluation of Taylor. Therefore, Father Medley's avowal testimony was cumulative and properly excluded by the trial court. Taylor was not prejudiced in any way by its exclusion. The Kentucky Supreme Court's decision in *Taylor I* rejecting Ground 29 was neither an unreasonable determination of the facts in light of the evidence, nor was it contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

In considering whether Taylor's Trial counsel was ineffective for failure to disclose the state social service records to the Commonwealth during discovery, this Court has reviewed the colloquy of the bench conference requested by the trial court during the redirect examination of Father Medley leading to the avowal testimony. [TE 4/28/86, Vol. III, 25–28] The trial court sustained the Commonwealth's objection to Father Medley's testimony regarding the information he had obtained from the state social services records because Taylor's counsel did not disclose those records to the Commonwealth in discovery. However, even assuming that Taylor's counsel was deficient by failing to disclose the state social service records to the Commonwealth, Taylor was not prejudiced by this allegedly deficient performance.

Father Medley's avowal testimony was excluded for two reasons. First, the avowal testimony was "based on the social service reports—which were not prepared by Father Medley—[making them] classic hearsay." *Taylor II*, 63 S.W.3d at 162. "Failure to offer at the penalty phase evidence which would not have been admissible cannot rightly be characterized as ineffective representation." *Stanford*, 854 S.W.2d at 748. Father Medley

could not have testified to the contents of the records because he did not prepare them. Second, the records were cumulative of the testimony of Dr. Thomas Colley, Taylor's two sisters, and Taylor's mother. Thus, even if Taylor's counsel had disclosed the state social service records during discovery, Father Medley still would have been unable to testify regarding what he learned about Taylor from them. The Supreme Court of Kentucky's decision in *Taylor II* that there was no ineffective assistance of counsel concerning the failure to produce the social service reports during discovery was not an unreasonable determination of the facts in light of the evidence. Further it was not contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground 31 - Taylor's Counsel Were Not Ineffective in Their Presentation of Mitigating Evidence or by Failing to Present Additional Mitigating Evidence.

Taylor claims that his attorneys were ineffective in the way they presented mitigating evidence during trial. He also argues that they were ineffective by failing to discover and/or present additional mitigating evidence during trial. The additional mitigating evidence which Taylor contends should have been presented includes information: (i) concerning Taylor's childhood home life and abuse from his parents when he was very young; (ii) concerning Taylor's mother's serious medical problems that adversely affected her ability to care for her children, resulting in Taylor and her other children being placed in foster homes at an early age; and (iii) that Taylor was abused by his mother after being returned to her care. Taylor argues that it is likely that the jury would not have recommended a death sentence if they had heard this additional mitigating evidence.

Taylor raised this claim in his post-conviction RCr 11.42 motion before the trial court. The trial court conducted an evidentiary hearing on the motion. With the agreement of the Commonwealth, Taylor's juvenile court records were introduced during that evidentiary hearing. In denying Taylor's RCr 11.42 motion, the trial court addressed Taylor's claims of ineffective assistance of counsel at trial, as follows:

> These issues [19-20-21-22-23] raised by Movant relate to his trial counsel's conduct of his defense. The Court finds no merit in these arguments being previously held that the representation afforded by the Movant's defense team far exceeded [the] standard of review with respect to ineffective assistance of counsel as set forth by [the] United States Supreme Court and the Kentucky Supreme Court.

[Order, 3/16/98, p. 6 - Inventory Item 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming the denial of Taylor's RCr 11.42 motion, the Kentucky Supreme Court in *Taylor II* analyzed this particular claim of ineffective assistance, stating:

> Taylor presents a list of mitigating evidence that he argues should have been presented during the penalty phase of his trial. He claims that his counsel was ineffective for either not presenting the evidence or failing to discover it in the first place. In support of this argument, he cites to a long list of cases that hold that failure to investigate and present mitigating evidence is reversible error. But these cases concern the complete failure to either investigate mitigating evidence or to present available mitigating evidence, or both. Such is not the case here where defense counsel did introduce the favorable testimony of numerous witnesses in support of mitigation. Thus, Taylor's argument is basically that defense counsel did not put on enough or all of the available mitigation evidence.
>
> Defense counsel is not required to place all available mitigating circumstances into evidence. *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir.), *cert. denied*, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995). The mitigation evidence presented on Taylor's behalf included testimony concerning his mental state, his background, his family history, his time spent in foster homes, the physical and mental abuse inflicted upon him by his parents, and his distrust of people and institutions.

There was no ineffective assistance of counsel concerning the quantity and quality of mitigating evidence presented during the penalty phase of Taylor's trial.

63 S.W.3d at 162.

When examining a claim of ineffective assistance of counsel regarding the introduction of mitigating evidence, "it is best to begin with the evidence Petitioner actually presented in mitigation." *Lorraine v. Coyle*, 291 F.3d 416, 427 (6th Cir. 2002). In Taylor's case, his counsel presented as mitigation witnesses: (i) one of his experts, Dr. Thomas Colley, a licensed clinical psychologist; (ii) two of his sisters, Delores Thompson and Roberta Taylor; (iii) his mother, Anna Lee Taylor; and (iv) an Associate Pastor of the Cathedral of the Assumption in Louisville, Kentucky, Father Dennis Medley. Through these witnesses, Taylor presented evidence concerning his mental state, childhood background, family history, time he spent in foster homes, physical and mental abuse inflicted by his parents, and his distrust of people and institutions.

Taylor's counsel had a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, a "reasonable investigation" is not the investigation that the best defense lawyer, with unlimited time and resources and the benefit of hindsight, would conduct. *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998). In *Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995) (en banc), the Eleventh Circuit considered a claim that trial counsel should have presented additional mitigating evidence and discussed the standard that must be met to establish ineffectiveness.

[W]e have never held that counsel must present all available mitigating circumstance evidence in general, or all mental illness mitigating circumstance evidence in particular, in order to render effective assistance of counsel. To the contrary, the Supreme Court and this Court in a number of cases have held counsel's performance to be constitutionally sufficient when no mitigating circumstance evidence at all was introduced, even though such evidence, including some relating to the defendant's mental illness or impairment, was available. (citations omitted) In an even larger number of cases we have upheld the sufficiency of counsel's performance in circumstances, such as these, where counsel presented evidence in mitigation but not all available evidence, and where some of the omitted evidence concerned the defendant's mental illness or impairment. (citations omitted) Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence, or all available mental illness or impairment evidence, in order to render effective assistance of counsel at the sentence stage. *See, e.g.*, *Stevens v. Zant*, 968 F.2d at 1082 ("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.").

. . . Instead, our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny.

Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.1994). That result is no accident but instead flows from deliberate policy decisions the Supreme Court has made mandating that "[j]udicial scrutiny of counsel's performance must be highly deferential," and prohibiting "[i]ntensive scrutiny of counsel and rigid requirements for acceptable assistance." *Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66. The Supreme Court has instructed us to begin any ineffective assistance inquiry with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; . . . Because constitutionally acceptable performance is not narrowly defined, but instead encompasses a "wide range," a petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden. As we have explained:

'The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers'

> performances; we are interested in whether the adversarial
> process at trial, in fact, worked adequately.'

*Waters*, 46 F.3d at 1511–12 (quoting *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992)).

As noted previously, Taylor's counsel presented mitigating evidence from an expert, three family members, and a Catholic priest. Nevertheless, Taylor claims that the *additional* mitigating evidence should have been produced, including his juvenile court records. The additional mitigating evidence Taylor described was, for the most part, duplicative and cumulative. Further, it included substantial negative evidence. For instance, Taylor's juvenile court records would have shown Taylor's lengthy criminal history, his violent tendencies, and his propensity to commit robberies which involved violence. The juvenile court records also portray Taylor as shrewd and manipulative.

Introduction of Taylor's juvenile court records certainly would not have cast him in a good light. Additionally, pursuant to KRS § 532.025(1)(a), introduction of this information could have allowed Taylor's adult criminal history to be introduced. As a result, and as a part of the strategy of his counsel, the juvenile records were not introduced. Taylor also claims that his mother's medical condition should have been presented as mitigating evidence. However, such evidence, including that she suffered from seizures, was introduced during the guilt phase of his trial during the testimony of Renee Woods. [TE 4/15/96, 103–07]

A review of the record strongly suggests that the failure of Taylor's counsel to introduce the additional, alleged mitigating evidence was a strategic decision to prevent the jury from learning about Taylor's extensive criminal history, including many violent

offenses, beginning when he was a juvenile. Strategic decisions such as this fall well outside the scope of review. *See Strickland*, 466 U.S. at 681; *Jackson*, 687 F.3d at 744.

Again, the Court notes that the test for ineffectiveness does not require perfection. *Atkins v. Singletary*, 965 F.2d 952, 960 (11th Cir. 1992) ("Trial counsel did enough. A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance."). The test is also not whether the best criminal defense attorneys might have done more. Instead, the test is whether Taylor's trial counsel acted within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also White*, 972 F.2d at 1220. Taylor's attorneys certainly met this standard. As a result, the Supreme Court of Kentucky's decision in *Taylor II* regarding this claim was neither an unreasonable determination of the facts in light of the evidence, nor was it contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### Ground 32 - Taylor's Trial Attorneys Were Not Ineffective for Failing to Object to the Prosecutor's Arguments to the Jury in Both the Guilt and Penalty Phases of His Trial. Likewise, His Appellate Attorneys Were Not Ineffective for Failing to Raise This Claim on Direct Appeal.

Taylor argues that his trial attorneys were ineffective for failing to object to the prosecutor's use of religious references in his closing arguments in both the guilt and penalty phases of his trial, and by failing to object to the prosecutor's improper argument concerning deterrence in the penalty phase closing argument. Taylor contends that he was prejudiced by the prosecutor's improper remarks.

Taylor raised this claim in his post-conviction RCr 11.42 motion filed in the trial court. In addressing Taylor's claim concerning the prosecutor's references to religion in closing argument, the trial court stated:

BIBLICAL REFERENCES (I).

The Court finds that use of biblical references by the prosecutor does not rise to the level of a due process violation as required in *Smith v. Commonwealth*, Ky., 412 S.W.2d 256, Ky. Ct. App., (1967).

BIBLICAL REFERENCES (II).

Movant's speculation that his trial counsel's misstatement as to the exact amount of silver paid Judas in exchange for his betrayal rendered the totality of his representation ineffective is in the opinion of the Court without merit, is speculation at best, and is unsupported by legal authority.

[Order, 3/16/98, p. 5 (Inventory No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Supreme Court of Kentucky. In that appeal, Taylor made numerous claims of ineffective assistance of counsel. In affirming the denial of Taylor's RCr 11.42 motion, that court addressed this particular claim of ineffective assistance of counsel, as follows:

Taylor raised forty-four (44) issues on direct appeal. We directly addressed only a select few of these issues in that opinion. The rest we cursorily dismissed by stating: "Allegations of error which we consider to be without merit will not be addressed here." *Taylor*, 821 S.W.2d at 74. Even though some issues were not specifically addressed on direct appeal, they were all considered and resolved against Taylor. *See Commonwealth Transportation Cabinet Department of Highways v. Taub*, Ky., 766 S.W.2d 49, 51–52 (1988). Taylor tries to circumvent this well-settled rule by glossing errors already raised as claims of ineffective assistance of counsel. These issues include:

. . . .

*Failure to Object to Prosecutor's Closing Remarks*

The issue of the appropriateness of the prosecutor's closing remarks was raised and rejected on direct appeal. *Appellant's Brief* at 83–84, *Taylor, supra.*

*Taylor II*, 63 S.W.3d at 160–61.

The Kentucky Supreme Court also addressed Taylor's claim that his appellate counsel were ineffective for failing to raise on direct appeal his claim that trial counsel were ineffective for failing to object to the prosecutor's improper remarks in closing arguments.

Taylor raises a number of claims of ineffective assistance of appellate counsel claims. Such claims cannot be raised in a RCr 11.42 motion. *Harper v. Commonwealth*, Ky., 978 S.W.2d 311, 318 (1998), *cert. denied*, 526 U.S. 1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). Therefore, these claims will not be considered.

*Id.* at 165.

Regarding Taylor's present habeas petition, the Commonwealth contends that this claim was considered on the merits in Taylor's direct appeal and may not be relitigated as a claim of ineffective assistance of counsel. [Record No. 12-7, p. 10] However, out of an abundance of caution, this Court has considered this argument on the merits but concludes that it is without merit.

At the outset, the trial court admonished the jury several times that the prosecutor's comments were not evidence. In fact, the trial judge told the jury that nothing that was said by either Taylor's counsel or the prosecutor was evidence in the case. Specifically, the court stated:

Ladies and gentlemen, as I have indicated throughout, at the beginning of the trial and again – counsel please remain up – the arguments of counsel, both opening statements and closing arguments, is [sic] not to be considered as evidence. I notice that you all have taken notes and your memories and your recollection of the events that occur are to be relied upon.

[Transcript of Closing Argument at 163–64]

Also, the prosecutor told the jury at the beginning of his guilt phase argument that, "[t]here is nothing that I say that is evidence in this case and heaven forbid anything the defense counsel says is evidence in this case." [*Id.* at 100]  Additionally, in his penalty phase closing argument, the prosecutor stated: "Ladies and gentlemen, if any point in time you might feel that I have misstated something, sometimes this happens.  I would suggest to you that I am arguing based upon my recollection of the evidence.  If you conclude I'm wrong, then you are to rely upon your individual recollection of the evidence."  [TE 4/28/86, Vol. III, 120]

Taylor's counsel objected to some of the prosecutor's statements during closing arguments, indicating a pattern of objecting to certain materials as a matter of trial strategy which does not qualify as ineffective assistance under *Strickland*.  466 U.S. at 681.  Additionally, closing arguments cannot be viewed in a vacuum.

> *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), provides that the prosecutor's statements or conduct must be viewed in the context of the trial and only by so doing can it be determined whether the conduct affected the fairness of the trial.  A reviewing court must consider the impact of the remarks of the prosecutor's [sic] balanced against those of the defense counsel because a criminal conviction should not be lightly overturned on the basis of the prosecutor's comments only.  *See Niemeyer v. Commonwealth*, Ky., 533 S.W.2d 218 (1976).  The style and approach to the presentation in the courtroom is different, but we find that considering the two together, they are able and aggressive adversaries who sought legitimate tactical advantage as the case developed.  In view of the fact that they merely present opposing points of view, styles and techniques, it is our opinion that the jury was not unduly influenced by either counsel.

*Smith v. Commonwealth*, 734 S.W.2d 437, 452 (Ky. 1987).

In Taylor's case, some of the prosecutor's comments Taylor now finds objectionable were made in response to a defense argument.  Thus, it is necessary to examine the defense's closing argument as a preliminary matter.  For instance, defense counsel's criticism of the

prosecutor for "making deals" with witnesses in exchange for their testimony at Taylor's trial, [Transcript of Closing Arguments at 78–79], provoked the prosecutor to explain that although he would prefer to have witnesses who are school teachers and ministers, sometimes his witnesses are convicted criminals who have struck deals. Taylor also argues that the prosecutor's references to religion in his closing argument were inappropriate. However, Taylor's own attorney made statements with religious overtones and references to Biblical passages during the penalty phase closing argument. [TE 4/28/86, Vol. III, 173–74] Such responses were a logical, legitimate reaction to defense counsel's arguments.

It should be noted that Kentucky courts permit great leeway during closing arguments. In *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky. 1987), the defendant challenged the prosecutor's closing argument as being improper. In addressing that claim on appeal, the Kentucky Supreme Court stated:

> In any consideration of alleged prosecutorial misconduct, particularly, as here, when the conduct occurred during closing argument, we must determine whether the conduct was of such an "egregious" nature as to deny the accused his constitutional right of due process of law. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The required analysis, by an appellate court, must focus on the overall fairness of the trial, and not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

> In his final summation, the prosecutor noted that what defense counsel said is not evidence in the case. He criticized the defense counsel for presenting a "great octopus" defense. He accused counsel of pulling a "scam," and he questioned the sharpness of counsel. Great leeway is allowed to *both* counsel in a closing argument. It is just that—*an argument*. A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position. We find that the remarks referred to here were well within the proper bounds of a closing argument and certainly did not affect the outcome of the trial. See *Hunt v. Commonwealth*, Ky., 466 S.W.2d 957 (1971); *Houston v. Commonwealth*, Ky.App., 641 S.W.2d 42 (1982); and *Johnson v. Commonwealth*, Ky., 302 S.W.2d 585 (1957).

*Id.* at 411–12.

Taylor also claims ineffective assistance when his trial counsel failed to object to comments regarding deterrence made by the prosecutor during the penalty phase. The prosecutor stated: "We feel that life is important and that the punishment should be severe enough that it would get the attention of other persons and through that, help deter crime and criminals." Any objection to these comments would likely have been overruled because prosecutors are permitted to argue deterrence. In *Wallen v. Commonwealth*, the Kentucky Supreme Court noted, "We have not engaged in any blanket condemnation of prosecutorial comment relating to deterrence. We have condemned argument only where the prosecutor suggests that the jury convict or punish on grounds or for reasons not reasonably inferred from the evidence." 657 S.W.2d 232, 234 (Ky. 1983); *see also Davis v. Kemp*, 829 F.2d 1522, 1527–28 (11th Cir. 1987).

To establish a claim that counsel was ineffective for failing to object, a defendant must satisfy the *Strickland* standard. *Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010) ("[T]he pertinent question is whether counsel's failure to object was both objectively unreasonable and prejudicial."). Here, given: (i) the numerous reminders by the trial court and counsel to the jury that the attorneys' arguments were not evidence; (ii) the trial court's instruction to the jurors to rely on their own notes and recollections of the evidence presented in considering arguments of counsel and any discrepancy between counsels' statements in closing argument about the evidence; (iii) the strategic decisions of counsel in deciding whether to make an objection to a statement made in closing argument; and (iv) the leeway

both sides are afforded during closing arguments, the challenged remarks of the prosecutor were not constitutionally impermissible.

### Ground 33 - Taylor's Trial Attorneys Were Not Ineffective for Allegedly Failing to Present Evidence in Cross-Examinations That Was Favorable to the Defense.

Taylor claims that his trial attorneys were ineffective during the cross-examination of several witnesses that would have presented evidence favorable to Taylor. Specifically, Taylor refers to the cross-examination of Wilson, Pepper, Shackelford, and Detective Duff relating to: (i) an allegation that Louisville police detective Leslie Wilson fed information to George Wade that the police believed Taylor was the triggerman prior to Wade's statement; (ii) evidence that Cecil Pepper saw George Wade with the gun; (iii) the failure to impeach Beverly Shackelford with the statement that she originally named Victor Spencer, not Victor Taylor, as the person responsible for the murders; and (iv) the fact that the police failed to search the residence where George Wade was living. Taylor argues that if the jury had heard this evidence, there is a reasonable probability that the jury would have found him not guilty. Thus, he was prejudiced by his counsels' ineffectiveness.

Taylor raised this claim in his post-conviction RCr 11.42 motion filed in the trial court. Ultimately, however the trial court denied the motion but did not address the argument in any detail. [Order, 3/16/98, p. 6 (Inventory Item 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In that appeal, Taylor raised numerous claims of ineffective assistance of counsel. In affirming the denial of Taylor's RCr 11.42 motion, the Kentucky Supreme Court in *Taylor II* addressed these particular claims of ineffective assistance of counsel, as follows:

Some background information is necessary to understand this argument. Taylor and George Wade were both indicted for the murders for which Taylor stands convicted. The trials were severed. Wade was tried first, found guilty, and sentenced to life imprisonment. Before he was arrested, Wade was questioned by the police. In the course of being questioned, he confessed to the crimes. His confession was introduced at Taylor's trial under an exception to the hearsay rule. *Taylor*, 821 S.W.2d at 74. In the confession, Wade identified Taylor as the triggerman.

Detective Leslie Wilson testified for the Commonwealth at both Taylor's trial and Wade's trial. Taylor argues that, if properly questioned, Detective Wilson would have testified that — during the police questioning of Wade — he told Wade that police had heard on the street that Wade was present at the shootings, but that Taylor had pulled the trigger. This, Taylor argues, would have impeached or discredited Wade's confession by explaining how Wade came to implicate Taylor as the triggerman. The Commonwealth argues that this was trial strategy and that similar evidence was admitted through the cross-examination of another witness. We agree.

The defense made a motion in limine to exclude any reference to evidence gathered "on the street." The trial court granted the motion. Wilson's testimony at Wade's trial was that the police were hearing "on the street" that Wade and Taylor committed the murders and that Taylor was the triggerman. Thus, presumably Wilson's testimony on this point at Taylor's trial would have been similar and could have opened the door to evidence gathered "on the street." This would have undermined existing trial strategy. Further, defense counsel did cross-examine a Detective Duff about whether Detective Wilson "fed" Taylor's name to Wade during police questioning of Wade.

There was no ineffective assistance of counsel concerning the cross-examination of Detective Wilson.

. . .

*OTHER CLAIMS OF INEFFECTIVE ASSISTANCE*

Finally, Taylor makes a number of claims of various failure on the part of defense counsel that are so trivial, so contrary to the record, or so without foundation that they do not merit separate analysis. These errors include: (i) failure to point out that the police did not investigate Wade's girlfriend's residence; (ii) failure to cross-examine Cecil Pepper regarding contradictory statements he allegedly made to the police; . . . (v) failure to effectively cross-examine Beverly Shackelford; . . .

63 S.W.3d at 164–65.

Notwithstanding the deference accorded to a state court's findings, and out of an abundance of caution, this Court has considered these four separate claims of ineffectiveness of trial counsel but concludes that they have no merit.

**A.     Cross-Examination of Detective Leslie Wilson**

The trial record reflects that, through a motion in limine, Taylor's counsel successfully suppressed any reference to evidence gathered from informants or "on the street."  [TE 7438-39, 7440]  With that in mind, Taylor's counsel necessarily had to tailor cross-examination of Leslie Wilson so that he did not disclose that the police were hearing "on the street" that Taylor and Wade had committed these crimes and that Taylor was the triggerman, which is consistent with Leslie Wilson's testimony during George Wade's trial. [Wade TE Vol. III, 347-48]  The cross-examination of Leslie Wilson that Taylor contends his counsel should have undertaken would have undermined counsel's trial strategy and nullified their motion in limine to exclude any evidence regarding what the police were hearing "on the street" about these crimes.   Therefore, Taylor's attorneys were not ineffective in their cross-examination of Leslie Wilson.   Additionally, during the cross-examination of Louisville police officer Detective Duff, Taylor's counsel did question him regarding Detective Wilson's "feeding" Taylor's name to George Wade before Wade made his statement to the police.  [TE 4/18/86, 38]  Thus, the jury heard evidence suggesting that perhaps the police had given Wade information that prompted him to implicate Taylor as the triggerman.  There was no ineffectiveness with respect to the cross-examination of Detective Leslie Wilson.

**B.      Evidence That Cecil Pepper Saw George Wade With a Gun**

Taylor claims that his trial counsel should have brought out during cross-examination of Cecil Pepper that Pepper saw George Wade with the gun, implying that it was Wade who shot the victims.  In considering this claim, this Court has reviewed the statement Cecil Pepper made to the police on October 1, 1984.  [TE 45, 6558–83]   Taylor is mistaken that Pepper told police that he saw George Wade with a gun.  The statement to which Taylor refers is one in which Pepper is questioned regarding how Taylor and Wade entered the backseat of the victims' car.  [*Id.* at 6566–68]  In this lengthy statement, Pepper does not state that he saw George Wade with a gun, and he does not state that he ever witnessed Taylor give a gun to George Wade.  The focus of the questioning and Pepper's responses concerns where and how Taylor was pointing the gun as he entered the backseat of the vehicle.  [*Id.*]  Pepper specifically stated that Taylor continued to point the gun toward the victims as he entered the car.  Taylor's attorney was not ineffective in his cross-examination of Cecil Pepper on this point.

**C.      Alleged Failure to Impeach Beverly Shackelford**

Taylor also argues that his attorney was ineffective in cross-examining Beverly Shackelford by failing to point out that, in her statement to police, she had previously identified Taylor as Victor Spencer, not as Victor Taylor.  Taylor suggests that better cross-examination of Shackelford would have discredited her testimony or established that another person (i.e. Victor Spencer) should have been charged with these offenses.

This Court has reviewed the statement Beverly Shackelford made to police on October 3, 1984.  In this statement, Shackelford states that she knew Victor by the name of

Victor Spencer. Detective Dossett then asked if that was his real name, to which Shackelford responded, "I'm not certain." [TE 45, 6515] Shackelford then stated that she believed that his last name was "Spencer," because she thought that he had a brother and sister that went by the last name of Spencer. While not certain of Victor's last name, Shackelford said that she knew him by sight and described him as being probably 27 or 28 years old, weighing 160 or 170 pounds, and having a medium dark complexion. [*Id.* at 6517] She also said that he was known at the bar. [*Id.*]

Taylor's counsel was not ineffective by failing to impeach Shackelford with her statement identifying Taylor as Victor Spencer because Shackelford had initially told police in that statement that she was not certain of Victor's last name, but she knew him on sight. Taylor's counsel properly focused on the timing of when she had heard Taylor make statements admitting the crimes and, in closing argument, Taylor's counsel attacked Shackelford's testimony regarding her identifying Taylor as Victor Spencer. [Transcript of Closing Argument, pp. 81–82] Counsel's questioning of Shackelford should be viewed as sound trial strategy rather than a basis for alleging ineffective assistance of counsel.

## D.     The Search of George Wade's Residence

Taylor contends that his attorneys were ineffective by not presenting evidence at trial that police failed to search the residence where George Wade was living. Taylor suggests that had his counsel pointed out this omission by police, the jury could have inferred that if law enforcement had searched Wade's residence, they might have discovered evidence, including the murder weapon, implicating Wade as the triggerman.

Wade stated during his interview with police that his home address was 813 South Shelby Street and that he lived there with his sister, Lois Chandler. [TR 42, 6096] During this interview, Wade also disclosed that he stayed with his girlfriend, Edna Battle, and their one-year old son, and that her address was 729 Nugent Court. [*Id.*] The police searched the residence Wade identified as his home address (813 South Shelby Street) but none of the victims' property or any other evidence linking Wade to these offenses was found at that location. The police did not search Wade's girlfriend's residence.

Taylor asserts that the jury should have known that police did not search Wade's girlfriend's residence for the murder weapon or any other evidence connecting Wade to these crimes. In support, he states that if Wade had been in possession of the murder weapon after the shootings, and if the police had searched 729 Nugent Court, they might have found the murder weapon, which would have undermined the prosecution's theory that Taylor was the triggerman.

Taylor's argument is speculative because there is no evidence that Wade ever possessed the gun. Dino Pace and Cecil Pepper testified that they saw Taylor holding a gun as he entered the back seat of the victims' car. [TE 66, 4/16/86, Pace, 59; TE 66, 4/16/86, Pepper, 146] There was no basis for an inference that incriminating evidence of these crimes might have been found at Edna Battle's residence. Nevertheless, Taylor's counsel did question Detective Duff at trial regarding Wade's statement that he resided on Nugent Court. Duff testified that he was unaware that Wade had told Detective Wilson that he lived on Nugent Court with his girlfriend and was being supported by her. [TR 67, 4/18/86, 39–40]

Taylor's counsel was not ineffective for pointing out to the jury that police failed to search 729 Nugent Court for evidence connecting Wade to these crimes. His argument regarding what the jury could have inferred from the fact that police did not search 729 Nugent Court is totally speculative, and his claim of ineffective assistance of counsel on this point is without merit.

The Kentucky Supreme Court's decision in *Taylor II* that there was no ineffective assistance of counsel for his trial counsel with respect to the cross-examination of several witnesses (Louisville Police Detective Leslie Wilson, Cecil Pepper, Beverly Shackelford, and Detective Duff) that would have presented evidence favorable to Taylor was not an unreasonable determination of the facts in light of the evidence. Likewise, the court's holding on this issue was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground 34 - Taylor's Trial Counsel Were Not Ineffective for Allegedly Failing to Investigate and Present Evidence That Jeffrey Brown Had Collected Newspaper Articles About This Homicide Case While Brown Was Incarcerated at the Jefferson County Jail.

Taylor asserts that prosecution witness Jeffrey Brown was a jail-house snitch who falsely claimed to have information concerning this homicide case to help him receive favorable treatment regarding pending felony charges. At the time, both he and Taylor were confined in the Jefferson County Jail. During Taylor's trial, Brown testified that Taylor admitted that he had committed the charged offenses. Taylor claims that his counsel were ineffective for failing to discover that Brown had been collecting newspaper articles about the homicide case and that he was prejudiced by this ineffectiveness because the jury should have had the benefit of this information in evaluating Brown's testimony and credibility.

Taylor raised this claim in his post-conviction RCr 11.42 motion filed in the trial court. During the hearing on this motion, the court received testimony from Anthony Barker that he had observed Brown collecting newspaper articles concerning Taylor's case. Ultimately, the trial court denied the motion. In addressing Taylor's claim of ineffectiveness regarding Brown, the trial court stated:

> Movant fails to assert exactly what his trial counsel could have done to uncover information provided by fellow inmate, Anthony Barker, that the witness, Jeffrey Ira Brown, had allegedly been collecting newspaper articles containing information about the Movant's case. The only means of uncovering this information is for the person with that information to volunteer it; which Mr. Barker apparently did not.
>
> The Court agrees with the Commonwealth that Movant's counsel at the time this case was tried would have had no way to determine the information apparently known only by Mr. Barker.

[Order, 3/16/98, pp. 8-9 - Inventory Item 5(u)]

In affirming the denial of Taylor's RCr 11.42 motion, the Supreme Court of Kentucky held as follows:

> Finally, Taylor makes a number of claims of various failure on the part of defense counsel that are so trivial, so contrary to the record, or so without foundation that they do not merit separate analysis. These errors include . . . (vi) failure to uncover that Ira Brown—a witness against Taylor—was collecting newspaper articles about the murders before Taylor was arrested . . .

*Taylor II*, 63 S.W.3d at 165.

Again, notwithstanding the deference accorded to a state court's findings, this Court has considered this claim of ineffectiveness of trial counsel on the merits but agrees with the Kentucky Supreme Court. Anthony Barker testified on Taylor's behalf during the evidentiary hearing held on Taylor's RCr 11.42 motion. Barker was held in the Jefferson County Jail at the same time that Jeffrey Brown was held there. [11.42 TE 3/17/97 at 117]

He testified that Jeffrey Brown collected newspaper clippings about several criminal cases at that time, including Taylor's. Barker also testified that he never told Taylor's trial counsel that Jeffrey Brown was collecting these newspaper articles and did not disclose this information to any Department of Corrections officer or employee. *Id.* Given these facts, Taylor's counsel could not have known that Jeffrey Brown was collecting newspaper articles about this case. In the absence of such knowledge, Taylor's attorneys were not ineffective in their investigation prior to trial.

Further, a review of the cross-examination of Jeffrey Brown during trial reflects that Taylor's attorneys vigorously questioned him. [TE 4/17/86, 31–51, 68–69] In short, Taylor fails to meet his burden of proof on this claim of ineffective assistance of counsel. The Supreme Court of Kentucky's decision in *Taylor II* regarding this claim was not an unreasonable determination of the facts in light of the evidence. Likewise, it was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground 35 - Taylor's Trial Counsel Were Not Ineffective During the Cross-Examination of Prosecution Witness Jeffrey Brown.

During trial, prosecution witness Jeffrey Ida Brown provided incriminating information about Taylor which Taylor had conveyed to him in confidence. Taylor's counsel questioned Brown about the plea deal he had negotiated with the Commonwealth regarding criminal charges that were pending against him in 1984. Brown acknowledged that he received a good deal from the Commonwealth by ultimately receiving the benefit of a concurrent sentence on a robbery charge. Elaborating, Taylor's counsel then stated: "A real

good deal? I mean Judas only got twenty pieces of silver for betraying Christ, didn't he?"
[TE 4/17/86, Vol. I, 43–44]

In the Biblical story of Judas' betrayal of Jesus Christ, the Bible states that Judas received thirty pieces of silver, not twenty. *Matthew* 27:3. During closing argument in the guilt phase of Taylor's trial, the prosecution pointed out that Taylor's counsel had misquoted the Bible in that Judas actually received thirty pieces of silver. Taylor claims that he received ineffective assistance of counsel because the misquotation made the defense look like "a bunch of heathens."

Taylor raised this claim in his post-conviction RCr 11.42 motion. In addressing this argument, the trial court stated:

> Movant's speculation that his trial counsel's misstatement as to the exact amount of silver paid Judas in exchange for his betrayal rendered the totality of his representation ineffective is in the opinion of the Court without merit, is speculation at best, and is unsupported by legal authority.

[Order, 3/16/98, p. 5 - Inventory Item 5(u)]

In his appeal, the Supreme Court of Kentucky in *Taylor II* addressed this particular claim of ineffective assistance of counsel as follows:

> The following exchange occurred between defense counsel and a prosecution witness who had been incarcerated with Taylor:
>
> Q. You gained his confidence . . . . You held yourself out to help him. And then you dumped him in to save yourself fifteen years, right?
>
> A. Yes.
>
> Q. You got a pretty good deal on that robbery, didn't you?
>
> A. Yes, sir.

Q. A real good deal, right? I mean Judas only got twenty pieces of silver for betraying Christ, didn't he?

Taylor argues that he was prejudiced by this last remark when the prosecutor pointed out to the jury that Judas betrayed Christ for *thirty* pieces of silver and not twenty. Taylor claims that this biblical misquote made the defense look like "a bunch of heathens." The argument is without merit and borders on being sanctionable for its frivolity.

63 S.W.3d at 162–63.

Defense counsel's misstatement from a Biblical story should not be equated with ineffective assistance of counsel, especially since Taylor's counsel explained the misstatement during his penalty phase closing argument. His counsel stated:

You've seen emotion boil over, in fact you saw me get a little bit mad in the trial itself, when we had the criminal Jeffrey Brown on the stand. He was portraying his role in keeping up his deal, and I got mad at that point, and as I found out when I listened to it back, when you all asked to hear it, I said 20 pieces of silver instead of 30. I only realized that when I played it back – when you all played it back, because I was a little bit angry at that time at what was going on, and it shows that in anger we sometimes get confused.

[TE 4/28/86, Vol. III, 152–53]

Contrary to Taylor's claim that his counsel's misquote made the defense look like "a bunch of heathens," his counsel returned to his knowledge of the Bible during the penalty phase closing argument, as seen from the following excerpt:

. . . [Y]ou have to look at the Bible for what it is. The Bible is the Word of God to be used as a learning tool, sometimes it's a teaching tool, it's an instrument of his worship. I don't think the Bible was ever intended to be an instrument, a weapon, for somebody to stand up here and use to try and get you to kill a mental defective. That's contrary to everything that Book stands for. When you look at the Bible, you see changes going throughout the Bible, it covers epochs, eras. And you'll see in the Old Testament, they had the eye for an eye, life for a life. And that was intended at that time to be a limit so that excess punishment wasn't taken, and that was your first limit. And then you saw more limits come on, until Jesus himself undermined the whole idea of capital punishment with the lady at the well . . . . You know, you have to

-142-

look at the teachings of the New Testament, as well as the Old Testament, and look what the teachings are. Remember in the Book of Luke when Jesus sad, "be ye therefore merciful, your Father is merciful. Judge not and ye shall not be judged; condemn not and ye shall not be condemned; forgive and ye shall be forgiven."

[*Id.* at 173–74]

This court agrees with the Supreme Court of Kentucky that this claim of ineffective assistance lacks merit. The Supreme Court of Kentucky's decision in *Taylor II* that there was no ineffective assistance of counsel for his trial counsel's misstatement describing a Biblical story was not an unreasonable determination of the facts in light of the evidence, nor was it contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground 36 - Taylor's Counsel Were Not Ineffective for Failing to Request a Missing Evidence Instruction.

This claim relates to the loss and destruction of physical evidence relating to the sodomy conviction and overlaps with Ground 20, *infra*.[19] For ease of reference, the factual basis for these claims is restated in this section.

Taylor was convicted of sodomizing Nelson. The bodies of Nelson and Stephenson were autopsied. Regarding the missing evidence, at the time of the autopsy, Nelson was wearing white, jockey-type underpants. [TR 11, 1590; TE Trial 4/7/86, 74] The pathologist gave the victims' clothing, including the underpants, to Louisville Police Detective Sohl.

---

19     Taylor alleges in Ground 20 that the Commonwealth violated his "6th and 14th Amendment rights to due process of law and to present a meaningful defense when crucial pieces of physical evidence (anal swabs and underwear) . . . were lost or destroyed in violation of court order." [Record No. 1-3, p. 37] In Ground 36, Taylor alleges that his "6th, 8th, and 14th Amendment rights to the effective assistance of counsel were violated when his trial defense counsel failed to request a missing evidence instruction." [Record No. 1-5, p. 7]

[TE Trial 4/7/86, 78, 92]  Detective Burden instructed Detective Sohl to take the underpants and the rest of the victims' clothing to the Evidence Technician Unit Office.  Later, when Burden and Sohl inventoried the clothing items at Louisville police headquarters, they discovered that Nelson's underpants were missing.  Burden and Sohl returned to the autopsy room to look for the missing underpants but did not find the item of clothing.  According to Burden, Sohl was the last person to be in possession of the underpants but he did not know what happened to them.  [TE Trial 4/9/86, 63-64]  Nelson's underpants were never located.

During the autopsies, anal swabs were taken of both victims to be tested for the presence of human sperm.  The quantity of human sperm on the anal swabs from Nelson was insufficient for conclusive blood group ABO testing.  As a result, the serologist, William Durbin, could not eliminate or include Taylor as the source.  [TE Trial 4/10/86, 123, 142–43, 146–47]  Durbin's lab report reflects that he received the anal swabs on October 1, 1984, at 11:35 a.m.  The testing was performed on October 2, and was completed by October 4, 1984. [Tape 1/7/86, 14:24:25–27; TR 11, 1629]  The anal swabs were fully used during the analysis.  [TR 11, 1629]  Durbin testified that it was necessary to use all of the swabs in the test, and they were destroyed as part of the testing procedure.  [Tape 1/7/86, 14:52:08–35; 14:54:25–40]

Prior to trial, Taylor moved to dismiss the sodomy charge because the anal swabs had been destroyed by the Kentucky State Police Crime Lab and because the underpants Nelson was wearing at the time of his death had been lost by the Louisville police officers.  Taylor argued that the destruction of the anal swabs precluded independent testing and violated an order entered by the Jefferson District Court on October 4, 1984, requiring the

Commonwealth to preserve such evidence. He further asserted that Nelson's lost underpants had potentially exculpatory value to the defense. The trial court denied the motion to dismiss. Taylor preserved this claim on direct appeal. [Inventory Item No. 1, pp. 67–72]

In *Taylor I*, the Supreme Court of Kentucky did not address this issue in detail during the first appeal. 821 S.W.2d at 74. Subsequently, in his post-conviction RCr 11.42 motion, Taylor raised a similar issue, vis-a-vis Nelson's lost underwear, contending that his trial attorneys were ineffective in several respects, including their failure to request a missing evidence instruction. In denying Taylor's RCr 11.42 motion, the trial court addressed his claim of ineffective assistance of counsel, as follows: "Having reviewed the entire record in this case, the Court is of the opinion that the conduct of Movant's trial counsel not only falls within the acceptable range of reasonable and effective assistance of counsel as is guaranteed by the Constitution, but far exceeds this standard." [Order, 3/16/98, p. 2 - Inventory Item No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming that denial, the Kentucky Supreme Court in *Taylor II*, analyzed Taylor's claim of ineffective assistance of counsel with respect to counsel's failure to request a missing evidence instruction.

> Inexplicably, the two murdered boys' underwear disappeared and was never located. Defense counsel moved to dismiss the sodomy charges against Taylor because "the loss of the undershorts of the victims not only results in the loss of material evidence to which the defendant had a right to have tested, but also means the loss of potentially exculpatory evidence." The trial court denied the motion. Subsequently, defense counsel did not request a missing-evidence instruction based on the missing underwear. Taylor argues that this failure resulted in ineffective assistance of counsel.

At first blush, it appears that Taylor would have been entitled to a missing evidence instruction if defense counsel had moved for one. *See Collins v. Commonwealth*, Ky., 951 S.W.2d 569, 573 (1997). Such an instruction would have informed the jury that it could, but was not required to, infer that the underwear evidence if available would have been favorable to Taylor. But Taylor was tried in 1986. *Collins* was rendered in 1997. The use of a missing-evidence instruction was first approved of in 1988 in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 539 (1988). Thus, there was no Kentucky authority for allowing the use of a missing-evidence instruction at the time of Taylor's trial. Failure to anticipate changes in the law cannot constitute ineffective assistance of counsel. *Sanborn v. Commonwealth*, Ky., 975 S.W.2d 905, 913 (1998), *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 361 (1999). Further, even if failure to request the instruction was error, the effect of such an instruction on the jury in this case is pure speculation.

The jury may or may not have made the inference allowed by the instruction. Even if it had, it still could have found Taylor guilty of sodomy. In light of the totality of evidence presented against Taylor, we cannot say that there exists a reasonable probability that the jury's verdict would have been different.

63 S.W.3d at 164–65.

This Court finds no error in the Supreme Court of Kentucky's decision in *Taylor II* that Taylor's attorneys were not ineffective for not requesting a missing evidence instruction. At the time of Taylor's trial in 1986, there was no Kentucky authority approving the use of a missing evidence instruction. Such approval did not occur until 1988 in *Sanborn*, some two years after Taylor's trial. As pointed out in *Taylor II*, failure to anticipate changes in the law cannot constitute ineffective assistance of counsel. *See Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999) ("Only in a rare case will a court find ineffective assistance of counsel based upon a trial attorney's failure to make an objection that would have been overruled under the then-prevailing law."); *Brunson v. Higgins*, 708 F.2d 1353, 1356 (8th Cir. 1983) (citations omitted) ("The failure to anticipate a change in the law will not generally constitute ineffective assistance of counsel.").

**Ground 37 - Taylor's Attorneys Were Not Ineffective for Failing to Object to Inadmissible Prosecution Evidence Regarding the Hollow-Point Bullets and Rat or Insect Mutilation.**

Taylor claims that his attorneys were ineffective for failing to object to the introduction of the four .357 hollow-point bullets found at his sister's residence and for not seeking to exclude the evidence of insect and rat mutilation of the victims' bodies. The murder weapon in this case was never located, but the bullets removed from the bodies were .357 hollow-point bullets that were shot from a .357 magnum revolver. During trial, the Commonwealth introduced evidence that during a search of the residence of Taylor's sister, where Taylor also lived at that time, four hollow-point .357 magnum bullets were found in a dresser drawer in the bedroom of Renee Woods and her husband, Charles Woods. Taylor claims that these bullets were completely irrelevant as they were not connected to him or the crime. He argues that if his counsel had objected to their introduction, they would have been excluded under Kentucky evidence law.

Regarding the evidence of insect or rat mutilation, Dr. George Nichols performed the autopsies on the murder victims. During the Commonwealth's direct examination of Dr. Nichols regarding Richard Stephenson's autopsy, the prosecutor asked about any injuries or any other deformities noted on the body. Dr. Nichols responded that there was a post-mortem insect deformity on the skin of the upper abdomen, probably from either an ant or a cockroach. [TE 4/7/86, Vol. I, 58] Taylor's counsel did not object regarding Dr. Nichols' answer, but reviewed a series of photographs the Commonwealth was preparing to offer as evidence. The court held a bench conference to consider counsel's objections to the photographs. During this conference, Taylor's counsel moved to exclude any evidence from

Dr. Nichols regarding deformities from post-mortem insect trauma and post-mortem rodent trauma with respect to Nelson. The court sustained the motion. [*Id.* at 66]

Taylor raised this claim of ineffective assistance of counsel in his post-conviction RCr 11.42 motion. In denying the motion regarding the hollow-point bullets evidence the court stated that, "[t]his issue having been raised and resolved in favor of the Commonwealth on direct appeal will not be addressed by this Court." [Order, 3/16/98, p. 6 - Inventory Item 5(u)] Regarding the failure to object to Dr. George Nichols' testimony concerning insect trauma and rodent trauma, the trial court concluded that it, "finds no merit in these arguments being previously held that the representation afforded by the Movant's defense team far exceeded [the] standard of review with respect to ineffective assistance of counsel as set forth by [the] United States Supreme Court and the Kentucky Supreme Court." *Id.*

In affirming the trial court's determination, the Kentucky Supreme Court in *Taylor II*, analyzed these claims of ineffective assistance of counsel, as follows:

> The prosecution introduced four hollow-point, .357 magnum shells that were found in a dresser in the house of Taylor' sister, which was where Taylor was living at the time of the murders. While this was the same type of ammunition used to kill the two boys, Taylor argues that the bullets were not relevant because there was no evidence introduced that linked these bullets to either the crime itself or to Taylor. He then argues that his defense counsel was ineffective for failing to object to the introduction of this evidence. The Commonwealth argues that the evidence was admissible and that it was defense counsels' trial strategy to not object to the evidence.

> It appears from a thorough review of the record that it was trial strategy not to object to the introduction of the bullet evidence. Defense counsel made a strong argument during closing that the evidence was not relevant and used that fact to discredit the Commonwealth's case. Clearly, defense counsel knew that the relevance of the bullet evidence was weak and used this fact in Taylor's favor.

Next, Taylor argues that defense counsel was ineffective for failing to move to exclude evidence of insect and rat mutilation during Dr. George Nichols' testimony. Again, we disagree.

Dr. Nichols performed the autopsies on the two murdered boys. While testifying concerning the autopsy of one of the boys, the following exchange occurred between the Commonwealth's Attorney and Dr. Nichols:

> Q. Were there any other deformities noted on the body, sir?
>
> A. Well, an insect deformity was, indeed, present on the skin of the upper abdomen, which was felt to be post mortem and felt to be of the garden variety, either an ant or cockroach.

Shortly after the above exchange, the Commonwealth's Attorney moved to admit certain post-mortem photographs of the boys. Defense counsel objected. At the bench conference concerning the objection, defense counsel also moved to exclude any evidence of "post-mortem insect trauma and post-mortem rodent trauma" during Dr. Nichols' testimony concerning his autopsy of the other murdered boy. This motion was granted. Thus, Taylor's ineffective assistance argument is that trial counsel should have objected to the above-outlined testimony by Dr. Nichols.

First of all, Dr. Nichols' reference to insect trauma was brief and cursory. More importantly, the testimony came in response not to a direct question about insect trauma, but rather, it came in response to a general question about "other deformities." There is no indication that defense counsel should have anticipated Dr. Nichols' exact response to this question. Further, after the response was made, the most likely relief at that point would have been an admonishment from the trial court. Trial counsel may have well felt that an admonishment would have only served to focus the jury's attention on the issue.

There was no ineffective assistance of counsel concerning the failure to object to either the introduction of the bullet evidence or to Dr. Nichols' testimony concerning insect trauma.

63 S.W.3d at 163–64.

This Court finds no error with the Kentucky Supreme Court's decision in *Taylor II* that Taylor's attorneys were not ineffective with respect to the foregoing claims. Regarding the hollow-point bullets evidence, the evidence was relevant and admissible because: the

murder weapon was a .357 magnum revolver; the murder weapon was never located; and Taylor was living at the residence of his sister when the offenses were committed. "The performance of an attorney is not deficient for failure to object to admissible evidence." *Russell v. Jones*, 886 F.2d 149, 152 (8th Cir. 1989); *see also Garret v. United States,* 78 F.3d 1296 (8th Cir. 1996); *Alder v. Burt*, 240 F. Supp. 2d 651, 670 (E.D. Mich. 2003) ("Failing to present meritless objections at trial or meritless claims on appeal is not ineffective assistance of counsel.") (citing *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999)). Thus, defense counsel had no duty to object to this evidence. However, the evidence was skillfully addressed in closing arguments during the guilt phase of the trial.

> Looking at the other scientific test they talked about, there was the fellow who came in with the bullets. You know they found four, 357 magnum shells in a dresser at Renee Woods and Charles Woods' apartment in their room, and I guess the point of that was supposed to be that these could have come from the same manufacturer, the same source as those that were used in the murder weapon. The problem, again, is when we examine the lead source that was used for those bullets, we found the lead sources were different, so much different that nobody can say they did come from the same informer or the same source or not, as it goes with the only 357 magnum bullets in the whole world. Again, you don't know.

[TR 67 Closing Arguments, pp. 45–46]

As this evidence was admissible, defense counsel elected to argue its probativeness rather than move to exclude it entirely, since such a motion would likely have been denied. Taylor's attorney was effective in pointing out the tenuous connection of this evidence to Taylor, since it was found in a drawer in a dresser in his sister's bedroom rather than being found in Taylor's bedroom in that residence.

Regarding the failure of Taylor's counsel to move to exclude evidence of insect and rodent mutilation, contrary to Taylor's argument, during a bench conference following Dr.

George Nichols' testimony concerning the autopsy of Richard Stephenson, his trial counsel successfully moved to prevent Dr. Nichols from offering any testimony concerning post-mortem insect trauma or post-mortem rodent trauma regarding Nelson. Taylor's attorney elected not to call further attention to Dr. Nichols' testimony regarding this type of evidence regarding Stephenson. Such strategic decisions of counsel do not constitute ineffective assistance under *Strickland*. However, a *de novo* review of the Kentucky Supreme Court's decision in *Taylor II* rejecting these claims of ineffective assistance of counsel demonstrates that the decision was not an unreasonable determination in light of the evidence.

### Ground 38 - Taylor's Appellate Attorneys Were Not Ineffective for Failing to Raise Certain Preserved Issues on Direct Appeal.

Taylor claims that his appellate attorneys were ineffective for failing to raise on direct appeal the following four preserved issues: (i) the trial court gave an erroneous jury instruction for murder, kidnapping, and robbery; (ii) the trial court erred in denying Taylor's motion to suppress his prior convictions; (iii) the trial court erred by denying Taylor's motion to strike Dr. Frank Flenning's testimony during Taylor's competency hearing; and (iv) the trial court erred in denying Taylor's motion to represent himself, in part, at trial. Further, Taylor contends that he was prejudiced by the failure to bring the foregoing claims.

Taylor raised this claim of ineffective assistance of appellate counsel in his post-conviction RCr 11.42 motion. In denying Taylor's RCr 11.42 motion, the trial court acknowledged this claim by stating that, "[i]ssues concerning the alleged ineffectiveness of Appellate counsel are not properly brought before the Court under RCr 11.42." [Order, 3/16/98, p. 7 - Inventory Item 5(u)]

Taylor pursued this claim in appealing the denial of his RCr 11.42 motion. In affirming the denial of Taylor's RCr 11.42 motion, the Kentucky Supreme Court stated:

> Taylor raises a number of claims of ineffective assistance of appellate counsel claims. Such claims cannot be raised in a RCr 11.42 motion. *Harper v. Commonwealth*, Ky., 978 S.W.2d 311, 318 (1998), *cert. denied*, 526 U.S. 1056, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). Therefore, these claims will not be considered.

*Taylor II*, 63 S.W.3d at 165.

Since the Kentucky state courts did not consider Taylor's claim that his appellate counsel were ineffective for failing to raise certain issues that had been preserved, this Court has considered it on the merits; however, the Court finds that the claim is without merit.

## A. The Jury Instruction for the Offenses of Murder, Kidnaping, and Robbery

Taylor contends that in instructing the jury regarding murder, kidnapping, and robbery, the trial court failed to properly define, or adequately explain, the theory of complicity to the jury. Taylor alleges that the jury instructions contained no definition of "complicity" and were much broader than the complicity statute in imposing accomplice liability. Taylor's trial counsel objected to the jury instruction as given. Taylor asserts that had his appellate counsel raised this issue on appeal, his conviction would have been reversed.

The court instructed the jury to find Taylor guilty of the charges if it believed from the evidence that Taylor "acted alone or with George Ellis Wade," in the commission of the offenses. [TR 7615–20 - Instruction Nos. 2 - 7 (Inventory Item No. 6(d)] The jury was properly instructed because the instructions conformed to the evidence. The proof offered during trial indicated that Taylor was the principal in the commission of these offenses and

Wade was the accomplice. Dino Pace and Cecil Pepper testified that Taylor possessed the gun. Pepper saw Taylor remove the gun from his waistband as he entered the back seat of the victims' vehicle before the four left the restaurant parking lot. Eugene Taylor testified that when he saw Taylor and Wade in the victims' vehicle, Taylor was driving, Wade was in the front passenger seat, and the victims were seated in the back. [TE 4/16/86, 204 - (Inventory Item No. 4(f)] Wade assisted Taylor by searching the victims, tying them up, and taking money out of their wallets while Taylor held them at gunpoint. [TR 309–10 - (Inventory Item No. 2(b)(1)] Eugene Taylor also testified that he heard Taylor admit to his sister that he had killed the two boys. [TE 4/16/86, 201–04, 219–23, 227] Jeffrey Brown testified that Taylor admitted to the offenses while the two were incarcerated in November 1984. [TE 4/17/86, 21–30] This evidence was sufficient for the jury to find Taylor guilty as the principal and not the accomplice. Therefore, even if the language "acted alone or with George Ellis Wade" had not been a part of the jury instructions, the jury still could have properly concluded that Taylor was guilty of these offenses.

Had the trial court given a "complicity instruction" as requested by Taylor's counsel, the result would likely have been the same. As either principal or accomplice, Taylor was properly convicted and would have been subject to the same potential sentence. Taylor's claim that the trial court's failure to instruct the jury as he had requested violated his constitutional rights is contrary to the proof at trial which supported Taylor's conviction as a principal. Thus, Taylor's claim that his appellate attorneys were ineffective for not raising this claim on direct appeal is without merit.

## B.     The Denial of Taylor's Motion to Suppress His Prior Convictions

Taylor moved to suppress evidence of his prior convictions from being introduced at trial because the convictions were allegedly defective. In October 1985, the trial court heard this motion and denied it in part, ruling that Taylor's prior convictions could only be used for impeachment purposes if Taylor testified during trial. Taylor claims that he was prejudiced by the denial of this motion to suppress. He alleges that the Court's ruling prevented him from testifying in his defense phase because his prior convictions would have been used to impeach him.

During the suppression hearing, Taylor's counsel moved the court to "rule whether or not those particular cases could be used, one, to impeach, and two, as a basis of the PFO." [Transcript of Proceedings 10/19/85, 16] The trial court decided to suppress any evidence of Taylor's prior convictions, *except for impeachment purposes*. It held that Taylor's prior felony convictions could only be introduced if he were to testify during trial. The court also directed that Taylor's PFO sentencing phase would occur after the capital penalty phase was complete. However, because Taylor received a death sentence, there was no need for the PFO phase to be conducted.

In *Commonwealth v. Richardson*, the Kentucky Supreme Court set out procedures for introducing prior convictions for impeachment purposes:

> In future cases, the rule will be construed essentially as in *Cowan, supra*, so that a witness may be asked if he has been previously convicted of a felony. If his answer is "Yes," that is the end of it and the court shall thereupon admonish the jury that the admission by the witness of his prior conviction of a felony may be considered only as it affects his credibility as a witness, if it does so. If the witness answers "No" to this question, he may then be impeached by the Commonwealth by the use of all prior convictions, and to the extent that *Cowan* limits such evidence to *one* prior conviction, it is

-154-

overruled.  After impeachment, the proper admonition shall be given by the court.

674 S.W.2d 515, 517–18 (Ky. 1984).

Because the rule in *Richardson* was established in 1984, and Taylor's trial was held two years later, the trial court did not err by ruling that Taylor's prior convictions could be used for impeachment purposes if he testified during trial.  Consistent with *Richardson*, if Taylor had testified, he could have been asked if he had ever been convicted of a felony.  If he answered "Yes," the Commonwealth could have asked no further questions about those convictions.  Thus, the jury would only know that Taylor had been convicted of a felony offense but would not have known what that offense was.  On the other hand, if Taylor had answered "No," the Commonwealth could have introduced the records of his prior convictions to impeach him.  At trial, Taylor decided not to testify, and the jury was not given information concerning prior convictions.

In keeping with *Richardson*, the trial court correctly ruled that Taylor's prior convictions could only be used for impeachment purposes if he elected to testify.  This ruling did not violate Taylor's constitutional rights, and Taylor's attorneys were not ineffective for failing to raise the claim that the trial court erred by denying his motion to suppress his prior convictions on direct appeal.

**C.**     **The Testimony of Dr. Frank Flenning at Taylor's Competency Hearing**

As discussed above, because Taylor's competency was an issue prior to trial he was examined by four mental health professionals.  Taylor alleges ineffective assistance of appellate counsel for failing to appeal the trial court's refusal to suppress the testimony of Dr.

Flenning during his competency hearing. The factual analysis discussed herein in reference to Ground 25, *infra*,[20] is incorporated for the discussion of this claim.

The trial court properly relied on the opinion, report, and testimony of Dr. Moore, rather than that of Dr. Flenning, in determining that Taylor was competent to stand trial. Thus, striking Dr. Flenning's testimony would not have produced a different result. Taylor's appellate counsel were not ineffective for failing to raise the issue concerning the court's decision not to strike Dr. Flenning's testimony.

**D.**     **The Denial of Taylor's Motion to Represent Himself, in Part, at Trial**

In Ground 27, Taylor claimed that the trial court erred in denying his motion for limited self-representation. [Record No. 1, pp. 115–18] However, in responding to the Warden's motion to dismiss, or alternatively, for summary judgment, Taylor withdrew this claim, conceding that it was not a federal claim properly raised in a § 2254 petition. [Record. No. 38, p. 121] Given Taylor's concession, it is not necessary to address Taylor's argument that his appellate counsel were ineffective for failing to raise this claim on direct appeal.

In summary, having considered Taylor's foregoing claim that he received ineffective assistance of appellate counsel, this Court concludes that all aspects of the claim are without merit.

---

20     Taylor alleges in Ground 25 that his trial was fundamentally unfair because he was incompetent at the time of trial and was unable to rationally assist counsel in presenting his defense. [Record No. 1-5, pp. 172-73] The factual portion of Ground 25 relating to Taylor's KCPC competency exam and hearing is incorporated for this discussion on Dr. Flenning's testimony during the competency hearing.

**Ground 39 - Taylor's Right to Effectively Cross-Examine Dino Pace Was Not Impaired When the Prosecutor Allegedly Gave Pace a Copy of His Statement to Review During Lunch Recess Prior to Cross-Examination.**

The trial court recessed for lunch following Dino Pace's direct examination. When court reconvened, Taylor's counsel moved for a mistrial on the grounds that, during the lunch recess, the prosecutor gave Pace a copy of the statement he had made to the police and instructed him to review it prior to his cross-examination. Taylor claims that this action by the prosecutor was an attempt to refresh Pace's memory and bolster his testimony prior to cross-examination. Further this conduct interfered with his right to effectively cross-examine Pace. Following the lunch recess, the trial court conducted a bench conference and questioned Pace. The court then recessed briefly to confer with counsel in chambers.

The statement which the prosecutor gave Pace was a copy of the same statement Pace had made to the police and which the prosecutor had provided to Pace approximately three months before trial. The prosecutor learned that Pace had not reviewed his statement the morning before testifying because he had left it in Louisville. As a result, she gave him another copy of it. Pace did not ask for the statement. Instead, the prosecutor simply gave it to him. Thereafter, the court denied Taylor's motion for a mistrial. [TR 66, Vol. I, 4/16/86, 97–102]

On direct appeal, Taylor claimed that the prosecutor's action in giving Pace a copy of his statement to police during his trial testimony operated to bolster Pace's testimony, violating his right to effectively cross-examine Pace. Taylor further argued that the trial court erred in denying his motion for a mistrial on this ground. Because the Supreme Court

of Kentucky did not address this claim in detail in *Taylor I*, 821 S.W.2d at 74, this Court has reviewed this claim on the merits.

Approximately three months prior to trial, the prosecution gave Pace a copy of the statement he had made to police. [TE 4/16/86, Vol. I, 97, 128] Pace had forgotten to bring this statement with him to trial. [*Id.* at 97, 100, 102] The record is not clear regarding exactly when the prosecutor gave Pace a copy of his statement. She testified that Pace was given a copy of his statement before he testified on direct examination. [*Id.* at 96, 102–03] However, Pace testified that he was given the statement during the lunch recess, after his direct examination by the Commonwealth, but before his cross-examination by Taylor's counsel. [*Id.* at 98–100] This conflict, however, does not impact the decision on the merits.

In denying the motion for a mistrial, the trial court noted that this issue could be brought out and developed in cross-examination. [*Id.* at 102] Taylor's counsel successfully cross-examined Pace about his being given a copy of his prior statement. [*Id.* at 126] Pace's testimony reveals that he either did not read it or did not comprehend what he had read because Taylor's counsel successfully impeached him with the statement at several points during cross-examination. [*Id.* at 114–15, 117–18] Thus, contrary to Taylor's claim, Pace's review of his statement did not result in the bolstering of his testimony during cross-examination. *See Bray v. Commonwealth*, 703 S.W.2d 478 (Ky. 1986).

On re-direct examination, Pace was questioned regarding whether he had read any of the statement he had given to police. His response was "not clearly, I haven't. This is the first - - about the second time I got to look at it." [TE 4/16/86, Vol. I, 128] Consequently, if

there was any error in providing Pace with his statement, it was cured during cross-examination.  Clearly, Taylor was not prejudiced by this alleged error.

### Ground 40 - Taylor's Due Process Right to a Fair Trial Was Not Violated by Testimony from the Hair Analysis Expert.

The Commonwealth presented evidence from a hair and fiber analysis expert that microscopic examination of three of the hairs recovered during the investigation of the murders matched hair samples obtained from Taylor.  Prior to trial, Taylor moved to exclude the hair analysis evidence, contending that this type of evidence is too untrustworthy to be admissible.  During the hearing on Taylor's motion to exclude this evidence, Lou Ann Gary, a forensic specialist for the Jefferson Regional Crime Lab, who had testified in court regarding hair/fiber analysis twenty-five times, noted that the process of microscopic hair analysis had been determined to be reliable on a national level.  [TE 3/17/86, Vol. III, 1151–52]  Following the hearing, the trial court denied Taylor's motion to exclude the microscopic hair analysis evidence.

During the Commonwealth's case-in-chief, Gary testified that three hairs found on a tan shirt near the crime scene and one hair found on the gray and white Puma tennis shoes (identified as belonging to Stephenson) found in a bedroom at Taylor's mother's residence on Jackson Street matched hair samples taken from Taylor.  [TE 4/11/86, 189, 195–96, 217–19]   A fourth hair exhibited both similarities and dissimilarities to Taylor's.  [*Id.*]  Other hairs were found and examined, but none appeared to have come from co-defendant Wade.  [*Id.* at 215–17]  Gary explained that hair comparison analysis is not conclusive. [*Id.* at 229–32, 237, 243, 247–56]   At best, this type of evidence can eliminate a particular suspect, similar to "ABO" blood-typing.  Gary stopped short of concluding that the three hairs

originated from Taylor, but explained that, based on her analysis, he could not be ruled out as a suspect. [*Id.*]

On direct appeal, Taylor claimed that his due process rights to a fair trial were violated by the admission of the hair comparison analysis evidence because this type of evidence is not reliable. In *Taylor I*, the Kentucky Supreme Court affirmed Taylor's conviction, finding no merit to any of his claims. The Supreme Court of Kentucky did not address this claim in any detail. *Taylor I*, 821 S.W.2d at 74. In his habeas petition, Taylor reiterates this claim, contending that his due process rights to a fair trial were violated by the admission of the hair comparison analysis evidence.

Federal habeas relief ordinarily does not lie to review questions regarding the admissibility of evidence. *McGuire*, 502 U.S. 62; *Sanborn v. Parker*, 629 F.2d 554, 575 (6th Cir. 2010) ("[E]rrors in application of state law, especially with regard to the admissibility of evidence, are not usually cognizable in federal habeas corpus."). Generally, to rise to the level of a constitutional violation, the state court evidentiary ruling must be so prejudicial that it renders a fair trial impossible. *Lisenba*, 314 U.S. at 228–29. In short the evidentiary ruling must be so egregious that it amounts to a denial of fundamental fairness. *McGuire*, 502 U.S. at 67; *see also Jeffers*, 497 U.S. at 780; *Baze*, 371 F.3d at 318. Again, this Court has considered this claim on the merits.

In *Ford v. Commonwealth*, 665 S.W.2d 304, 309–10 (Ky. 1983), the Kentucky Supreme Court found no error in the introduction of a lab technician's expert opinion regarding the microscopic comparison of pieces of skin found at a murder scene. In that case, the technician concluded that skin matched certain wounds suffered by the defendant.

Ultimately, the Sixth Circuit considered this claim in the context of the denial of his federal habeas petition. The Court confirmed that the trial court did not err by admitting the skin comparison analysis evidence. *Ford v. Seabold*, 841 F.2d 677, 693 (6th Cir. 1988). In Taylor's case, Gary acknowledged that microscopic hair comparison analysis has its limitations. It is not an exact science and the results are not conclusive. Thus, if there were error in its admission, it would have been harmless, similar to reasons noted in *Ford*. *Id.*

In the present case, Taylor does not question Gary's qualifications as an expert. Instead, his claim goes to the weight of the hair comparison analysis evidence rather than its admissibility. Given Gary's explanation that the hair comparison testing process has limitations, the jury was able to properly assess this evidence and assign it the weight to which it was entitled. There are no fairness concerns surrounding this evidence and Taylor's claim that he was denied a fair trial by its admission is without merit.

### Ground 41 – The Trial Court's Denial of Taylor's Motion for the Disclosure of the Identity of Two Informants Did Not Violate His Due Process Rights to a Fair Trial.

Within a few days following the murders, Louisville Detectives Fischer and Nichter and Lieutenant Lyons received information from two informants that Victor Taylor and George Wade had committed these crimes and that Victor Taylor was the trigger man. [TR 10, 1436; TR 11, 1582–84] Taylor's counsel filed a pretrial motion to compel the Commonwealth to disclose the identity of the informants. [TR 40, 5840–44] Following a hearing, the trial court denied the motion. [TR 41, 5945; TE Hrg., 11/20/85, 1–20]

Taylor claims that the Commonwealth's failure to disclose the identity of the informants violated his due process rights and denied him a fair trial. Taylor raised this

claim on direct appeal. And while the Kentucky Supreme Court in *Taylor I* did not find merit in any of the petitioner's claims, it did not address this argument in detail. 821 S.W.2d at 74.

In his habeas petition, Taylor again argues that the Commonwealth had a duty to provide the identity of the informants and that its failure to do so violated his due process rights and his right to a fair trial. Contrary to Taylor's argument, the prosecution is not always required to disclose an informant's identity to the defense. This point is explained in *Rovario v. United States*, 353 U.S. 53 (1957).

> What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

> The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.

. . . .

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 59–62 (internal citations and footnotes omitted).

In *Schooley v. Commonwealth*, 627 S.W.2d 576 (Ky. 1982), the Kentucky Supreme Court applied the balancing test regarding disclosure of an informant's identity.

> Generally we find that where the informer participated in the criminal transaction, both Federal and state decisions require disclosure on the theory of fundamental fairness. *United States v. Barnett*, 418 F.2d 309 (6th Cir. 1969), and *United States v. Barnes*, 486 F.2d 776 (8th Cir. 1973).

> On the other hand, we find that generally where the informer gives the police a "tip" or a "lead" which provides information enabling police to identify and charge a defendant, and the informant's information is not used at trial, disclosure is not required.

*Schooley*, 627 S.W.2d at 578.

In Taylor's case, as in *Schooley*, the information provided to the police by the informants enabled the police to identify and charge Taylor and Wade with these offenses. Because the informants' information was not used during Taylor's trial, disclosure of the informants' identifies was not required. The trial court properly recognized this rule and referred to *Schooley* in its Order denying Taylor's motion to compel. [TR 41, 5945] The trial court properly applied federal law in denying Taylor's motion to compel the disclosure of this information.

**Ground 42 - Taylor's Trial Attorneys Were Not Ineffective for Failing to Point Out During Cross-Examination That Pace Had Failed to Identify Taylor in a Photo Pack Lineup as One of the Abductors.**

Pace and Pepper witnessed the abduction of the victims at the fast food restaurant parking lot. Pace testified at Taylor's trial and identified Taylor as the person he had seen with a gun. However, a few days after the abduction, when Pace viewed a photo pack lineup that included Taylor at the police station, he did not recognize or identify Taylor as one of the abductors. Taylor claims that his trial attorneys were ineffective in the cross-examination of Pace by not pointing out that Pace had been unable to identify Taylor in the photo pack lineup shortly after the abduction.

Taylor raised this claim in appealing the denial of his RCr 11.42 motion. In *Taylor II*, the Kentucky Supreme Court affirmed the denial of Taylor's RCr 11.42 motion and addressed this claim, as follows:

> Dino Pace, an identification witness, failed to identify Taylor in a photo pack lineup. Further, the police never placed Taylor in an in-person lineup for identification by either Pace or Cecil Pepper, who was another identification witness. We have reviewed defense counsel's cross-examination of these witnesses and defense counsel's closing argument. Defense counsel vigorously attacked the reliability of Pace's and Pepper's identification of Taylor. Apparently, Taylor's argument is that defense counsel was ineffective for specifically failing to ask Pace whether he had been able to identify Taylor in the photo pack. In light of what the defense did do to attack the reliability of Pepper's identification, what little it failed to do does not come even close to rising to the level of ineffective assistance of counsel.

63 S.W.3d at 164.

In assessing the correctness of this decision in *Taylor II*, this Court agrees with the Supreme Court of Kentucky that Taylor's counsel did not provide ineffective assistance in this respect. The trial record completely refutes Taylor's claim that his counsel was

ineffective on this point, as seen from the following excerpt from defense counsel's opening statement during the guilt phase of the trial:

> Two days after the event when everything was still fresh in their minds, they both looked at a photo spread with several pictures in it, and they included a photograph of Victor Taylor – looked right at. You recognize anybody from the abduction? No.

[TE 4/7/86, 49]

During trial, Pace testified on direct examination that he was unable to identify anyone from the groups of photographs that he viewed when he went to police headquarters. [TE 66, 4/16/86, Vol. I, 72] The prosecutor did not specifically ask whether Taylor was a part of the photo pack lineup that Pace viewed. However, on cross-examination, Taylor's counsel inquired regarding whether Taylor's picture had been included in the photo packs Pace had viewed a few days after the murders:

Q:    And you did not pick anybody out of those photographs, did you?

A:    No sir, I didn't.

Q:    Have you been made aware that Victor Taylor was in that group of photographs?

A.    Not – I didn't know at the time, I didn't.

[*Id.* at 120–21] Thus, on cross-examination, Pace acknowledged that he did not pick Taylor out of the photo lineup he viewed a few days after seeing Taylor in the fast food parking lot, but that he had since learned that Taylor's photo had been included in that photo lineup.

The trial record also reflects that Taylor's counsel vigorously cross-examined Pace regarding his in-court identification of Taylor. [*Id.* at 123–25, 133–34, 135–36] Defense counsel emphasized that neither Pace nor Pepper were given the opportunity at any time to

view an in-person lineup that included Taylor because the police did not organize such a lineup. Defense counsel stated:

> They arrested Victor at 4:00 or 4:30 in the morning on October the 4th. They had him in custody. They knew where Cecil Pepper and Dino Barr [Pace] lived. They had just taken them home a few hours before. The had easy access to all kinds of people to put in a line up and they didn't put Victor in a line up and they didn't call Cecil and Dino back in and do you know why? Because if they put Victor Taylor in a line up and have Cecil Pepper and Dino Barr [Pace] look at him, the had to be afraid they wouldn't identify Victor Taylor because they both made bizarrely different descriptions of him.

[TE Closing Arguments, pp. 49–51]

Thus, through defense counsel's opening statement in the guilt phase and from Pace's testimony on cross-examination, evidence was before the jury that Pace did not identify Taylor as one of the abductors from his picture in the photo lineup at the police station just a few days after the crimes occurred. This claim of ineffective assistance is without merit. Consequently, the Supreme Court of Kentucky's decision in *Taylor II* that Taylor's counsel was not ineffective in respect to the cross-examination of Pace or conveying to the jury that Pace failed to identify Taylor in a photo lineup at the police station was not an unreasonable determination of the facts. Likewise, its decision was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground 43 - Taylor Was Not Denied Due Process or a Fair Trial by Pepper and Pace's In-Court Identification of Him During Trial.

Taylor also claims that he was denied due process and a fair trial by the trial court's denial of his motion to suppress and exclude Pace and Pepper's identifications of him because those identifications were tainted. The grounds for this claim stem from the separate

trial of Taylor's co-defendant, George Wade, that preceded Taylor's trial. Pepper and Pace testified during Wade's trial. While cross-examining Pepper and Pace, Wade's counsel showed each a single photograph of Taylor that appeared in a Louisville newspaper showing Taylor in handcuffs in court with news print stating that Taylor had been arrested on these charges. Both Pepper and Pace identified the person in this newspaper photograph as Taylor. In moving to suppress, Taylor claimed that these identification procedures were so unnecessarily suggestive and conducive to mistaken identification that they violated his due process rights, citing *Foster v. California*, 394 U.S. 440 (1969).

This claim was raised in Taylor's direct appeal. And although the Supreme Court of Kentucky rejected all of Taylor's claims it did not address this issue in detail. *Taylor I*, 821 S.W.2d at 74.

Although deference is given to a state court's findings, this Court has considered the merits of Taylor's claim that his due process rights were violated by the in-court identification by Pepper and Pace during Wade's trial, with the end result that he was denied a fair trial. After an evidentiary hearing on Taylor's motion to suppress, the trial court made the following findings:

1.      That the witnesses, Cecil Pepper and Deno Barr [Pace] had a sufficient opportunity to view the Defendant at the time of the abduction. The conditions surrounding their initial viewing were such that the opportunity for misidentification was extremely remote.

2.      Both Pepper and Barr failed to identify Victor D. Taylor from a photo pack shown to them approximately five (5) days after the event in question.

3.      The description provided to the police, although not precise as to height and hair style of Defendant Taylor, did not deviate substantially from the actual physical characteristics of Defendant Taylor.

4.     The photograph of Defendant Taylor submitted to both witnesses for identification at the trial of the Co-Defendant, George Wade, was not suggestive in nature and the identification in Court at that trial was made with certainty by both Pepper and Barr [Pace]

5.     Both witnesses testified as to great certainty of their recollection of Defendant Taylor at the time of the event as opposed to the basis having been the photograph submitted to them for identification in the trial of Co-Defendant Wade.

[TR 50, 7453–54]

Based on these findings, the trial court concluded:

The Court in applying the totality of the circumstances test set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), and the balancing test set forth in *Manson v. Brathwaite*, 432 U.S. 98 (1977), is of the opinion that the corrupting effect of the suggestive in-court identification at the trial of the Co-Defendant is exceeded by the certainty indicated in the testimony of both witnesses at the present hearing and their opportunity to have properly identified the Defendant at the time of the event in question.

For the foregoing reasons Defendant's motion to suppress the pre-trial and in court identifications by Cecil Pepper and Deno Barr be and the same is hereby denied.

[TR 50, 7454]

While not preferred, suggestive identification procedures similar to the procedure used by Wade's counsel during Wade's trial do not necessarily violate a constitutionally protected interest. *Manson v. Brathwaite*, 432 U.S. 98 (1977). If the "totality of the circumstances" show that the identification was reliable, even though the confrontation procedure was defective, there is no constitutional violation. *Neil v. Biggers*, 409 U.S. 188 (1972). The "totality of the circumstances" includes, but is not limited to, considering the opportunity of the witness to view the criminal at the time of the crime, the witness's level of

attentiveness, the accuracy of the witness's prior description of the accused, and other pertinent factors along those lines. *Id.* at 196, 199.

In Taylor's case, both Pepper and Pace viewed Taylor in close proximity prior to the commission of the crime. Pace observed Taylor for about three minutes after he exited the restaurant and sat a picnic table and ate a sandwich. Pepper observed Taylor for a longer time while he and Taylor were at the counter in the restaurant waiting for their food to be delivered. While viewing Taylor at the time of the offense, both witnesses noted distinguishing details prior to the crime. For example, the witnesses noted that Taylor had an "Afro" hairstyle (while Wade's hair was corn-rowed), Pepper knew that Taylor had ordered a fish sandwich in the restaurant and had asked for tartar sauce, both witnesses described Taylor's attire, and both provided detailed descriptions of Taylor's face, hair, and clothing.

Although the witnesses did not recognize Taylor in the photo array they viewed at the police station a few days after seeing him in the fast food restaurant parking lot, they testified at the suppression hearing that their in-court identification was based upon their independent recollection of Taylor. Further, they both testified as to their great certainty of that recollection. Applying applicable law, the trial court concluded that the corrupting effect of the suggestive in-court identification of Taylor at Wade's trial was exceeded by the certainty indicated by Pace and Pepper's testimony during the suppression hearing and their opportunity to have properly identified Taylor at the time of the crime. Therefore, if any error occurred, it was harmless. *See Chapman*, 386 U.S. 18. Taylor was not denied due process or a fair trial by the alleged tainted in-court identification of him. The state court's

ruling on this issue was neither contrary to nor did it involve an unreasonable application of clearly established federal law.

### Ground 44 - Taylor Was Not Denied His Fourteenth Amendment Right to an Unbiased Grand Jury.

The foundation for this claim is, in part, what Taylor describes as the adverse publicity in Louisville, Kentucky, soon after the crimes were discovered. Taylor states that, due to this adverse publicity, before this case was submitted to a grand jury in Jefferson County, he moved the Jefferson Circuit Court to prohibit the presentment of this case until such time as a fair grand jury could be seated without the taint of the adverse publicity. In the alternative, his attorney moved for leave to voir dire the grand jury to determine if any members of the panel were unable to sit impartially and, if so, to have those members stricken from the panel.

Taylor asserts that the grand jury that indicted him was in fact biased. As ground for this claim, Taylor states that one of his trial attorneys testified before the grand jury and that at the conclusion of his testimony, one of the grand jurors referred to his counsel as a "jerk." This claim was one of forty-four raised in Taylor's direct appeal. In *Taylor I*, the Kentucky Supreme Court did not find any merit regarding any of his claims. However, it did not address this claim in detail. *Taylor I*, 821 S.W.2d at 74.

As a general rule, there is a strong presumption of regularity that attaches to grand jury proceedings. *United States v. Jones*, 766 F.2d 994, 1001 (6th Cir. 1985). Here, Taylor's claim is based solely on the fact that, after one of Taylor's trial attorneys testified before the grand jury, one of the grand jurors allegedly referred to his attorney as a "jerk." Assuming the truthfulness of this allegation, that fact does not establish a colorable claim that is

cognizable on federal habeas review. As explained in *Watson v. Jago*, 558 F.2d 330 (6th Cir. 1977):

> The Fifth Amendment's guarantee of a grand jury indictment in cases of capital crimes, however, has never been incorporated into the Fourteenth Amendment and hence is not applicable to the states. In *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment did not require a grand jury indictment in a prosecution by the State of California for a capital crime. While it is true that *Hurtado* once stood in a line of Supreme Court cases that refused to incorporate Bill of Rights guarantees relating to criminal procedure into the Fourteenth Amendment and while it is true that such older precedent, except for *Hurtado*, has been overruled and most of the Bill of Rights guarantees relating to criminal procedure have been incorporated into the Fourteenth Amendment as fundamental rights, *Hurtado* remains good law.

> . . . .

> In addition, even if a state adopts a grand jury system, federal constitutional requirements, binding in federal criminal cases are not binding on the states, *Alexander v. Louisiana*, *supra*, 405 U.S. at 633, 92 S.Ct. 1221, except with respect to the racial or national composition of grand juries. *Carter v. Jury Commission*, 396 U.S. 320, 330, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).

558 F.2d at 337 (footnotes omitted).

There is no claim of grand jury bias unless there is a claim that the grand jury was not legally constituted or that the indictment was invalid on its face. *United States v. Adamo*, 742 F.2d 927, 935–56 (6th Cir. 1984). The federal inquiry into a state grand jury is limited solely to issues of equal protection. In this instance, Taylor does not allege racial bias but a suspicion that one of the grand jurors did not like his trial counsel. Such a claim is not cognizable on federal habeas review. The state court's determination that Taylor was not denied the right to an unbiased grand jury was not an unreasonable determination of the facts in light of the evidence. Likewise, it was neither contrary to, nor did it involve an

unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### Ground 45 – The Trial Court Did Not Violate Taylor's Due Process Rights to a Unanimous Verdict by Giving a Sodomy Instruction Permitting a Conviction as Either a Principal or a Complicitor to Sodomy.

Taylor claims that although there was no evidence to suggest that Wade sodomized the victims, the trial court erroneously instructed the jury that it could convict Taylor as either a principal or a complicitor to sodomy committed by Wade. Taylor argues that this alternative instruction was erroneous and that the jury instruction should have permitted a conviction only as a principal. Taylor objected at trial to the court's alternative instruction, but his objection was overruled. In *Taylor I*, the Kentucky Supreme Court did not find any merit in any of Taylor's forty-four claims but did not address this specific claim in detail. 821 S.W.2d at 74.

Challenges to jury instructions are reviewed under a harmless error standard. *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000), *cert. denied*, 531 U.S. 1021 (2000). Federal courts will not grant habeas relief on such claims unless the erroneous jury instruction "'so infected the entire trial that the resulting conviction violates due process.'" *McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Coleman v. Mitchell*, 268 F.3d 417, 434 (6th Cir. 2001). Thus, to warrant habeas relief due to erroneous jury instructions, a petitioner must show that the instructions as a whole were so infirm that they rendered the entire trial fundamentally unfair. *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000). In *Millender v. Adams*, 376 F.3d 520 (6th Cir. 2004), the Sixth Circuit held that this rule also applied in cases where the trial court failed to give a particular instruction.

In Taylor's case, anal swabs from the autopsy of Nelson's body indicated the presence of sperm. However, the amount of sperm was insufficient to identify its source. [TE 4/10/86, 123, 143, 147–47] Additionally, unidentifiable semen was found on a tee shirt found in the crawl space of an abandoned house near the murder scene. [*Id.* at 124] Further, Jeffrey Brown testified that Taylor had stated that he and Wade had sodomized one of the victims. [TE 4/17/86, 21–30] Given the physical evidence that one of the victims had been sodomized but that the evidence was insufficient to determine the source of the donor and the testimony of Jeffrey Brown that Taylor had acknowledged to him that he and Wade had sodomized one of the victims, the evidence supported both theories included in the jury instruction regarding sodomy. *See Halvorsen v. Commonwealth*, 730 S.W.2d 921, 925 (Ky. 1987).

However, even if the evidence had not supported the alternative theories as Taylor claims, no constitutional error occurred. In *Griffin v. United States*, 502 U.S. 46 (1983), the Supreme Court held that due process is not violated when a trial judge instructs a jury on two different legal theories, only one of which is supported by the evidence. The jury instruction at issue in this case falls squarely within those permitted by the Supreme Court. As a result, the Kentucky Supreme Court's decision in *Taylor I* rejecting Taylor's claim that his due process rights were violated by an erroneous jury instruction on the sodomy charge was not an unreasonable determination of the facts in light of the evidence. Likewise it was neither contrary to, nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

**Ground 46 - Taylor's Due Process Rights to a Fundamentally Fair Capital Trial Were Not Denied by the Trial Court's Failure to Give Jury Instructions on Lesser-Included Offenses.**

In conjunction with the murder charge, Taylor requested a lesser included offense jury instruction on manslaughter in the first degree based on extreme emotional disturbance. Taylor also asked the court to instruct the jury that the absence of extreme emotional disturbance was an element of the murder offense. Regarding the robbery instruction, Taylor requested a lesser included offense instruction on receiving property over $100.00. The trial court denied Taylor's requests for these lesser included offense instructions and denied his request to instruct the jury that the absence of extreme emotional disturbance was an element of the murder offense. Taylor objected to the trial court's denial of these requests.

Citing to *Beck v. Alabama*, 447 U.S. 625 (1980), Taylor claims that his due process rights were violated and that he was denied a fundamentally fair capital trial. Again, this claim was one of forty-four raised in Taylor's direct appeal. In *Taylor I*, the Kentucky Supreme Court rejected Taylor's arguments but did not address this claim in detail. 821 S.W.2d at 74.

In *Beck*, the Supreme Court afforded state defendants in capital cases the protection of instructions on lesser included offenses, when the instructions are supported by the evidence. 447 U.S. 625. Beck was sentenced to death after a jury found him guilty of the capital offense of "'[r]obbery or attempts thereof when the victim is intentionally killed by the defendant.'" *Id*. at 627 (quoting Ala. Code § 13–11–2(a)(2) (1975)). Beck maintained that during the robbery his accomplice had unexpectedly killed the victim and ,as a result, he was entitled to an instruction on felony murder. *Id.* at 629–30. Under Alabama law at that time,

the intent to kill required in a capital offense could not be supplied by the felony murder doctrine. Thus, traditional criminal law concepts would recognize felony murder as a lesser included offense to the charged capital crime. *Id.* at 628. However, an Alabama statute specifically precluded any lesser included offense instruction in capital cases. ALA. CODE § 13–11–2(a) (1975). Accordingly, the jury was not given the option to convict of a noncapital crime. Instead, the jury was instructed that it could either acquit Beck or convict him of the charged capital offense which required the imposition of the death penalty. *Beck*, 447 U.S. at 630.

The Supreme Court granted certiorari in *Beck* to address a carefully framed question:

> "May a sentence of death constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict?"

*Id.* at 627 (quoting *Beck v. Alabama*, 444 U.S. 897 (1979)). The Court answered that "the death penalty may not be imposed under these circumstances." *Id.* It reasoned that:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

*Id.* at 637. The court found the risk of an unwarranted conviction imposing the death penalty intolerable because "there is a significant constitutional difference between the death penalty and lesser punishments." *Id.* at 637–38 (citing *Gardner v. Florida*, 430 U.S. 349, 357–58 (1977)). The *Beck* Court reasoned that failing to give the jury a "third option" when warranted by the evidence, enhances the risk that a capital defendant will be sentenced to death because of caprice or emotion, and not on the basis of reason. *Id.* at 638. As a result,

Alabama courts were "constitutionally prohibited from withdrawing that option from the jury in a capital case." *Id*. A fully instructed jury might have convicted on the noncapital offense, and "the judge would not have the opportunity to impose the death sentence." *Id*. at 645.

Later, in *Hopper v. Evans*, 456 U.S. 605, 610 (1982), while holding that a capital defendant is entitled to a lesser included offense instruction only when there is evidence to support it, the Court noted that its holding in *Beck* was limited to the question submitted on certiorari. The Court further stated that "[o]ur holding in *Beck*, like our other Eighth Amendment decisions in the past decade, was concerned with insuring that sentencing discretion in capital cases is channeled so that arbitrary and capricious results are avoided." *Id*. at 611. Thus, in keeping with *Beck*, the trial court was obligated to instruct the jury on the lesser included offenses that were supported by the evidence at trial. However, in this matter, the trial court concluded that the evidence did not warrant instructing the jury on the lesser included offenses that Taylor requested.

Again, this Court recognizes that challenges to jury instructions are reviewed under a harmless error standard. *Scott*, 209 F.3d at 882; *McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *see also Coleman*, 268 F.3d at 434. Thus, to warrant habeas relief due to erroneous jury instructions, a petitioner must show that the instructions as a whole were so infirm that they rendered the entire trial fundamentally unfair. *Murr*, 200 F.3d at 906; *see also Millender v. Adams*, 376 F.3d 520 (6th Cir. 2004) (holding that this rule also applies in cases where the trial court failed to give a particular instruction).

In Taylor's case, the trial court did not instruct the jury on the lesser included offense of manslaughter in the first degree based on extreme emotional disturbance ("EED") because there was insufficient evidence that Taylor suffered from an EED at the time the murders were committed. Prior to trial, Taylor was examined and evaluated by four psychiatrists or licensed clinical psychologists. Following a competency hearing, he was found competent to stand trial and to be able to assist his counsel in his defense. There were conflicting expert opinions, but none stated that Taylor was suffering from an EED at the time of the offenses. In the absence of such evidence, Taylor was not entitled to the lesser included jury instructions he requested regarding the murder charge.

Taylor's counsel also requested a lesser included instruction on receiving stolen property over $100.00. The evidence at trial reflected that both defendants, acting together, robbed the victims of money and various items of personal property and clothing while tying up and gaging them. The evidence at trial was that they obtained the victims' property first-hand and not from a third party. Taylor was not entitled to a lesser included instruction for receiving stolen property over $100.00, because the evidence at trial indicated that Taylor and Wade took, rather than received, the subject property. As a result, the Kentucky Supreme Court's decision in *Taylor I* rejecting this claim was not an unreasonable determination of the facts in light of the evidence. Likewise, it was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

**Ground 47 - Taylor's Constitutional Rights Were Not Violated by the Trial Court's Denial of His Request to Inform the Jury of the Sentence Wade Received.**

During the penalty phase of Taylor's trial, his counsel claimed that KRS § 532.025(2) authorizes the sentencing body to consider statutory, as well as non-statutory, mitigating evidence. As a result, counsel requested that he should be permitted to offer evidence in mitigation that Wade received a life sentence. [TE 4/28/86, Vol. III, 52–53] The trial court denied that request after hearing argument of counsel. [*Id.* at 53] Citing *Lockett v. Ohio,* 438 U.S. 586 (1978), Taylor claims that his constitutional rights were violated by the trial court's ruling. This claim was one of forty-four raised and rejected in Taylor's direct appeal. However, the claim was not addressed in detail by the Supreme Court of Kentucky. *Taylor I,* 821 S.W.2d at 74.

In *Lockett*, the Supreme Court held that in capital cases, the sentencer should:

> . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

438 U.S. at 604. However, the court clarified its holding, noting that, "[n]othing in this Opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12; *see also Eddings*, 455 U.S. at 125.

Taylor's reliance on *Lockett* is misplaced. The trial court properly excluded evidence of Wade's sentence because it had no bearing on Taylor's character, prior criminal record, or the circumstances of the offense. Clearly, the sentence received by an accomplice does not fit within these criteria of mitigating evidence.

-178-

**Ground 48 – The Trial Court's Use of the Word "Recommendation" in Voir Dire and in Penalty Phase Jury Instructions Did Not Lessen the Jury's Responsibility for Imposing the Death Sentence in Violation of Taylor's Eighth and Fourteenth Amendment Rights.**

In conducting the voir dire examination of the jurors, and over the objection of Taylor's counsel, the trial court used the word "recommend" regarding the subject of possible punishments.  The court explained that, even if the jury was to find an aggravating circumstance or that one or more mitigating circumstances existed, it could still recommend the death penalty or life imprisonment without the possibility of probation or parole until a minimum of twenty-five years had been served, if it found aggravating circumstances beyond a reasonable doubt.  [Inventory Item No. 2(a), p. 118]

Additionally, the penalty phase jury instructions began with the statement, "[i]t is now your duty to recommend what punishment must be imposed upon Victor D. Taylor for the kidnapping and murder of Richard David Stephenson and Scott Christopher Nelson."  [TE 4/28/86, Vol. III, 76]  Each instruction captioned "Authorized Sentences" used the word "recommend" four times, the instructions on the aggravating and mitigating circumstances used the word "recommend," and each verdict form used the word "recommend" in the context of imposing each possible punishment.  [*Id.* at 76–101]

Citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985), Taylor claims that the trial court's use of the word "recommend" unconstitutionally reduced the jury's sense of responsibility for imposing the death sentence.  This claim was one raised and rejected in Taylor's direct appeal.  However, the Kentucky Supreme Court did not address the claim in detail.  *Taylor I*, 821 S.W.2d at 74.

In *Caldwell*, Mississippi law placed the responsibility for imposing the death penalty on the jury. However, the prosecutor in *Caldwell* told the jurors that their decision was not final and that it was automatically reviewable by the state supreme court. 472 U.S. at 325–26. On certiorari, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who had been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29.

Kentucky law similarly requires the jury in capital cases to recommend a sentence for the defendant. Specifically, Kentucky law provides that:

> . . . [T]he judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances . . . exist *and to recommend a sentence* for the defendant. Upon the findings of the jury, *the judge shall fix a sentence* within the limits prescribed by law.

KRS § 532.025(1)(b) (emphasis added). Similar state sentencing schemes dividing responsibility between judge and jury have been upheld. *See, e.g.*, *Hildwin v. Florida*, 490 U.S. 638 (1989) (jury makes a recommendation without findings on aggravation and then the judge imposes the sentence).

To establish a *Caldwell* violation, Taylor must demonstrate that the trial court improperly described the jury's role under state law to reduce their responsibility. *See Dugger v. Adams*, 489 U.S. 401, 407–08 (1989). The Eleventh Circuit has reiterated this idea by holding that "to 'establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'" *Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) (quoting *Romano v. Oklahoma*,

512 U.S. 1, 9 (1994)). The problems identified in *Caldwell* do not exist without the jury being intentionally misled regarding its sentencing role. *Id.*

In *Kordenbrock v. Scroggy*, the Sixth Circuit held that a Kentucky jury instruction and a prosecutor's characterization of a jury's death sentence as a "recommendation" was consistent with Kentucky law and did not violate *Caldwell*. 919 F.2d 1091, 1101 (1990). Taylor attempts to distinguish his case from *Kordenbrock* by claiming that the trial court, rather than the prosecutor, used a form of the word "recommend" both in voir dire and in the jury instructions. He alleges that these comments resulted in constitutional violations because they diminished the jury's role in setting Taylor's sentence.

Upon review of Kentucky's death penalty statute, KRS § 532.025(1)(b), it is clear that the trial court's language informed the jurors that their role was to recommend a sentence for Taylor, and upon the jury's findings, the judge would "fix a sentence" within the limits prescribed by law. *Id.* Because the judge's language tracked the wording of the statute similar to *Kordenbrock*, no *Caldwell* violation occurred. *See also Coleman*, 268 F.3d at 435–36.

### Ground 49 – Application of Kentucky's Death Penalty Statute Did Not Violate Taylor's Constitutional Rights.

Taylor claims that Kentucky's death penalty statute, KRS § 532.025, violated his constitutional rights by improperly allowing the jury to consider parole and irrelevant aggravating circumstances during deliberations, resulting in the arbitrary imposition of the death sentences. This claim is apparently based on the avowal testimony of some of the jurors in Taylor's case who testified at the evidentiary hearing conducted on Taylor's RCr 11.42 motion. The trial court denied Taylor's motion and addressed Taylor's claim

regarding jury deliberations by stating that, "[t]his issue having been excluded by the Court from consideration will not be addressed." [Order, 3/16/98, p. 5 - Inventory Item No. 5(u)]

Taylor raised this claim in appealing the denial of his RCr 11.42 motion to the Kentucky Supreme Court. In affirming the denial of that motion, the Kentucky Supreme Court addressed the jury deliberations claim, as follows:

> Taylor argues that the jury improperly considered the possibility of parole during sentencing deliberations. Further, he argues that certain jurors prayed before casting their votes on sentencing. These arguments are based on the testimony—at the evidentiary hearing on his RCr 11.42 motion—of some of the jurors who sat on his case. This testimony was improper and should not have been allowed. *Gall v. Commonwealth*, Ky., 702 S.W.2d 37, 44 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); RCr 10.04.

*Taylor II*, 63 S.W.3d at 166.

It is well-settled that jurors are prohibited from testifying about matters considered during their deliberations to impeach a verdict. *McDonald v. Pless*, 238 U.S. 264 (1915); *United States v. Gonzales*, 227 F.3d 520, 523–25 (6th. Cir. 2000). The Court in *McDonald* explained the rationale for this rule.

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

238 U.S. at 267–68.

This long-standing rule stems from the fact that allegations of juror misconduct made months or years after the verdict threaten the finality of the proceedings. *Gonzales*, 227 F.3d at 525 (citing S. Rep. No. 1277, at 13 (1974)). Moreover, if a juror knew that his comments, discussions, or deliberations could later be subjected to post-trial scrutiny, he or she might be reluctant to engage in the frank and full exchange required during jury deliberations. *Id.* Permitting post-trial scrutiny of jury deliberations could have a chilling effect on the jury, as the jurors might not enjoy the freedom to be totally candid in their deliberations. In *Taylor II*, the Kentucky Supreme Court acknowledged this mandate. 63 S.W.3d at 166.

In *Taylor* I, the Supreme Court of Kentucky considered Taylor's claim that the death sentences were arbitrarily applied but found it to be without merit. 821 S.W.2d at 77. In short, there is nothing in the record to suggest that the death sentence was arbitrarily applied to Taylor. The Kentucky Supreme Court's decision in *Taylor I* that the death penalty statute was constitutionally applied to Taylor, and its decision in *Taylor II* affirming the rejection of Taylor's claim that the jury improperly considered parole and irrelevant aggravating circumstances during deliberations and arbitrarily imposing the death sentences, was not an unreasonable determination of the facts in light of the evidence  Further, its decision was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### Ground 50 – Taylor's Constitutional Rights Were Not Violated by the Penalty Phase Verdict Forms.

Taylor claims that the penalty phase verdict forms were defective because they failed to give the jury the option of finding that the prosecution had *not* proven the existence of one or more aggravating circumstances. Essentially, Taylor argues that these verdict forms

violated his due process rights by being geared toward encouraging the jury to find that one or more aggravating circumstances had been proven beyond a reasonable doubt. Although this claim was rejected in *Taylor I* by the Kentucky Supreme Court, the Court did not address it in detail. 821 S.W.2d at 74. However, this Court has considered it on the merits.

Jury instructions in a criminal case must be evaluated in the context of the overall charge rather than isolation. *Cupp*, 414 U.S. at 146–47. The Supreme Court has also held that the charge shall not instruct the jury conclusively or rebuttably to presume the presence of an element of a crime because this relieves the state's burden of proving guilt beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510 (1979). The test is whether any "reasonable juror could have given the presumption conclusive or persuasion-shifting effect." *Id.* at 519. As a result, evaluation of this claim necessarily requires a review of the instructions both individually and as a whole.

In *Francis v. Franklin*, 471 U.S. 307, 315–16 (1985), the Court stated that, with regard to jury instructions, the inquiry must turn on what a "reasonable juror" would have understood the charge to mean. To determine how a "reasonable juror" could interpret a jury instruction, the specific language in that instruction must be examined and "the potentially offending words must be considered in the context of the charge as a whole." *Id.* at 315. In Taylor's case, the relevant penalty phase instruction is Instruction No. 13, set out in its entirety below:

Instruction No. 13
Presumption of Innocence — Aggravating Circumstances

The law presumes the defendant to be innocent of the aggravating circumstances listed in Instructions 15, 18, 21, and 24, unless you believe from

the evidence alone, and beyond a reasonable doubt, that the aggravating circumstance under consideration does in fact exist.

If you have a reasonable doubt as to the existence of an aggravating circumstance listed in these instructions, you *shall not* make a finding that it exists.

If upon the whole case you have a reasonable doubt as to whether the defendant should be sentenced to death or imprisonment for life without eligibility for probation or parole until he has served a minimum of 25 years of his sentence, you shall sentence him to imprisonment for life, or to imprisonment for a terms of years not less than 20 years.

[TR 52, 7631] (emphasis added).

Instruction Nos. 14, 17, 20, and 23 contained the same paragraph listed above instructing the jurors that they could not sentence Taylor to death or life without probation or parole unless they found at least one aggravating circumstance. The jurors also were directed to designate in writing any aggravating circumstances they found. [TR 52, 7632, 7636, 7640, 7644] Instruction Nos. 15, 18, 21, and 24 regarding aggravating circumstances reiterated the reasonable doubt language. [TR 52, 7633, 7637, 7641, 7645] These instructions were clear enough for a reasonable juror to understand their duty regarding the verdict forms as described in *Franklin*.

The jury was given several verdict forms. [TR 52, 7649–58] The verdict forms concerning the finding of aggravating circumstances expressly stated that the aggravating circumstance must be proven from the evidence and beyond a reasonable doubt. [TR 52, 7649, 7652, 7655, 7657] The verdict forms, as worded, would have led a reasonable juror to understand that they should fill in the blank lines on the forms that applied to the jury's verdict. For example, the jury did not write anything on the forms relating to term of years, life, and life without the benefit of parole for twenty-five years, because this was not the

jury's verdict. Logically, the jury would not have completed the forms regarding aggravating circumstances had this not also been the jury's verdict. It is also abundantly clear from these verdict forms that the jury should not fill in the blanks in a particular aggravating circumstance unless the jury found it to exist beyond a reasonable doubt.

When viewed in their entirety, the jury instructions and verdict forms provided correct and clear instructions regarding reasonable doubt and the presumption of innocence. The Kentucky Supreme Court's decision in *Taylor I* rejecting Taylor's claim that the penalty phase verdict forms were constitutionally defective was not an unreasonable determination of the facts in light of the evidence. Likewise its decision was neither contrary to nor did it involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

### Ground 51 – The Use of the Multiple Murder Aggravating Circumstance in the Penalty Phase Instructions for Each Victim Did Not Violate Taylor's Rights Against Double Jeopardy.

Kentucky Revised Statutes § 532.025(2)(a), contains a list of eight aggravating circumstances that a jury may consider, if applicable, in a death penalty case. The aggravating circumstance identified as No. 6 states, "[t]he offender's act or acts of killing were intentional and resulted in multiple deaths." KRS § 532.025(2)(a)(6).

In Taylor's case, Instruction No. 15 concerned the aggravating circumstances regarding the murder of Stephenson. The aggravating circumstance at issue stated, "(b) [t]hat the defendant's acts of killing were intentional, and also resulted in the death of Scott Christopher Nelson." [TR 52, 7633] Instruction No. 18 concerned the aggravating circumstances relative to the murder of Nelson. The aggravating circumstance at issue

stated, "(c) [t]hat the defendant's acts of killing were intentional, and also resulted in the death of Richard David Stephenson." [TR 52, 7637]

Taylor claims that because there was only one instance of multiple murder in his case, the trial court's use of the multiple murder aggravating circumstance two times in the penalty phase jury instructions violated his double jeopardy rights not to be convicted twice of the same offense. Taylor did not raise this claim on direct appeal. However, the issue was raised in his post-conviction RCr 11.42 motion filed in the trial court. Ultimately, the trial court denied the motion, believing that this claim had been raised on direct appeal. The court explained that, "[i]ssues concerning the propriety of the tendered instructions were raised by Movant, reviewed by the Kentucky Supreme Court, and resolved in favor of the Commonwealth on direct appeal. The Court will not address these issues." [Order, 3/16/98, p. 5 (Inventory No. 5(u)]

Taylor appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court. Taylor raised his double jeopardy/multiple murder aggravating circumstance claim in that appeal. The Kentucky Supreme Court in *Taylor II* affirmed the denial of Taylor's RCr 11.42 motion. In its opinion, the *Taylor II* Court addressed some, but not all, claims raised in that appeal. Regarding those claims not specifically addressed, the *Taylor II* Court stated that, "[i]n conclusion, we note that any allegation of error not specifically addressed above has been considered and rejected as having no merit." 63 S.W.3d at 168.

Respondent now contends that Taylor has procedurally defaulted this claim because it should have been raised on direct appeal. The fact that Taylor raised this claim in his post-conviction RCr 11.42 motion would not cure the procedural default, even though it may have

been considered and rejected by the *Taylor II* Court on appeal. Nevertheless, this Court is persuaded that because this claim concerns an alleged double jeopardy violation, it may be raised in Taylor's present habeas petition, despite procedural default. *See Sherley v. Commonwealth*, 558 S.W.2d 615 (Ky. 1977); *Cardine v.* Commonwealth, 283 S.W.3d 641, 652–53 (Ky. 2009); *Menna v. New York*, 423 U.S. 61 (1975). Out of an abundance of caution, the Court has considered the claim but concludes that it is without merit.

This Court is unconvinced by Taylor's argument that the use of the multiple murder aggravating circumstance in both jury instructions imposes two punishments for one offense. *See Witte v. United States*, 515 U.S. 389 (1995). The multiple murder aggravating circumstance is a sentence enhancer, not an element of an offense. Therefore, it cannot be a double jeopardy violation. A sentence, even a death sentence, will not be invalid on the ground that an aggravating circumstance duplicates an element of the capital offense. *Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Tamme v. Commonwealth*, 973 S.W.2d 13, 40 (Ky. 1998) ("Imposition of two death sentences by application of the same aggravating factor, *i.e.*, intentional acts of killing resulting in multiple deaths, did not violate the proscription against double jeopardy."). Consequently, the Kentucky Supreme Court's decision in *Taylor II* rejecting this claim was not an unreasonable determination of the facts in light of the evidence. Likewise, it was not contrary to nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

**Ground 52 - The Death Penalty in Kentucky Was Not Applied Arbitrarily and Capriciously in Violation of Taylor's Constitutional Rights.**

In this claim, Taylor does not challenge Kentucky's death penalty statute, KRS § 532.025, as being unconstitutional on its face. Instead he argues that the death penalty statute, as applied in Kentucky, is unconstitutional. According to Taylor, statistical information indicates that Kentucky's death penalty is applied arbitrarily and capriciously. Further, he contends that its application is both racist and sexist, all in violation of his constitutional rights. In summary, Taylor contends that a statistical analysis shows that African-American males have a higher probability of receiving the death penalty than Caucasian females and that there is a greater chance of a defendant receiving the death penalty when the murder victim is Caucasian rather than African-American.

In affirming Taylor's conviction in *Taylor I*, the Kentucky Supreme Court did not address this argument in any detail. 821 S.W.2d at 74. As a result, this Court has considered this claim on the merits. However, this claim is foreclosed by *McCleskey v. Kemp*, 481 U.S. 279 (1987). In *McCleskey*, the defendant presented a statistical study ("the Baldus study") indicating that the manner in which Georgia's death penalty statute was administered demonstrated that those who murder Caucasians were more likely to receive the death penalty than those who murder African-Americans. The study further indicated that African-American defendants convicted of murder are more likely to receive the death penalty than Caucasian defendants committing the same offense. The Supreme Court in *McCleskey* held that such data was insufficient to prove that Georgia's death penalty statute operated in an arbitrary and capricious manner. *Id.* at 297.

The *McCleskey* Court noted that the defendant must prove the existence of "purposeful discrimination." Thus, McCleskey was required to show that the jury in *his* case acted with discriminatory purpose. *Id.* McCleskey only offered the Baldus study as proof of racial discrimination and offered no evidence specific to his own case to support an inference that racial considerations affected his sentence. In rejecting McCleskey's claim, the Court pointed to the numerous constitutional safeguards designed to minimize racial bias during trial and jury deliberations, the fundamental value of the jury trial, and the substantial benefits provided to criminal defendants by the discretion afforded to both the jury and the prosecutor in a death penalty case. *Id.* at 313.

The statistical analysis upon which Taylor relies to support this claim is remarkably similar to the statistical studies the Supreme Court has consistently found insufficient to support similar allegations. Here, Taylor demonstrates neither discriminatory intent in the death penalty statute nor any discriminatory effect. While Taylor attempts to create an apparent racial disparity in the application of the death penalty in Kentucky by manipulating statistics, he still cannot create a disparity in excess of that considered and rejected by the Supreme Court. *Id.* at 297. Therefore, this Court concludes that the Kentucky Supreme Court's decision in *Taylor I* rejecting Taylor's claim that the penalty phase verdict forms in his case were constitutionally defective was not an unreasonable determination of the facts in light of the evidence. Further the Kentucky Supreme Court's decision was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

**Ground 53 - Taylor's Death Sentences Were Not Arbitrarily Imposed. Likewise, the Death Penalty Statute Did Not Improperly Guide the Jury's Discretion by Permitting the Jury to Consider Aggravating Circumstances That Were Irrelevant to Sentencing.**

As an initial matter, Taylor contends that Kentucky's death penalty statute, KRS § 532.025, did not properly guide the jury's discretion in his case, allowing it to consider irrelevant, aggravating circumstances and to arbitrarily and capriciously impose the death penalty. Second, Taylor attacks the prosecutor's closing arguments, both in the guilt phase and the penalty phase. He asserts that the prosecutor misstated evidence and attempted to shift the burden of proof regarding Taylor's failure to present an expert to rebut the prosecution's hair analysis expert. Thus, Taylor claims that the prosecutor's closing arguments violated his constitutional rights and deprived him of a fair trial. Because the Kentucky Supreme Court did not specifically address this claim in resolving Taylor's direct appeal in *Taylor I*, this Court has considered this claim on the merits but concludes that it is unavailing.

Taylor first challenges the constitutionality of Kentucky's death penalty statute. Kentucky's death penalty statute mirrors that of the state of Georgia. The Georgia death penalty statute has been subjected to numerous challenges, similar to the ones Taylor raises, and has consistently been held to be constitutional both in form and in application. *See McCleskey*, 481 U.S. 279; *Zant v. Stephens*, 462 U.S. 862 (1983); *Gregg v. Georgia*, 428 U.S. 153 (1976). Additionally, the Sixth Circuit has rejected similar challenges to Kentucky's death penalty statute. *McQueen v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir. 1996), *overruled on other grounds by Adbur'Rahman v. Bell*, 392 F.3d 174 (6th. Cir. 2004).

Taylor also alleges that the prosecutor unconstitutionally shifted the burden of proof during closing arguments for the guilt phase. The prosecutor noted that Taylor did not offer any evidence to rebut the Commonwealth's hair analysis expert testimony. [TE Closing Argument, 111–12] The prosecutor is entitled to point out the fact that certain evidence has not been refuted. *See Hunt*, 466 S.W.2d at 959; *White v. Commonwealth*, 394 S.W.2d 770, 772–73 (Ky. 1965). His remark constituted a fair comment on the evidence and did not violate Taylor's constitutional rights.

Taylor's other challenge to the prosecutor's closing argument during the guilt phase concerns the testimony of Beverly Shackelford. At trial, Shackelford testified that Taylor had tried to sell her a Trinity High School jacket and class ring for $40.00. [TE 4/17/86, 102–03] Taylor asserts that the prosecutor misstated the facts and the evidence by reminding the jury of this testimony because neither of the victims were old enough to own a class ring. [TE Closing Argument, 137–40; TE 4/16/86, 9–10, 32–33] This claim presents a point the defense would likely make during closing arguments to suggest that the jury question the credibility of her testimony. However, the statement did not violate Taylor's constitutional rights.

Although the prosecutor reminded the jury that his summation of the case was argument, not evidence, he urged the jury to infer that Taylor's alleged mental deficiency would cause him to become more dangerous as he matured. [*Id.* at 117] This was not error because future dangerousness is a valid sentencing consideration in a death penalty case. *Brooks v. Kemp*, 762 F.2d 1383, 1411–12 (11th Cir. 1985), *vacated on other grounds,* 478 U.S. 1016 (1986), *reinstated,* 809 F.2d 700 (11th Cir. 1987); *see also Jurek v. Texas*, 428

U.S. 262, 274–76 (1976). Taylor's expert Dr. Thomas Colley testified that Taylor suffered from a low intelligence quotient and a "mild nervous system dysfunction." [TE 4/28/86, Vol. II, 33–35] It is not unreasonable to infer from such evidence that as Taylor aged and became more sophisticated, he could pose an even greater danger to the public. Thus, given the evidence of Taylor's alleged impairment that Taylor himself introduced during trial, the prosecutor's remark had a legitimate basis. Taylor's claim to the contrary is without merit.

Taylor's final complaint about the prosecutor's penalty phase closing argument concerns the prosecutor asking the jury whether Taylor's unhappy childhood was an excuse for committing these crimes. The prosecutor asked rhetorically, "[i]s that an explanation? Does that mean that he did – conceivably did not know what he was doing? Again, even at 12 he would know right from wrong." [TE 4/28/86. Vol. III, 123–24] Taylor claims that the foregoing argument misstates mitigating evidence by equating it with a legal defense.

Taylor argues that the prosecutor somehow misled the jury regarding the mitigating evidence, but he does not argue prosecutorial misconduct. The "supporting facts" Taylor presents in this claim are nothing more than an attempt to assert additional claims for relief which cannot be brought on federal habeas review. Moreover, Taylor does not raise any facts which show that the jurors did not perform their duty as required and instructed. In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court acknowledged that a state may grant the sentencing authority vast discretion to evaluate the circumstances relevant to the particular defendant and the crime he committed in deciding whether to impose a death sentence. The Court stated:

> In sum, "discretion to evaluate and weigh the circumstances relevant to
> the particular defendant and the crime he committed" is not impermissible in

the capital sentencing process. *McCleskey v. Kemp*, 481 U.S. 279, 315, n. 37, 107 S.Ct. 1756, 1779, n. 37, 95 L.Ed.2d 262 (1987). "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Ramos*, *supra*, 463 U.S., at 1008, 103 S.Ct., at 3457. Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant, supra*, 426 U.S., at 875, 103 S.Ct., at 2742; see also *Barclay v. Florida*, 463 U.S. 939, 948–951, 103 S.Ct. 3418, 3424–3425, 77 L.Ed.2d 1134 (1983) (plurality opinion).

*Id.* at 979–80.

The Supreme Court has also held that even if a jury were to rely on an unconstitutionally vague aggravating circumstance, in conjunction with finding other valid aggravating circumstances to support imposing the death penalty, the death sentence is not rendered unconstitutional as a result. *Stephens*, 462 U.S. at 890. In view of this authority, Taylor's claim has no merit.

The Kentucky Supreme Court's decision in *Taylor I* rejecting this claim was not an unreasonable determination of the facts in light of the evidence, nor was it contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### Ground 54 - The Death Penalty, as Applied in Taylor's Case, is Neither Cruel Nor Unusual Punishment. Further, Its Application Did Not Deny Taylor's Constitutional Rights to Equal Protection.

Finally, Taylor contends that the death sentences he received were the result of passion, prejudice, and other arbitrary factors. This claim incorporates aspects of other claims raised in Taylor's petition, including rearguing the mitigating circumstances the jury considered during the penalty phase of Taylor's trial, all of which he submits did not warrant

the imposition of the death penalty.  This claim was raised but rejected in Taylor's direct appeal.

In *Taylor I*, the Kentucky Supreme Court addressed this particular claim in the following manner:

> The death sentence imposed on Taylor was not inappropriate, arbitrary, cruel, unusual or disproportionate.  The death penalty statute was constitutionally applied.  The mitigating circumstances did not outweigh the aggravating circumstances.
>
> In making review required by K.R.S. 532.075(3), we find nothing in the record that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.  The death sentence was not excessive or disproportionate to the penalty imposed in similar sentences since 1970 considering both the crime and the defendant.  Those cases have been previously recited by this Court in *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988) and that list is incorporated herein by reference and our review is in accordance with K.R.S. 532.075(5).  In addition, we have also considered the case of *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1989).  We have conducted an independent review of the circumstances and conclude that they exceed any minimum justifying capital punishment.

821 S.W.2d at 77.

The Kentucky Supreme Court reviewed the death penalty under KRS § 532.075(3) and determined that the sentence as applied to Taylor is entirely justified.  *See McQueen*, 99 F.3d at 1333–34; *Bowling v. Parker*, 138 F. Supp. 2d 821, 919–21 (E.D. Ky. 2001), *affirmed*, 344 F.3d 487, 520–22 (6th Cir. 2003); s*ee also Walton v. Arizona*, 497 U.S. 639, 655–56 (1990); *Smith v. Dixon*, 14 F.3d 956, 966–67 (4th Cir. 1994) (en banc); *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994) (en banc); *Peterson v. Murray*, 904 F.2d 882, 887 (4th Cir. 1990).  Further, to the extent that Taylor is arguing cumulative error, this claim is rejected.  "Post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."  *Hoffner v. Bradshaw*, 622 F. 3d 487, 513

(6th Cir. 2010) (quoting *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).   Under controlling precedent, Taylor's cumulative error claim fails as a matter of law.

## III.

A Certificate of Appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). When the Court's denial of the requested relief is based on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 437, 484 (2000).   However, when the Court's denial is based on a procedural ruling, the movant must show that jurists of reason would find it debatable whether the motion states a valid claim of the denial of a constitutional right and that jurists or reason would find debatable whether the Court was correct in its procedural ruling.

Applying this standard to the claims raised by Taylor, and for the reasons set forth herein, the Court concludes that reasonable jurists could debate the issues raised in Ground 1. That is: whether the trial court properly admitted George Wade's statement at trial, whether *Crawford* impacts the admissibility of that statement, and, if improperly admitted, whether introduction of the statement at trial was harmless error?  Accordingly this Court will issue a Certificate of Appealability on this claim.  The Court finds that jurists of reason would not find the remaining grounds debatable and, consequently, no certificate will issue as to the remaining issues raised herein.

**IV.**

None of the claims presented in Taylor's petition warrant habeas relief. Accordingly, it is hereby

**ORDERED** that:

1.      Taylor's petition for a writ of habeas corpus [Record No. 1] is **DENIED**.

2.      With regard to appeal, a Certificate of Appealability will be issued for Ground 1. That is: whether the trial court properly admitted George Wade's statement at trial, whether *Crawford* impacts the admissibility of that statement, and, if improperly admitted, whether introduction of the statement at trial was harmless error?

3.      This action is **DISMISSED** and **STRICKEN** from the Court's docket. A judgment in conformity with this Memorandum Opinion and Order will be entered this date.

This 30th day of September, 2014.

Signed By:

*Danny C. Reeves* DCR

**United States District Judge**